**UNITED STATES DISTRICT COURT:**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Richard Roe, | **Second** |
| | **Amended** |
| Plaintiff, | **Complaint** |
| - against – | |
| St. John's University and Jane Doe, | 19-cv-04694 |
| Defendants. | PKC-RER |

Plaintiff Richard Roe ("Roe") alleges that:

### First Claim Against St. John's
### (Its discriminatory finding that Roe
### engaged in sexual misconduct
### in violation of Policy 703 and Title IX)

### THE PARTIES

1.      He is domiciled in Queens, New York and is a student at defendant St. John's University ("St. John's").

2.      He brings suit anonymously because of the harm publicity will have on his academic and professional career and because of St. John's confidentiality restrictions; he sues "Jane Doe" anonymously for the same reasons as applicable to her.

3.       St. John's is a private university whose principal place of business is located at 8000 Utopia Parkway, Jamaica, NY 11439.

4.      Upon information and belief, defendant Jane Doe ("Doe") is domiciled in Queens County, New York and is a student at St. John's.

## JURISDICTION & VENUE

5.      This Court has jurisdiction under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq*; accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

6.      This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over all other claims in this action, as they are so related to claims in this action within its original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

7.      This Court is an appropriate venue for this action pursuant to 28 U.S.C. § 1391.

8.      A substantial part of the events or omissions giving rise to the claims herein occurred in this district.

## THE FACTS

9.      Roe, a first generation college student, was accepted to St. John's University on nearly a full scholarship after he graduated with honors at the top of his class, with a weighted average of 4.5 GPA, and succeeded in multiple Advanced Placement classes in both his junior and senior year of high school.

10.      Roe is an immigrant from Ecuador and a citizen of the U.S.; he has completed two years of coursework at St. John's as an "A" student; he needs approximately 60 additional credits to obtain his undergraduate degree.

11.      As of October 15, 2018, he had enrolled in a five year program to receive both his bachelors in criminal justice and masters in government and politics at an accelerated rate; after graduation he expected to enroll in St. John's School of Law.

12.     Roe paid a significant amount of money to St. John's in the expectation of receiving an education, and upon completion, an undergraduate degree.

**The Incident in Paris**

13.     On April 12, 2018, Roe was in Paris at Duplex, a local club, to celebrate a birthday with several fellow St. John's students studying abroad.

14.     Roe was asked by Doe to dance, and they did.

15.     Sometime later, Doe told Roe that she was returning to the St. John's dorm where they were both staying.

16.     For both of them, it was their first night in Paris.

17.     Doe said she was taking an Uber, gave Roe her room number and asked him to "check on her" when he arrived back at the dorm.

18.     Several hours later, when Roe was back in the dorm, he went to Doe's room and found her awake and on her phone.

19.     Doe invited Roe into her room and, thereafter, Doe took Roe's right hand and placed it upon her fully clothed breast.

20.     He immediately said, "I am not interested in sex."

21.     She said, "Then, get the hell out of here," and he left.

**The September 2018 Complaint**
**and St. John's Discriminatory Procedures**

22.     On September 4, 2018, Roe was notified by St. John's that Doe had submitted a

complaint ("Doe's complaint") alleging four St. John's Code of Conduct violations (the "four

alleged violations.")

23.     St John's was required to follow its "Sexual Misconduct Policies and Procedures:

Policy 703" ("Policy 703") in investigating and determining Doe's complaint. (A copy of Policy

703 is attached hereto as Exhibit 1)

24.     Policy 703 was promulgated:

In furtherance of the University's mission, and in accordance with
Title IX of the Education Amendments of 1972 ("Title IX"), the Jeanne
Clery Disclosure of Campus Security Policy and Campus Crime Statistics
Act (the "Clery Act"), as amended by the Violence Against Women
Act/Campus Sexual Violence Act (the "Campus SaVE Act").

25.     Policy 703 also provides, *inter alia*, that:

The University will take all available steps to promptly, thoroughly,
and impartially investigate and address complaints of sexual misconduct
by and against its students…in order to stop prohibited conduct, prevent
its recurrence and address any effects on campus.

26.     On October 3, 2018, Roe attended a St. John's Faculty Board "Conduct Hearing"

scheduled to determine Doe's four alleged violations.

27.     On October 15, 2018, Roe was notified by St. John's (the "October 15 letter") that

he had been found in violation of one of the four alleged violations of St. John's rules, *i.e.,*

prohibiting "Non-Consensual Sexual Contact" and informed him that he was suspended (among other sanctions.)

28.    The October 15 letter contained the following statement of the Faculty Board as grounds for its finding:

> The following rationale has been provided by the hearing officer/board: "The respondent *admitted* (emphasis supplied) in engaging in physical contact of a sexual nature with the complainant, and the evidence demonstrated a lack of affirmative consent to engage in such contact. Such evidence included the complainant's intoxication, as described by multiple witnesses, and the respondent's assertion, which was not disputed, that he was not impaired by alcohol."

29.    At the Conduct Hearing, other than kissing on the dance floor, the only "physical contact of a sexual nature" Roe "admitted" was that Doe "took his right hand and placed it upon her fully clothed breasts."(If a record of the October 2018 St. John's proceeding where Roe was suspended for alleged misconduct against Doe exists, it is unavailable to Roe as "confidential.")

30.    Pursuant to Policy 703:

> "Non-consensual sexual contact" means any intentional sexual touching, however slight, with any body part or object by an individual upon another individual without consent. Intentional sexual contact includes contact with the breasts;…making another person touch any of these body parts… Consent is required regardless of whether the person initiating the act is under the influence of drugs and/or alcohol.

31.    Thus, in the October 15 letter, St. John's suspended Roe as of October 15, 2018, indefinitely (with a right to reapply) upon a finding that he "admitted" to "engaging in physical contact of a sexual nature," despite the fact that the only "physical contact of a sexual nature" to which Roe "admitted" was that Doe "took his right hand and placed it upon her fully clothed breast."

32.     Because Doe initiated the physical action, it constituted "non-consensual sexual contact" by Doe in violation of Policy 703's prohibition on "making another person touch any of these body parts."

33.     Thus, Roe was suspended mid semester for the "sexual misconduct" which Doe herself committed.

34.     As the initiator of the act, Doe was not shielded by Policy 703 for being "under the influence of alcohol."

35.     On November 7, 2018, Roe appealed his October 2018 suspension to the St. John's Conduct Appeals Board (the "Appeals Board") on grounds, *inter alia*, that he was not given the "opportunity," pursuant to Policy 703 to submit a written impact statement "to the decision-maker prior to a determination of an appropriate sanction(s)."

36.     On November 13, 2018, after application, Roe was readmitted to St. John's to resume classes on January 24, 2019.

## Doe's Defamatory Tweet

37.     On January 4, 2019, the hashtag "#SurvivingSJU" was created.

38.     #SurvivingSJU was the number one hashtag "trending" on Twitter in the U.S. from January 4, 2019, to January 6, 2019.

39.     Thereafter, also on January 4, 2019, Doe authored a tweet (the "tweet") which stated that, "[Roe] after raping me…only got half a semester suspension…" (See Exhibit 2 attached); the tweet also included a picture of Roe.

40.     Doe almost instantly "liked" the anonymously posted tweet, and less than 30 minutes later, posted in another tweet from her personal account that she had written a "final

statement" for the University Conduct Hearing (referencing the confidential proceedings) instead of "writing essays" for her classes.

41.     Policy 703 provides that:

> Hearings are to be private and not open to members of the
> university community or to the public. Conduct Board members
> are duty bound to maintain confidentiality. The Chair shall advise
> witnesses that they are not to discuss their testimony outside
> the hearing room. All written records of proceedings are confidential
> and are property of the University.
> \*                              \*                              \*
> 'Privacy' means that dissemination of information relating to each
> report of sexual misconduct is limited to individuals who have a
> legitimate need to know in order to carry out their duties and
> responsibilities in accordance with this policy and law.

42.     Thus, only Doe, Roe and University officials were informed of Roe's suspension and the reason for it.

43.     Since the tweet references Roe's suspension for sexual misconduct directed against the author of the tweet- the rational for his suspension- the only person who could have authored the tweet was Doe.

44.     By authoring the tweet, Doe violated St. John's rules mandating confidentiality relative to its hearings on sexual misconduct.

45.     On January 5, 2019, one day after the tweet, a male student threatened to "fuck [Roe] up" via phone calls and text messages.

46.     On January 5, 2019, one day after the tweet was published, in a complaint to St. John's, (the "second complaint") a second female student ("Mary Smith") accused Roe of sexual misconduct for an alleged incident that had taken place about three weeks before. ("Mary Smith" is not the second complainant's actual name.)

7

47.     Thereafter, a female St. John's student punched Roe in his face at a bar.

48.     On January 8, the St. John's student newspaper, "The Torch," reported that:

> More than 2,000 tweets surfaced on Friday, Jan. 4 [the date
> #SurvivingSJU was created] detailing alleged experiences of
> sexual misconduct that had taken place at St. John's.
> (See copy of the January 8, 2019, article attached as Exhibit 3)

49.     In response to the over 2,000 tweet posted to the #SurvivngSJU hashtag, St. John's

publicly announced that it would investigate all posted claims. (Exhibit 3)

50.     On January 7 and 8, 2019, in the wake of approximately 2,000 tweets criticizing St.

John's treatment of female complainants of sexual assault, St. John's officials, in obvious disarray,

contacted Roe inconsistently and repeatedly as follows:

> i) January 7, 2019, St. John's Office of Student Conduct (with cc to Jack
>    Flynn) notified Roe by emailed formal letter as follows:
>
> You are restricted from having any contact with… [the second complainant]
> until otherwise instructed by the Office of Student Conduct.
>          *                    *                    *
> *Entering a common area or classroom/ study space where this person
> is present should not be considered a violation of this order.* (See Exhibit 4
> attached), and
>
> ii) 11:31 am on January 8 St. John's denied Roe's appeal of the
> sanctions he received as a result of Doe's complaint (See Exhibit 5 attached), and
>
> iii) Around 12:00 noon to 1:00 pm on January 8, Dean of Students Jackie
> Lochrie notified Roe by telephone that he would be receiving formal notification
> of suspension from the University, and
>
> iv) January 8, at 1:38 pm, St. John's Director of Student Conduct Jack Flynn
> emailed Roe a formal letter as follows:
>
> This document will serve as a formal notification that you are
> immediately suspended from St. John's University, pending the
> results of a non-academic disciplinary investigation.

       *                 *                 *

*Suspension from the University means that you are not permitted to be in class, participate in any St. John's University –sponsored programs or events or be on any St. John's University property* (Exhibit 6 attached ), and

v) <u>January 8, at 3:16 pm,</u> Dean Lochrie emailed a formal letter to
    Roe as follows:

As we discussed on the phone, today, the University is beginning an investigation into an incident in which you were named as being involved. As such, you will be notified by Mr. John Breheny, the investigator assigned to this case. In addition, you have the right to the following:

        1. Academic and/or housing accommodations, and

        2. Counselling support through the Center for Counselling, and

        Consultation and/or Campus Ministry (Exhibit 7 attached), and

        *               *               *

vi) <u>On January 8, 2019</u> at 3:26 pm, Dean Lochrie notified Roe by emailed formal letter:

 You are indefinitely restricted from having any contact with [the second complainant].
*               *               *
Entering a common area or classroom/ study space where this person is present should not be considered a violation of this order* (Exhibit 8 attached).

51.      Thus, on January 7, Roe who was scheduled to return to his classes in less than two weeks, on January 24, was first given a "no contact" notification which permitted him to continue classes.

52.      One day later, on January 8, Roe was arbitrarily suspended from St. John's without a hearing, explanation or citation of rule, and, thereafter, also on January 8, he was confusingly given a second "no contact" letter permitting him to attend classes.

53.      In contrast, Roe had been permitted to attend classes during the investigation of Doe's complaint.

54.     On January 8, 2019, St. John's determined Roe's appeal as follows:

[Roe] argues that the "Conduct Board mandated sanctions simultaneously with the finding of his misconduct" and, therefore, he did not have the opportunity to submit a written impact statement … [Roe's] argument is premised on application of Section VII (G) of University Policy 703… [It] sets forth the University's policies to implement Title IX of the Education Amendments of 1972, the Clery Act, and the other state and federal laws. As such it is not part of the Code of Student Conduct or its process. ..The Code of Student Conduct provides that only a complainant in a Title IX-related student conduct matter has a right to present a written impact statement.

\*                                         \*                                         \*

Apart from claims of new evidence, our jurisdiction is limited to determining whether there was "an omission in the *Student Conduct Process…"* To the extent the Respondent claims that Policy 703 was not followed, his argument is beyond our purview.

\*                                         \*                                         \*

There was, thus, ample time for Respondent to submit whatever impact statement he wished. Although the Respondent may not have known of the Board's decision, he had admitted to the physical touching at issue here and, thus should have expected a sanction of some kind.

55.     However, Policy 703 also provides that: "This Policy supersedes any other University policy to the extent that such policy applies to sexual misconduct."

56.     St. John's discriminatory bias against Roe as a male student is evident by:

a)      Finding him in violation of the St. John's rules based upon the conduct of Doe taking his hand and placing it upon her breast, a clear violation of the St. John's rules by her and not by him, and

b)      Asserting that Roe, the male student, should have *expected* a sanction of some kind for admitting that Doe, the female student, had initiated physical contact of a sexual nature, and

c)      Denying his appeal in disregard of Policy 703 which applied to all policies of the University relating to sexual misconduct, and

d)      Denying Roe's appeal on January 8, 2019, at a time when St. John's was confronted by public scrutiny of over 2,000 complaints female students against it.

57.     In light of the intense criticism that St. John's faced in failing to adequately address complaints of sexual assault by female students, Roe's sex was a motivating factor in St. John's decision to abruptly suspend him without investigating the allegation or determining a violation.

58.     By reason of the foregoing, St. John's has favored a female student over a male student and, in doing so, denied Roe, the male student, due process in violation of Policy 703 as implemented pursuant to Title IX.

59.     By reason of the foregoing, Roe is entitled to:

   a) Judgment awarding him compensatory damages in the amount of at least $5,000,000, emotional distress damages of $300,000 and punitive damages of $2,000,000, and

   b) The destruction of all records concerning the finding of sexual misconduct against him, and

   c) Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C, and

   d)  Removal of all sanctions.

### Second Claim Against St. John's
### (Refusal to investigate Roe's complaint of sexual misconduct and its suspension of Roe without the due process in Violation of its own Title IX procedures)

60.     Roe repeats and realleges each and every allegation set forth above except for those of paragraph 59.

61.     On January 7, 2019, Roe's attorney complained by telephone and email about the tweet to Dean Jackie Lochrie and St. John's attorney Josh Hurwit as follows:

> I am attorney for Roe. Thank you for speaking with me today. I have forwarded a tweet- apparently from [Jane Doe]. As a result of the tweet, [Roe] received calls and messages from someone threatening to "fuck up" [Roe]. I ask for University action to protect Roe from a violation of policy and

11

false allegations. (See copy of January 7 letter attached hereto as Exhibit 9).

62.     Pursuant to Policy 703, all claims of violation must be investigated:

> Once a complaint or notice of any allegation of sexual
> misconduct is received, the Title IX Coordinator…will
> make an initial assessment of the reported information.
> *                              *                              *
> A preliminary investigation is when an investigator conducts a
> preliminary investigation and the Title IX Coordinator…will
> assess whether this Policy or the Student Code of Conduct may
> have been violated.

63.     Pursuant to Policy 703, "Sexual Harassment" includes "sexual offensive

comments…" and provides that:

> Sex discrimination is an act that disadvantages a person and that occurs
> because of the affected individual's gender … Sexual harassment
> includes … verbal conduct of a sexual nature, when … such conduct is
> sufficiently severe…such that it limits an individual's ability to
> participate in, or benefit from, the University's education or work
> programs or activities (hostile environment). A "hostile environment"
> exist when the conduct is sufficiently, severe, persistent, or pervasive that
> it unreasonably interferes with, limits, or deprives an individual from
> participating in or benefiting from the University's education or
> employment programs and/or activities when judged against a reasonable
> person standard.

64.     Because of Doe's false and defamatory tweet, published in violation of St. John's

rules against "verbal conduct of a sexual nature…sufficiently severe" to "limit" Roe's "ability to

participate in the University's activities" etc., Roe has been punched in the face, banned from

social events, suspended from St. John's and had his reputation destroyed.

65.     Thus, since at least January 4, 2019, Roe has been subjected to a hostile

educational environment permeated with discriminatory intimidation, ridicule and insult

sufficiently severe or pervasive that it altered the conditions of and destroyed his educational

environment.

12

66.     On January 16, 2019, Keaton Wong, St. John's Director of Title IX Compliance, responded to Roe as follows:

> Thank you for bringing to the University's attention the tweet that was recently posted about you. Although the University cannot sanction the individual who posted the tweet because we cannot confirm their identity, we recognize that it has deeply affected you and other students in the St. John's University community. Attached is the University's 'You are Not alone' guide. (See copy of Mr. Wong's letter attached as Exhibit 10); (a copy of the **You are Not Alone** guide is attached as Exhibit 11).

67.     In its "Preface," the **"You are Not alone"** guide provides, *inter-alia*, as follows:

> St. John's University is committed to supporting survivors of sexual Violence…by providing the necessary safety and support services so that students can remain at St. John's University, meet academic standards, obtain necessary health/mental health treatment, and maintain social relationships. This document is written for survivors of sexual misconduct… in order to assist survivors in the recovery process and in their efforts to heal from this unacceptable form of violence.

68.     Thus, St. John's recognized Roe as a "survivor of sexual misconduct."

69.     Yet St. John's, while having recognized that the tweet was sexual misconduct, failed to undertake an "impartial" investigation (beyond Mr. Keaton's dismissive treatment of Roe's January 7 complaint) as required by Policy 703 and Title IX.

70.     On June 12, 2019, Roe's attorney emailed Mr. Hurwit again seeking redress:

> Since the proceedings resulting in [Roe's] suspension were confidential, he may not himself "set the record straight." As a result of the tweet, [Roe] has been threatened with bodily harm and was punched in the face by a female student. The University is complicit in the tweet's defamation of [Roe] and in the physical attacks he has been threatened with or experienced. (See copy of email attached as Exhibit 12)

71.     On July 18, 2019, Roe's attorney wrote to Mr. Hurwit again to state, *inter-alia,* "requests" as follows:

[a]    "Will the University correct the defamatory statement in the notorious tweet of January 4, 2019?"

\*                    \*                    \*

[b]    "Since there can be no question as to the author of the tweet, will the University sanction [Doe]…?"

72.    On July 18, 2019, Mr. Hurwit responded, denying an obligation to investigate Roe's charges against Doe despite the overwhelming evidence that she was the author of the tweet that violated Roe's rights to privacy and confidentiality and right to be free of a hostile environment pursuant to Policy 703:

Your requests regarding the "tweet" are self-serving and inaccurate. As I have explained to you on multiple occasions, the "tweet" was made anonymously, St. John's University has no evidence whatsoever that [Doe] is the author of the "tweet…" (See copy of July 18 email attached as Exhibit 13)

73.    Mr. Hurwit obviously had evidence that the author of the tweet was almost certainly Doe, but St. John's acted with deliberate indifference to its legal obligation pursuant to Policy 703 to impartially investigate.

74.    Pursuant to Policy 703, St. John's defines "hostile environment" as follows:

A "hostile environment" exists when the conduct is sufficiently severe… that it is unreasonably interferes with, limits, or deprives an individual from participation in or benefiting from the University's education… when judged against a reasonable person standard.

75.    St. John's was obligated to protect Roe's academic atmosphere so as to eliminate any known "hostile environment" of which it was aware.

76.    Because of Doe's tweet, a hostile environment has existed at St. John's against Roe since at least January 4, 2019, as was recognized in the January 16, 2019, email by St. John's Title IX Director.

77.     However, despite due complaint by Roe and his attorney about Doe's privacy

violations and commission of "sexual harassment" of a "verbal sexual nature," St. John's did not

investigate Roe's complaint about the tweet or issue a statement correcting Doe's false

statements that Roe was suspended for raping Doe.

78.     Had it done so, it is reasonable to assume that the hostile environment against Roe

would have dissipated.

79.     St. John's failure to investigate the tweet constituted deliberate indifference to this

harassing conduct.

80.     St. John's did not investigate the tweet, denied Roe's October 2018 appeal and

simultaneously suspended Roe because it was under pressure to appear to fully support student

women in their allegations of sexual misconduct after #SurvivingSJU was created on January 4,

2019, and after over 2,000 women tweeted thereafter complaining about St. John's inadequate

investigation of complaints and about its allowing accused men to remain on campus.

81.     However, student men also are entitled to due process, pursuant to Policy 703 and

the St. John's Student Conduct Process, and in these circumstances St. John's, a) should have

followed its own rules and investigated Roe's complaint against Doe, and b) should not have

suspended Roe without the due process required by its own policies and procedures.

82.     Title IX of the Education Amendments of 1972 provides, *inter alia*, that:

> No person in the United States, shall on the basis of sex, be
> excluded from participation in, be denied the benefits of, or
> be subjected to discrimination under any education program
> or activity receiving Federal financial assistance.

83.     Both the U.S. Department of Education and the U.S. Department of Justice have

promulgated regulations under Title IX that require a school to "adopt and publish grievance

procedures providing for the prompt and equitable resolution of student... complaints alleging

any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. §

106.8(b) (U.S. Dep't of Education); 28 C.F.R. § 54.135(b) (U.S. Dep't of Justice).

84.     Policy 703 was promulgated pursuant to Title IX and its implementing

regulations.

85.     Such prohibited actions include all forms of sexual harassment.

86.     "The 'prompt and equitable' procedures that a school must implement pursuant to

Title IX to "accord due process to both parties involved" must include, at a minimum:

"Adequate, reliable and impartial investigation of complaints…"

87.     Although Roe made a complaint of hostile environment based upon Doe's false

and defamatory tweet in violation of Code of Conduct privacy requirements, St. John's refused

to investigate his complaint.

88.     As a male student, Roe was denied the right to have the "tweet" investigated

which St. John's admits, not only "deeply affected him" but also "other students in the St. John's

University community."

89.     Roe's sex was a motivating factor in St. John's decision not to investigate his

claim, while simultaneously publicly stating its intent to investigate all of the allegations by

female students posted using the #SurvivingSJU hashtag. (Exhibit 3)

90.     St. John's failure to investigate Roe's complaint was clearly unreasonable under

the circumstances.

91.     Despite its non-public knowledge that Roe was not suspended for rape as alleged

by the tweet, but for allowing Doe to place his hand on her breasts, St John's:

        a)      Did not investigate Doe for her violation of its confidentiality rules, and

        b)      Did not investigate Doe for her false and defamatory allegation that Roe was
                suspended for raping her which resulted in a hostile environment for Roe, and

16

c)     Did not release a statement condemning Doe's tweet and correcting its allegations that Roe was suspended for rape, and

d)     Has maliciously and purposely allowed the false and defamatory tweet to be unchallenged, thus, severely damaging Roe's future career and life prospects, and

e)     Arbitrarily suspended Roe without reference to any rule and in violation of the due process required by its own rules.

92.     St. John's deliberate indifference and failure to follow its own policies and procedures in response to Roe's complaint created a hostile environment and ultimately deprived Roe of access to educational opportunities.

93.     By reason of the foregoing, St. John's has violated Policy 703 and Title IX and Roe is entitled to the following relief:

a)     Judgment in favor of Roe awarding compensatory damages in the amount of at least $5,000,000, emotional distress damages of $300,000 and punitive damages of $2,000,000, and

b)     An injunction mandating an investigation of Roe's complaint about the tweet, restoring Roe as a student without any Code of Conduct violations and prohibiting further disciplinary proceedings against him that violate Title IX and which do not observe due process themselves, and

c)     An injunction restoring him as a full time student, and

d)     The destruction of all records concerning the October 15, 2018, finding of sexual misconduct against Roe, and

e)     Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988.

**Third Claim Against St. John's
(Its failure to afford Roe a fair and unbiased
hearing on the second complaint as
Required by Policy 703 and Title IX)**

94.     Roe repeats and realleges each and every allegation set forth above except for those of paragraphs 59 and 93.

95.     On December 15, 2018, Roe went to Parson's, a bar in Queens with housemates and friends.

96.     Also at the bar was "Mary Smith," whom he had met once before when she had had an affair with ("Joe Jones") one of his roommates. ("Jones" is not his actual name.)

97.     At the bar's closing time, about 2 a.m., a friend of Roe agreed that the friend would drive Smith back to Roe's house, at the time, Smith was visibly intoxicated.

98.     When they arrived at Roe's house at approximately 2:30 in the morning, Smith asked to see Jones, he was upstairs but came down to meet her.

99.     Smith asked if she could sleep on his floor, but he said that could not happen since he was entertaining another woman in his room.

100.    Thus, at approximately 3 a.m., Smith went outside to sleep on the concrete patio.

101.    The temperature was near freezing and it was raining and it was clear to Roe that she was not making a safe choice.

102.    After Roe asked Jones to bring her in and he refused, Roe went outside and invited her in to sleep on the couch in the living room.

103.    Smith came inside, Roe sat at one end of the long couch in the living room, and she stretched out next to him and fell asleep.

104.    Around the same time, another male friend of Roe's also fell asleep on a couch less than 6 feet away.

105.     Due to concerns of Roe that Smith might vomit due to her intoxication, he propped her up on her side with her back against the sofa to ensure that she could not choke.

106.     Roe then sat at the foot of the long couch, with the intent to ensure that Smith did not vomit and choke, and subsequently fell asleep.

107.     At dawn, Smith woke up, retrieved her shoes and apparently walked home.

108.     As stated above, "Smith" made a complaint against Roe on January 5, 2019, and on June 6, 2019, Director of Student Conduct Jack Flynn reported the complaint to Roe as follows:

> The Office of Student Conduct has received an incident report documenting your alleged involvement in a violation of the Student Code of Conduct. Consequently, you are scheduled to participate in a University Conduct Board hearing to address the following:
>
> Incident date: December 15, 2018
>
> Incident location: Off campus
>
> Incident Summary: The complainant reported to the University that she was sexually assaulted while spending the night at an off-campus private house. The complainant reported falling asleep on the living room couch and awaking to discover the respondent lying behind her on the couch with his hand inside her pants. The complainant reports that the respondent was penetrating her vagina with his fingers and that she did not consent to the activity.
>
> Alleged violation(s):
>
> 1. Non-Consensual Sexual Contact
>
> Any intentional sexual contact with another person, however slight, that occurs without that person's consent…
>
> 2. Non – Consensual Sexual Penetration
>
> Any act of oral, vaginal or anal penetration by a person's finder, body part, or an object without consent.

109.     St. John's scheduled a Conduct Hearing on the second complaint for September 17, 2019.

110.   St. John's did not publish the procedures that were to be followed to ensure that due process was observed at the September 17, 2019, Conduct Hearing on the second complaint. (the "2019 Conduct Hearing")

111.   On June 12, 2019, Roe's attorney had emailed St. John's attorney, *inter-alia*, as follows:

> …I have reliable information that the tweet "went viral" at the University with Faculty members and students almost universally aware of its content.
>
> A day after the tweet, [Roe] was accused of sexual misconduct in a second complaint. It will be impossible for him to receive a fair hearing regarding the second complaint. At a hearing, the faculty members on the panel will have most probably heard of or reviewed the defamatory allegations of the tweet- without there having been a contradiction of it by the University.

112.   On June 17, 2019 St. John's attorney, Mr. Hurwit, responded as follows:

> Your letter claims that it will be "impossible" for [Roe] to receive a fair hearing. We disagree. You offer no information that the individuals who will adjudicate the matter have knowledge of the tweet or the prior matter involving [Roe], or that even if these individuals had such knowledge, they would be unable to adjudicate the matter fairly and impartially. In sum, your belief that [Roe] will not receive a fair hearing is based on speculation and conjecture.

113.   On July 18, 2019, Mr. Hurwit emailed Roe's attorney, *inter-alia*, as follows:

> There will be no reference to the "tweet" at the University Conduct Board hearing unless your client opens the door. [Roe] has received, and will continue to receive, a fair and Impartial process.

114.   In Roe's circumstance, it is almost certain that one or more of the faculty members at the Conduct Board hearing the "2019 hearing" would know about the tweet, therefore, making it impossible to eliminate bias so as to ensure the fair and impartial process required by Policy 703.

20

115.    Upon the day of the 2019 hearing, Roe and his counsel were kept waiting for an hour past the original scheduled time for the commencement of the 2019 hearing.

116.    The following people were present at the Hearing from St. John's: Jack Flynn, Investigator John Breheny, panel members - Sharod Tomlinson, Mansoor Khan, Cheresa Fewell and Thomas J. Foley, Esq.

117.    Attorney Thomas J. Foley who identified himself as the Chair of the hearing (see copy of Foley's email attached hereto as Exhibit 14) was also Chair of the Jane Doe hearing in October 2018.

118.    Upon information and belief, Flynn conferred with the impartial investigator, Foley and members of the panel, both in advance of the hearing and thereafter.

119.    On October 2, 2019, Flynn notified Roe as to the result of the hearing as follows (Exhibit 15):

> **Alleged violation - Decision**
> 1. Non-Consensual Sexual Contact -- In Violation
> 2. Non-Consensual Sexual Penetration -- Not In Violation

120.    Flynn summarized the incident as follows:

> **Incident Summary:** The complainant reported to the University that she was sexually assaulted while spending the night at an off-campus private house. The complainant reported falling asleep on the living room couch and awaking to discover the respondent lying behind her on the couch with his hand inside her pants. The complainant reports that the respondent was penetrating her vagina with his fingers and that she did not consent to the activity. (Emphasis in original).

121.    Flynn rendered the sanctions of Roe as follows:

> **Expulsion from University:** You have been expelled from St. John's University effective immediately. Expulsion is a permanent separation from the University and means that you are not allowed to attend class, participate in any University programs or events, or be on University property. You shall not hereafter visit any

University owned or managed grounds. Expelled students forfeit any tuition and fees they may have paid and are not permitted to apply to St. John's University for student admission or employment at any time in the future.

122.    On October 25, 2019, Roe submitted an appeal of the Faculty Board decision.

(See copy of appeal attached as Exhibit 16)

123.    In the appeal Roe raised, among other items, the impartiality of the investigator as

follows:

> [N]one of the improper ties which may have occurred at the hearing were recorded for use by respondent in his appeal. For instance the investigator gave his opinion, 'that there was inconsistencies between respondent's reasons from moving from his off campus residence for his convenience when he was leaving to live with him mother miles away.' In fact, respondent moved from his off campus residence to his father's home minutes away. Not only was the investigator wrong- it was wrong for him to give his opinion.

124.    Upon Roe's appeal, the Conduct Appeals Board "AFFIRMED in all respects" and

"the matter" was "closed" in a decision signed by Professor Larry Cunningham, Chair. (the

"January 15, 2020, decision," Exhibit 17)

125.    The Conduct Appeals Board made findings in part as follows:

a) Respondent was charged with "non-consensual sexual contact" and "non-consensual sexual penetration"…The evidence showed that the Respondent digitally penetrated the Complainant's vagina.
       \*                           \*                        \*
b) This is the *second* disciplinary proceeding against the same Respondent in a year. In his previous case, he was found to have also engaged in "non-consensual sexual contact" but against a *different* female student. That case also involved an unconscious victim.

c) To succeed on his claim, he must show that that similarly situated female respondents have been treated more leniently than males in the conduct process. Without any proof that this is the case, his claim of gender discrimination must fail.
       \*                           \*                        \*
d) [T]here is no evidence of any improper contact between the Student Conduct Administrator and the members of the University Conduct Board. In his response to our interim decision, the Administrator described his communications with the members of the panel, all of which were of a scheduling nature. Respondent has offered no evidence

to refute the Student Conduct Administrator's written response and to show improper contact with the panel members.

\*                                 \*                                 \*

e) Respondent argues that he had did not have an opportunity to submit a written impact statement before the sanction was imposed. [A]ny purported violation of Policy 703 would not constitute a ground for appeal here. This argument is beyond our purview.

126.     The Appeals Board's decision also stated in part as follows, "The chair of the panel reported the Conduct Board's finding that the Respondent violated the Code[5]." Footnote 5 read as follows:

> [5] In the summary portion of the report, "NIV" (not in violation) was listed in the summary section for the charge in question, but the findings section states "IV" (in violation). The summary notation appears to have been a typographical error.

127.     The decision of the Conduct Appeals Board was erroneous and demonstrated the bias of the Conduct Appeals Board, Professor Larry Cunningham- Chair, as follows:

> a) Since Policy 703 "supersedes any other University policy to the extent that such policy applies to sexual misconduct," the appeals body was in error for the second time under Chair, Law Professor Larry Cunningham, for determining that Policy 703 did not apply.

> b) No argument can be made that Roe committed an offense against Doe while she was "unconscious" since the only evidence was that Doe took Roe's hand and placed it on her breast.

> c) Since the Conduct Board found Roe "not in violation" of digital penetration by Roe, the appeal board could not make its own factual finding that "evidence showed that Roe digitally penetrated complainant while she was asleep." The opinion on appeal stated Flynn's October 2 summary of the complainant's allegation as a factual finding.

> d) The statement in footnote 5 that the Not In Violation finding was a "typographical error" is unsupported, very confusing and reflects a bias against Roe.

128.     There is no due process type information published by St. John's as to a) how faculty members are selected for a Conduct Board or a Conduct Appeals Board, b) who may speak to them prior to, during and after the Conduct Hearing and the Conduct Appeals Board deliberations, c) the permissible subjects of any St. John's officials' conversations with members

or prospective members of the Conduct Board or the Conduct Appeals Board, d) as to safeguards to be observed to prevent bias in the circumstances of the wide spread knowledge of the tweet's false allegation of Roe being suspended for rape, and e) as to have a supposed "impartial investigator" is retained and isolated from a St. John's point of view and interest.

129.    In violation of due process required by Policy 703, there is no record available to respondents or claimants participating in the Student Conduct Process in which Roe was adjudged in violation of Student Conduct rules as to record communications between and among:

a) Jack Flynn, and

b) St. John's investigators, and

c) Panel members of the Conduct Board and the Conduct Appeal Board, and

d) Thomas Foley, Esq. who served as Chair of both Conduct Board hearings, and

e) Professor Larry Cunningham who served as Chair of both Conduct Appeal Board deliberations.

130.    Upon information and belief, in violation of Policy 703, Flynn controlled every aspect of the two faculty hearings where Roe was found to have violated the Student Code and every aspect of both appeals where sanctions were upheld against Roe including:

a) Suspending Roe before investigation on January 8, without due explanation, and

b) Selecting the members of both appeal and hearing panels, and

c) Retaining Foley as Chair of both Conduct Boards, and

d) Selecting Larry Cunningham as the Chair of the Appeal Board for each Appeal by Roe, and

e) Discussing Roe's alleged conduct with attorney Foley and Conduct Appeal Board Chair Cunningham, and

f) Asking Cunningham to expedite the January 8, 2019 appeal decision due to pressure of over 2,000 tweets by female students against St. John's, and

g) Conspiring with Cunningham, a St. John's School of Law professor, to deny the clear mandate by Title IX to St. John's Policy 703 to permit written impact statements, and

h) Coaching the investigator to testify adversely to Roe- including questioning his credibility regarding the fact that he moved for his own convenience by stating falsely that he lived his mother 15 miles away, when in fact, he moved with his father only minutes away.

131.    The Conduct Appeals Board bias against Roe as a male student is reflected in their making factual findings beyond their purview and jurisdiction such as:

a) Determining both complainants were "unconscious" at the time of the alleged incidents, and

b) Determining Roe digitally penetrated the vagina of the second complainant although the Conduct Board found him "Not In Violation" of sexual penetration, and

c) Determining that the Conduct Board's panel's finding of "Not In Violation" was a "typographical error," and

d) Determining that Roe did not offer evidence of gender bias – when he was not entitled to offer such evidence on appeal.

132.    Thus, on the basis of sex, St. John's has deprived Roe of his right to due process and equal protection pursuant to Policy 703 through the improper administration of St. John's procedures when St. John's was facing enormous pressure from female students and public scrutiny.

133.    The procedures adopted by a school whose conduct is governed by Title IX must not only "ensure the Title IX rights of the complainant, but must also accord "due process to both parties involved…"

134.    By reason of the foregoing, Roe's education and future career prospects have been severely damaged.

135.     Without appropriate redress, the unfair administration procedures at the Conduct Hearing and appeal of its finding will continue to cause irreversible damages to Roe's educational career and future employment prospects, with no end in sight including problems completing an undergraduate degree, being admitted to a law school, or being admitted as a member of any bar association.

136.     By reason of the foregoing, Roe requests, pursuant to 28 U.S.C. § 2201, a declaration that:

a) St. John's procedures for handling student complaints of sexual misconduct, are in violation of its own Policy 703 and Title IX as applied to sexual conduct complaints against Roe, and

b) Roe be readmitted to St. John's and all record of the first and second complaints be expunged, and

c) Roe be awarded damages as follows:

a. Compensatory damages of $5,000,000

b. Emotional distress damages of $300,000, and

c. Punitive damages of $2,000,000

**Fourth Claim**
**(Against St. John's for Breach of Contract)**

137.     Plaintiff repeats and realleges each and every allegation except for those of paragraphs 59, 93 and 136.

138.     By accepting Roe as a student, St. John's University entered into an implied contract with Roe.

139.     Pursuant to Policy 703, St. John's was contractually obligated to:

(a) "Take all available steps to promptly, thoroughly, and impartially investigate and address claims of sexual misconduct"(Policy 703 VII);

    (b) Conduct a "fair and unbiased hearing" and ensure that a "fair, impartial hearing body" evaluates alleged misconduct (Section F: Rights of St. John's Participating in the Student Conduct Process);

    (c) Require that any findings be supported by a preponderance of the evidence standard (Policy 703 VII A);

    (d) Provide the respondent with the opportunity to submit a written impact statement to the decision-maker prior to the determination of appropriate sanctions (Policy 703 VII – G)

    (e) Address harassing conduct that creates a "hostile environment," "limiting an individual's ability to participate in, or benefit from, the University's education or work programs or activities (Policy 703- III)

140.    In finding that Roe violated the prohibition against "non-consensual sexual conduct" because Doe placed his hand on her fully clothed breasts, St. John's breached its contractual obligation to adjudicate claims based on a preponderance of the evidence standard.

141.    Since Doe physically initiated and implemented this contact, no reasonable fact finder could conclude, by a preponderance of the evidence that Roe acted without Doe's consent.

142.    In violation of St. John's contractual obligation to address all claims of sexual misconduct, it made no findings against female student Doe despite Roe's testimony that Doe intentionally placed his hand on her breast.

143.    By suspending and expelling Roe without providing him the opportunity to submit a written impact statement, St. John's violated its contractual obligation to provide this opportunity prior to the determination of sanctions with respect to both the first and second complaints.

144.    St. John's failure to impartially investigate Roe's complaint as to the defamatory tweet constitutes a violation of his contractual right to a prompt investigation of this complaint under Policy 703.

145.     In failing to redress the defamatory tweet or its effects, including the threats of violence to Roe, St. John's breached its contractual obligation to prevent and remedy a hostile education environment.

146.     St. John's violated Roe's contractual right to a thorough and impartial investigation of the second complaint by abruptly suspending Roe within three days of the second complaint.

147.     St. John's breached its contractual obligation to conduct a fair and unbiased hearing by (a) failing to publish procedures as to how faculty members are selected for the Hearing Board; (b) failing to enforce procedural safeguards, such as preventing panel members from conferring with St. John's prior to the hearing; (c) disregarding the potential bias created by the fact that faculty members had almost certainly seen the tweet prior to the hearing; and (d) failing to provide a record of the hearing to serve as a basis for an appeal, and in securing an impartial investigator.

148.     By notifying Roe of his expulsion in the same document by which he was informed that he was found "in-violation" by the Conduct Board, St. John's breached its contractual obligation to provide Roe the opportunity to submit a written impact statement prior to the imposition of sanctions.

149.     By reason of the forgoing, St. John's breached its contractual obligations to Roe pursuant to Policy 703. Roe is entitlted to up to $5,000,000 in compensatory damages

### Fifth Claim Against Defendant Jane Doe
### (Defamation)

150.     Roe repeats and realleges each and every allegation set forth above except those of paragraphs 59, 93, 136 and 149.

151.    The tweet was false, malicious, vindictive and intended to cause him great harm and emotional distress. Doe's false allegations of rape have caused bias among St. John's leading to his expulsion.

152.    By reason of the foregoing Roe has been damaged as to his future employment prospects

153.    By reason of the foregoing, Doe has defamed Roe and caused him great emotional distress and he seeks monetary damages as follows:

        a.    Compensatory damages of at least $250,000, and
        b.    Emotional distress damages of approximately $100,000, and
        c.    Punitive damages of $50,000.


**Wherefore**, plaintiff seeks the relief requested above in paragraphs 59, 93, 136, 149 and 153.

### Jury Demand

Roe hereby demands a trial by jury.

Attorneys for plaintiff Richard Roe:

February 18, 2020

Peter G. Eikenberry (7257)
75 Maiden Lane, Room 402
New York, NY 10038
(917) 596-4168, and
pete@eikenberrylaw.com

Michael Valentine
61 Third Place
Brooklyn, New York 11231
Tel: (718) 858 0818
Cell: (917) 593 1047
mvalentine@valentinelaw.com

29

# EXHIBIT 1



ST. JOHN'S
UNIVERSITY

# Policy 703 - Sexual Misconduct Policy and Procedures

**Section:** Employee Relations

**Policy Number:** 703

**Responsible Office:** Public Safety; and Equal Opportunity and Compliance

**Effective Date:** 6/27/16

**Revised:** 8/25/16; 8/1/17; 11/1/17; 3/13/18

Adapted from and replaces former policy #703 Sexual Assault

## Table of Contents

- I. Policy Statement
- II. Scope of the Policy
- III. Definitions within the Policy
- IV. Off Campus Options for Assistance
  - A. Medical or Emergency Assistance and Resources
  - B. Medical Examination for Preservation of Evidence

- o **C. Law Enforcement Notification**

- **V. On-Campus Options for Assistance**
  - o **A. Confidential Versus Non-Confidential Resources**
  - o **B. Public Safety – Non Confidential**
  - o **C. Center for Counseling and Consultation (for students) – Confidential**
  - o **D. Campus Ministry**:
  - o **E. Medical Assistance or Support for Students – Confidential**
  - o **F. Confidential Support Advisor for Students**
  - o **G. Confidential Support and Resources for Employees**

- **VI. Reporting Sexual Misconduct To Non-Confidential Resources at the University**
  - o **A. Reports of Sexual Misconduct from Others and/or Anonymous Sources**
  - o **B. Time for Reporting**
  - o **C. Alcohol and Drug-Use Amnesty Policy**
  - o **D. Advisors**
  - o **E. Requests for Confidentiality.**

- **VII. Process For Investigating and Resolving Complaints of Sexual Misconduct**
  - o **A. Evidentiary Standard**
  - o **B. Initial Assessment**
  - o **C. Preliminary Investigation**
  - o **D. Interim Remedies**
  - o **E. Time Frame for Investigation and Resolution**
  - o **F. Notice of Outcome**
  - o **G. Possible Sanctions**
  - o **H. Appeals**
  - o **I. Adjudication**

- VIII. Adjudication of Complaints Against Faculty, Administrators and Staff
  - A. Process for Investigation and Resolution
- IX. Prohibition on Retaliation
- X. Prevention and Awareness Education Programs
- XI. Clery Act Compliance
- XII. Policy Compliance

## Appendices

- Appendix A: Students' Bill of Rights

## I. Policy Statement

The health, safety, and well-being of all members of the St. John's University (the "University") community are the University's primary concerns. Consistent with the University's mission as a Catholic, Vincentian, metropolitan and global institution of higher education, the University abides by all applicable federal, state and local laws that prohibit discrimination in any educational or employment program, policy, or practice of the University, In furtherance of the University's mission, and in accordance with Title IX of the Education Amendments of 1972 ("Title IX"), the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act"), as amended by the Violence Against Women Act/Campus Sexual Violence Act ("Campus SaVE Act"), Article 129-B of the New York State Education Law, Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law and the New York City Administrative Code, this Policy prohibits all forms of sex and gender discrimination, including sexual harassment and sexual misconduct; and the University does not discriminate on the basis of sex in its education programs or activities.

Sexual misconduct includes a broad range of behaviors that will not be tolerated in the University's education programs or activities. The University strictly prohibits sexual harassment and sexual violence, including the offenses of sexual assault, sexual coercion, sexual exploitation, dating violence, domestic violence, and stalking

prohibited by this policy (collectively, "sexual misconduct"). The University also prohibits retaliation against a person for the good faith reporting of any alleged violation or for participating in any investigation or hearing.

Sexual misconduct can occur between strangers, acquaintances, or people who know each other well, including those who are involved in an intimate or sexual relationship, and can be committed by anyone regardless of sex, gender, or gender identity.

The purpose of this Sexual Misconduct Policy & Procedures for the St. John's University Community (the "Policy") is to ensure that all community members live, work and learn in a safe and respectful environment free from any form of sexual misconduct. If there is a violation of this Policy, the University will take steps to eliminate the sexual misconduct, prevent its recurrence and to remedy any effects of the sexual misconduct.

Inquiries concerning the application of this Policy or Title IX may be referred to the University's Title IX Coordinator.

Keaton Wong
Director of Equal Opportunity, Compliance and Title IX
St. John's University
Office of Human Resources, University Center
8000 Utopia Parkway
Queens, NY 11439
Phone: 718-990-2660
titleix@stjohns.edu or wongk1@stjohns.edu

The Title IX Coordinator's responsibilities include, but are not limited to, overseeing the University's response to complaints of sexual misconduct, coordinating investigations into allegations of sexual misconduct, ensuring that students and employees receive appropriate education and training, and identifying and addressing any patterns or systemic problems of sexual misconduct that arise during or following the investigation of a complaint of sexual misconduct. The University has designated two Deputy Title IX Coordinators. The Deputy Title IX Coordinators aid the Title IX Coordinator in overseeing and responding to reports of sexual misconduct. The Deputy Title IX

Coordinators, either alone or in collaboration with Public Safety, ensure that resources, guidance and support services are offered, explain the procedural options, and facilitate access to interim remedies.

The Deputy Title IX Coordinators may be contacted at:

Jackie Lochrie
Associate Dean for Student Services
St. John's University
Student Affairs, University Center
8000 Utopia Parkway
Queens, NY 11439
Phone: 718-990-6568
lochriej@stjohns.edu

Kathleen F. Meehan
Associate Vice President, Athletics
St. John's University
Athletic Department
Lou Carnesecca Arena, Room 157
8000 Utopia Parkway
Queens, NY 11439
Phone: 718-990-6173
meehank@st.johns.edu

^ Back to top

## II. Scope of the Policy

This Policy applies to all members of the University Community regardless of sex, race, national origin, disability, sexual orientation, gender identity and gender expression, or other status protected under federal, state or local law.

For the purpose of this Policy, the University Community includes, but is not limited to, all faculty, administrators, staff (including student workers), students, alumni, interns, members of the Board of Trustees, and members of University-sponsored advisory committees. Non-community members (e.g., family or friends of students, visitors to the University, vendors and service-providers) who are visiting campus, participating in a program or activity or interacting with University Community members may also be subject to this policy.

This Policy applies to any allegation of sexual misconduct that takes place on University property, or any other property on which a University-sponsored program or activity takes place. This Policy also covers conduct that takes place off-campus if the conduct creates a threatening or uncomfortable environment on the University's campus or within a University program, or if the incident causes concern for the safety or security of the University's campus.

This Policy supersedes any other University policy to the extent that such policy applies to sexual misconduct. A particular situation may potentially invoke one or more University policies or processes. The University reserves the right to determine the most applicable policy or process and to utilize that policy or process.

This policy (i) defines the prohibited conduct; (ii) sets forth the available resources and reporting options; (iii) describes the University's procedures for responding to complaints of sexual misconduct, including the investigation and adjudication process; and (iv) describes programs implemented by the University to educate and increase awareness among the University community regarding sexual misconduct.

## III. Definitions Within The Policy

^ Back to top

For the purposes of determining whether a course of conduct constitutes a violation of this Policy, the relevant definitions are listed below.

"Affirmative consent" is defined as a knowing, voluntary and mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate

consent. The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity or gender expression. All references to "consent" in this policy will mean affirmative consent as defined in this policy.

The following principles, along with the above definition, will be used to evaluate whether affirmative consent was given:

- Consent to one form of sexual contact (such as kissing or fondling) or prior consensual sexual activity between or with any party does not necessarily constitute consent to any other forms of sexual activity or to sexual activity in the future.

- A current or previous dating relationship is not sufficient to constitute consent.

- Consent is required regardless of whether the person initiating the act is under the influence of drugs and/or alcohol.

- Consent may be initially given but withdrawn at any time during sexual activity by expressing in words or actions that they no longer want the sexual activity to continue.

- Consent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity. Incapacitation may be caused by the lack of consciousness or being asleep, being involuntarily restrained, or if an individual otherwise cannot consent. Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be incapacitated and therefore unable to consent.

- Consent cannot be given when it is the result of any coercion, intimidation, force or threat of harm.

- In accordance with New York state law, a person who is less than 17 years of age is incapable of consenting to sexual activity.

- When consent is withdrawn or can no longer be given, sexual activity must stop.

"Complainant" means the individual who reportedly experienced sexual misconduct, regardless of whether such individual reports such sexual misconduct to the University or participates in the University's conduct process for responding to complaints of sexual misconduct described herein.

"Dating violence" means violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim. The existence of such a relationship shall be determined based on the complainant's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship. Dating violence includes, but is not limited to, sexual, physical, or psychological abuse, or the threat of such abuse. Dating violence does not include acts covered under the definition of domestic violence.

"Domestic violence" means a felony or misdemeanor crime of violence committed by (i) a current or former spouse or intimate partner of the victim, (ii) a person with whom the victim shares a child in common, (iii) a person who is cohabitating with or has cohabitated with the victim as a spouse or intimate partner, (iv) a person similarly situated to a spouse of the victim under the domestic or family violence laws of New York, or (v) any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of New York.

"Intimidation" means unlawfully placing another person in reasonable fear of bodily harm through the use of threatening words and/or other conduct, but without displaying a weapon or subjecting the victim to actual physical attack.

"Non-Fraternization" Even with consent, amorous or sexual relationships may not be conducted by persons in unequal positions. The University considers it inappropriate for any member of the faculty, administration, or staff to establish an intimate relationship with a student, subordinate, or colleague upon whose academic or work performance he or she will be required to make professional judgments. These relationships may be less consensual than perceived by the individual who is in the position of power. Intimate relationships also have the potential to interfere with the University's ability to provide an appropriate and safe working and learning environment for the University Community and may constitute sexual harassment or other unlawful discrimination. The University has adopted a comprehensive non-fraternization policy included in its Policy #704, Policy Against Discrimination and Harassment and Related Complaint Procedures.

"Privacy" means that dissemination of information relating to each report of sexual misconduct is limited to individuals who have a legitimate need to know in order to carry out their duties and responsibilities in accordance

with this Policy and the law.

"Reporting Individual" means any individual who reports a violation of this Policy to the University.

"Respondent" means the individual alleged to have committed acts constituting sexual misconduct, regardless of whether such individual has entered into the University's conduct process for responding to complaints of sexual misconduct described herein.

"Retaliation" means taking any adverse action or attempting to take adverse action, including intimidating, threatening, coercing, or in any way discriminating against an individual because of the individual's complaint of sexual misconduct or participation in an investigation or proceeding related to alleged sexual misconduct.

"Sexual assault" includes non-consensual sexual intercourse and non-consensual sexual contact.

- "Non-consensual sexual intercourse" means any form of sexual penetration or intercourse (vaginal, anal, or oral), however slight, with any body part or object by an individual upon another individual without consent and/or by force.

- "Non-consensual sexual contact" means any intentional sexual touching, however slight, with any body part or object by an individual upon another individual without consent. Intentional sexual contact includes contact with the breasts, buttocks, or groin, or touching another with any of these body parts; making another person touch any of these body parts; and any intentional bodily contact in a sexual manner.

"Sexual coercion" is the application of unreasonable pressure, including emotionally or physically manipulative actions or statements, or direct or implied threats, in order to compel the person to engage in sexual activity.

"Sex discrimination" is an act that disadvantages a person and that occurs because of the affected individual's gender, sexual orientation, gender identity, or gender expression. Examples of sex discrimination include, but are not limited to, denying a student a research opportunity because of the student's gender; giving a student a lower grade than s/he deserved because of the student's gender; denying an employee a raise or promotion because of the employee's gender.

"Sexual exploitation" means any act whereby one person takes sexual advantage of another who has not provided consent. Sexual exploitation occurs when the perpetrator acts for his or her own advantage or benefit, or for the benefit or advantage of anyone other than the person being exploited. Sexual exploitation includes the exposure of one's self to another person without that person's consent; it also includes recording, photographing, transmitting, viewing or distributing intimate or sexual images or sexual information without the knowledge and consent of all parties involved, observing others who are engaged in intimate or sexual situations without permission, acts of incest, or engaging in consensual activity with another person while knowingly infected with HIV or some other sexually transmitted disease without informing the other person of such infection.

"Sexual harassment" means unwelcome conduct, based on sex or on gender stereotypes, that a reasonable person would find intimidating, hostile, or offensive. Sexual harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, graphic or physical conduct of a sexual nature, when: (1) submission to, or rejection of, such conduct is made either explicitly or implicitly a term or condition of an individual's employment, education or campus life activities, or used as the basis of any academic, student life or employment decision (quid pro quo or "this for that"); or (2) such conduct is sufficiently severe, persistent or pervasive such that it limits an individual's ability to participate in, or benefit from, the University's education or work programs or activities (hostile environment).

- A "hostile environment" exists when the conduct is sufficiently severe, persistent, or pervasive that it unreasonably interferes with, limits, or deprives an individual from participating in or benefitting from the University's education or employment programs and/or activities when judged against a reasonable person standard.

- In evaluating whether a hostile environment exists, the University will consider the totality of known circumstances, including, but not limited to:
  o The frequency, nature and severity of the conduct;
  o Whether the conduct was an isolated incident or repeated
  o Whether the conduct was physically threatening;
  o The effect of the conduct on the complainant's mental or emotional state;
  o Whether the conduct was directed at more than one person;

o The relationship of the individuals involved in the conduct;

o Whether the conduct arose in the context of other discriminatory conduct;

o Whether the conduct unreasonably interfered with the complainant's educational or work performance and/or University programs or activities; and

o Whether the conduct implicates concerns related to academic freedom or protected speech.

Examples of sexual harassment include, but are not limited to, posting sexually explicit or offensive material that does not serve an academic purpose; obscene or sexually offensive gestures and comments; lewdness; repeatedly subjecting a person to unwelcome sexual attention or sexual advances; requesting sexual favors; conditioning a benefit on submitting to sexual advances; engaging in inappropriate or unnecessary touching or rubbing against another; or making sexually suggestive or degrading jokes.

"Sexual misconduct" includes exposing a person to a range of unwelcome behavior of a sexual nature that is committed without consent or by intimidation, coercion, threat or force. Sexual misconduct includes, but is not limited to, sex discrimination, sexual harassment, sexual assault, sexual coercion, sexual exploitation, dating violence, domestic violence, and stalking. Sexual misconduct can occur between strangers or acquaintances, as well as people involved in intimate or sexual relationships. Sexual misconduct can occur between individuals of the same gender or opposite gender and in heterosexual and homosexual relationships.

"Stalking" means engaging in a course of conduct directed at a specific person that would cause a reasonable person to: (1) fear for his or her safety or the safety of others; or (2) suffer substantial emotional distress. For purposes of this definition:

• "Course of conduct" means two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or other means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.

• "Substantial emotional distress" means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling.

• "Reasonable person" means reasonable person under similar circumstances and with similar identities to the victim.

Conduct that violates this Policy may also violate New York State laws and subject an individual to criminal prosecution. Sex Offenses under New York law are described in Sections 130.00 to 130.96 of the New York State Penal Code.

^ Back to top

# IV. Off Campus Options for Assistance

The University strongly encourages anyone who has experienced sexual misconduct or who has been the victim of a crime to seek immediate assistance to ensure physical safety and to obtain medical or other support services.  There is a wide range of community resources available.  Reports to these off-campus community resources will not constitute a report to the University and will not result in the University taking any action against the accused.  Some of those options and resources, which may or may not charge service fees, include:

## A. Medical or Emergency Assistance and Resources

Assistance is available 24 hours a day, 7 days a week from:

- Local Police and Emergency Assistance - Call 911
- Mount Sinai - Elmhurst Hospital Sexual Assault and Violence Intervention Program (SAVI), 79-01 Broadway Queens, NY 11373, 718-334-1418
- NYPD Special Victims Division 646-610-7272
- Safe Horizon Rape and Sexual Assault Hotline - (866) 689-HELP (4357)
- Safe Horizon Domestic Violence Hotline - (800) 621-HOPE (4673)
- New York State Office of Victim Services Toll Free Number – (800) 247-8035
- New York State Sexual Assault and Domestic Violence Hotline (800) 942-6906; Spanish: (800) 942-6908
- New York State Police Sexual Assault Hotline – (844) 845-7269

In addition to the above list, there are many other available resources. Students should refer to the Student Assault Resource Guide: Sexual Assault: You Are Not Alone.

## B. Medical Examination for Preservation of Evidence

In instances involving physical injury or sexual assault, the University strongly encourages the complainant to obtain a medical examination to determine the extent of injuries. A hospital, with the complainant's permission, will collect physical evidence in a sexual offense evidence collection kit. Consenting to the completion of a sexual offense evidence collection kit does not obligate the complainant to pursue criminal charges with the police; it is a way to preserve evidence should there be a choice to pursue criminal charges at a later time. Hospitals are required by law to preserve such evidence for a minimum of 30 days.

## C. Law Enforcement Notification

In keeping with its commitment to taking all appropriate steps to eliminate, prevent, and remedy sexual misconduct, the University urges the complainant to report all instances of sexual misconduct or criminal activity to local law enforcement. Timing is a critical factor in collecting and preserving evidence that may assist in proving that the alleged sexual misconduct or crime occurred and may also be helpful in obtaining a protection or restraining order from the police. The complainant may contact local law enforcement directly, whether or not a complaint has been filed with the University. If requested, University representatives are available to assist the complainant in notifying law enforcement or legal service organizations to learn about these remedies. The complainant may also decline to notify law enforcement.

A person may report an incident to either the police or the University or to both.

Effect of Law Enforcement Notification: The filing of a complaint of sexual misconduct under this Policy is independent of any criminal investigation or proceeding. The University will not wait for the conclusion of any criminal investigation or proceedings to commence its own investigation or to take any necessary interim remedies to protect the complainant and the University community. However, the University may temporarily delay its

investigation to enable law enforcement to gather evidence and to engage in a preliminary investigation of sexual misconduct matters that may also violate state or federal law. Such delays will not last more than 10 days, except when law enforcement authorities specifically request and justify a longer delay.

The standards for finding a violation of criminal law are different from the standards for finding a violation of this policy. Therefore, criminal investigations or reports are not determinative of whether sexual misconduct, for purposes of this policy, has occurred. In other words, conduct may constitute sexual misconduct under this policy even if law enforcement agencies lack sufficient evidence of a crime and/or decline to prosecute.

Court Orders of Protection: Family court is an option for a person to seek a civil court order of protection in many circumstances. Upon request, Public Safety Officers are available to provide employees with information on how to seek an Order of Protection or a Temporary Restraining Order, but a public safety officer cannot request an Order of Protection or Temporary Restraining Order on behalf of an employee. A Public Safety Officer may provide a student with assistance in obtaining an order of protection.

If an order of protection is granted, the complainant will have the right to receive a copy of the order of protection when it is received by the University. The parties will also have the opportunity to speak with an appropriate University official who can explain the order and the consequences for violating the order (including but not limited to arrest, additional conduct charges, and interim suspension), and answer any questions about the order, including information about the respondent's responsibility to stay away from the protected person(s). Additionally, if the respondent violates the order of protection, the complainant may receive assistance from the University in calling local law enforcement to inform them of the violation.

^ Back to top

# V. On-Campus Options for Assistance

## A. Confidential Versus Non-Confidential Resources

The University offers a number of confidential and non-confidential resources on-campus. The available reporting and confidential disclosure options are described below so individuals can make informed choices about where to turn should they become the victim of sexual misconduct. If you are unsure of a person's reporting obligations, please ask.

## B. Public Safety – Non-Confidential

A victim of any crime can seek assistance from the Department of Public Safety 24 hours a day, 7 days per week, 365 days a year. Supervisors are former ranking police officers who have prior experience working with crime victims. Seeking assistance from the Department of Public Safety ensures that a victim is properly supported by the University and the University can take steps to stop the sexual misconduct, prevent it from recurring, and remedy any effects.

- St. John's Department of Public Safety, Public Safety Emergency Hotline: (718) 990-5252, or if on campus Ext. 5252.

- Campus Public Safety
  ○ Queens Campus, ROTC Building: (718) 990-6281
  ○ Staten Island Campus, Spellman Hall, Room 116: (718) 390-4487(8)
  ○ Manhattan Campus, Front Desk: (212) 277-5155
  ○ Hauppauge location: (718) 990-5252

- Global Sites Local Police and Emergency Assistance – Call 112
  ○ Rome, Italy, Security Desk: +39-06-393-84299
  ○ Paris, France, Security Desk: +33-(0)-1-7745-8901
  ○ Limerick, Ireland, director of international office, Mary Immaculate College: (011) 353-61774787, (011) 353-86042808 (cell).

## C. Center for Counseling and Consultation (for students) – Confidential

The Center for Counseling and Consultation has licensed mental health professionals available to provide free, confidential mental health counseling to students who have been affected by sexual misconduct. However, state law requires professional counselors to report when: (i) there is an imminent threat of harm to self or others; (ii) the conduct involves suspected abuse of a minor under the age of 18; or (iii) as otherwise required or permitted by law or court order.

The Center for Counseling and Consultation is located:

- Queens Campus, Marillac Hall, Room 130, (718) 990-6384
- Staten Island Campus, Flynn Hall, Room 115, (718) 390-4451

Confidential resources can connect you with other on or off-campus resources and explain the other options for assistance that are available to you as well. If you choose to file a formal report with the Title IX Coordinator and/or local law enforcement, these individuals may accompany you and support you through those processes if you so desire.

## D. Campus Ministry

For Non-confidential support:
Campus ministers are available for spiritual support and referrals for follow up assistance outside of Campus Ministry.

For non-confidential spiritual support:

- Queens Marillac Hall, Room 239, (718) 990-6255
- Staten Island, Notre Dame House, (718) 390-4475

Priests on the Campus Ministry Staff are non-confidential except when information is shared in the Sacrament of Reconciliation/Confession.

# E. Medical Assistance or Support for Students – Confidential

Student Health Services has staff available for medical assistance or support:

- Queens, DaSilva, First Floor, (718) 990–6360
- Staten Island, Campus Center, Room B-17 (718) 390-4447

# F. Confidential Support Advisor for Students

The Confidential Support Advisor is a trained University administrator who serves as a confidential resource to students who have experienced sexual misconduct. The Confidential Support Advisor will provide information on University procedures, discuss all available interim remedies, and facilitate referrals for other support services. You do not need to disclose any information or personal details about an incident of sexual misconduct to access or receive interim remedies or support from the Confidential Support Advisor.

The Confidential Support Advisor is located on the Queens Campus in Marillac Hall, Room 130, (718) 990-6384.

The Confidential Support Advisor will maintain an individual's disclosures as confidential, and will not report crimes to local law enforcement or the University, unless: (i) he or she is given permission to share information by the person who experienced the sexual misconduct; (ii) there is an imminent threat of harm to self or others; (iii) the conduct involves suspected abuse of a minor under the age of 18; or (iv) as otherwise required or permitted by law or court order.

# G. Confidential Support and Resources for Employees

Employees who have experienced sexual misconduct are encouraged to obtain emotional support and/or counseling. Professional counselors are available for full-time faculty, administrators and staff through the free, confidential Employee Assistance Program (EAP) 24 hours a day, 7 days a week, 365 days per year. St. John's University's

employees may speak with a counselor on the phone or schedule an appointment by calling: 1 (800) 833-8707 or go online to www.mycaonline.com. (Log in with company code: STJOHNS).

^ Back to top

## VI. Reporting Sexual Misconduct to Non-Confidential Resources at the University

The University is committed to providing a prompt, thorough, and impartial investigation and resolution to all allegations of sexual misconduct. Therefore, the University encourages the reporting of sexual misconduct to the University in accordance with this Policy regardless of whether the incident took place on or off campus, and even if it is also reported to local law enforcement.

Once any of the individuals or offices listed below is notified of an incident of sexual misconduct, she/he will coordinate with the Title IX Coordinator, or a designee, to address the matter in accordance with the procedures outlined in this Policy, including implementing any appropriate reasonable interim remedies. Such reporting will enable complainants to get the support they need, and provide the University with the information it needs to take appropriate action. The individuals and offices listed below are not Confidential Resources. However, even University offices and employees who cannot guarantee confidentiality will maintain your privacy to the greatest extent possible. This means that the information you provide in connection with a report will be shared only as necessary and on a need-to-know basis.

The following offices and individuals have been trained to receive and respond to allegations of violations of this policy.

• Title IX Coordinator, Keaton Wong (718) 990-2660, or titleix@stjohns.edu
• Deputy Title IX Coordinator / Dean of Students, Jackie Lochrie, Lochriej@stjohns.edu or (718) 990-6568, University Center, Division of Student Affairs
• Deputy Title IX Coordinator in Athletics, Kathleen Meehan, Meehank@stjohns.edu or (718) 990-6173, Athletic Department, Lou Carnesecca Arena, Room 157
• Department of Public Safety: (718) 990-6281 or (718) 990-5252

All University employees (except for those employees who have a recognized confidentiality privilege such as a Campus Minister or Confidential Support Advisor) are required to report incidents of sexual misconduct to the Title IX Coordinator, a Deputy Title IX Coordinator and/or the Department of Public Safety.

## A. Reports of Sexual Misconduct from Others and/or Anonymous Sources

If the University receives a report of alleged sexual misconduct by someone other than the victim (e.g., the reporting individual is a friend or coworker) or from an anonymous source, the University's Title IX Coordinator, or designee, will promptly notify the victim of the report, and inform the victim of the available resources and assistance. The University will respond to the report of sexual misconduct as if the victim had made the initial report. The University will accept anonymous reports. However, due to the nature of anonymous reports, the University's ability to take responsive action may be limited.

## B. Time for Reporting

There is no time limit for reporting sexual misconduct to the University under this Policy. Nevertheless, any member of the University community who believes that he or she has been a victim of sexual misconduct is encouraged to report the alleged sexual misconduct immediately in order to maximize the University's ability to obtain evidence and conduct a prompt, thorough and impartial investigation.

## C. Alcohol and Drug-Use Amnesty Policy

The health and safety of every student at the University is of utmost importance. The University realizes that students who have been drinking and/or using drugs (whether such use is voluntary or involuntary) at the time that sexual misconduct occurs may be hesitant to report such incidents due to fear of potential consequences for their own conduct. The University strongly encourages students to promptly report any incident of sexual misconduct to University officials. A bystander acting in good faith or a reporting individual acting in good faith who discloses any incident of sexual misconduct to University officials or law enforcement will not be subject to the University's Code

of Conduct for violations of alcohol and/or drug use policies occurring at or near the time of the commission of the sexual misconduct.

## D. Advisors

In any investigatory or disciplinary proceeding and any related meeting held under this policy, the complainant and respondent have the right to choose and consult with an advisor. The advisor may be any person who is not otherwise a party or witness involved in the investigation. The parties may be accompanied by their respective advisors (at the party's own expense if the advisor is a paid advisor) at any meeting or proceeding related to the investigation and resolution of a complaint under this Policy. Advisors cannot actively participate or speak on behalf of the complainant or respondent.  The choice of whether or not to invite an advisor is solely that of the complainant and respondent.  If any advisor's conduct is not consistent with these guidelines, he or she may be excluded from the process. The University reserves the right to have its own legal counsel present during the adjudication process.

Any faculty member who is accused of sexual misconduct will be advised that he/she may be accompanied by a union representative to any interviews in connection with the subject matter of the complaint in accordance with the procedures outlined in the University's Collective Bargaining Agreement.

## E. Requests for Confidentiality

After a report of sexual misconduct has been made to the University, a Complainant may request that the matter be investigated without revealing his/her identity or that the University not investigate the complaint.

The Title IX Coordinator, or a designee, will weigh the Complainant's request for confidentiality or not to investigate against the University's obligation to provide a safe, non-discriminatory environment for the University community and decide whether the request can be honored. Some, but not all, of the factors that are reviewed when assessing a complainant's request for confidentiality or not to pursue the investigation, include:

- whether there have been other sexual misconduct complaints about the same respondent;

- whether the respondent has a history of arrests or records from a prior school indicating a history of violence;
- whether the incident represents escalation and unlawful conduct on behalf of the respondent from previously noted behavior;
- whether there is an increased risk that the respondent will commit additional acts of violence;
- whether the sexual misconduct was committed by multiple perpetrators;
- whether the complainant's report reveals a pattern of perpetration (e.g., via illicit use of drugs or alcohol) at a given location or by a particular group;
- whether the alleged sexual misconduct was perpetrated with a weapon;
- the age of the complainant;
- the seriousness of the offense;
- whether the University has other means to obtain relevant evidence (e.g., security cameras or personal, physical evidence).

If, after considering these factors, the Title IX Coordinator or designee, determines that the University may honor the request for confidentiality or not to investigate, the Title IX Coordinator or designee will notify the Complainant of the decision and that, when confidentiality has been requested, the University's ability to meaningfully investigate the allegations and pursue disciplinary action may be limited.  A decision to maintain confidentiality of the Complainant's identity does not mean that confidentiality can be absolutely guaranteed in all circumstances, but only that all efforts will be undertaken to keep the complainant's identity confidential.  Ultimately, the University retains the right to act upon any information that comes to its attention.

In all cases, the University will take appropriate steps to mitigate the effects of sexual misconduct, prevent its recurrence, and provide ongoing assistance and support, including where appropriate, any interim remedies as set forth in Section VII, D of this Policy.

The University will also consider broader remedial action, such as increased monitoring and/or security at locations where the reported sexual misconduct occurred, increasing training, education and prevention efforts, and conducting climate surveys.

^ Back to top

# VII. Process for Investigating and Resolving Complaints of Sexual Misconduct

The University will take all available steps to promptly, thoroughly, and impartially investigate and address complaints of sexual misconduct by and against its students, employees and third parties (including visitors and community members),, in order to stop prohibited conduct, prevent its recurrence and address any effects on campus.

## A. Evidentiary Standard

The evidentiary standard in determining the facts will be based upon a preponderance of the evidence, i.e., a finding that it is more likely than not that the alleged sexual misconduct occurred or did not occur.

## B. Initial Assessment

Once a complaint or notice of any allegation of sexual misconduct is received, the Title IX Coordinator, or a designee, will make an initial assessment of the reported information and respond to any immediate health or safety concerns raised by the report, including interim remedies.

The Title IX Coordinator, or a designee, will provide the complainant with a general understanding of this Policy and the process for responding to complaints of sexual misconduct. The complainant will be provided with a written explanation of all available resources and options (e.g., reporting to appropriate law enforcement agencies; referrals for medical treatment at local hospitals and trauma centers) and the opportunity to discuss those resources and options.   The complainant will also be advised of the right to an advisor of his or her choice to accompany him or her to all meetings in relation to these Procedures.

The Title IX Coordinator, or a designee, will also explain the University's prohibition against retaliation and that the University will prompt action in response to any act of retaliation. (See Section VIII for a complete explanation of this Policy's prohibition of Retaliation),.

## C. Preliminary Investigation

An investigator will conduct a preliminary investigation and the Title IX Coordinator, or a designee, will assess whether this Policy or the Student Code of Conduct may have been violated. If the Title IX Coordinator, or a designee, determines that this Policy or the Code of Conduct may have been violated, the Title IX Coordinator, or a designee, will notify the respondent in writing that a complaint has been filed and provide the factual allegations concerning the alleged violation, and possible sanctions.

The Title IX Coordinator, or a designee, will schedule a meeting with the respondent, within a reasonable amount of time, and ensure the respondent is provided with a written explanation of all available resources and options, and is offered the opportunity to meet to discuss those resources and options.

Upon the preliminary investigation, the Title IX Coordinator, or a designee, may determine that an effective remedy designed to prevent recurrence and address the effects on the complainant and community can be implemented. Such remedies include, but are not limited to: No Contact Orders; separating the parties; placing limitations on the parties; adjusting work schedules; adjusting student housing or living arrangements; or reasonable academic adjustments. Where the respondent is not a member of the University Community, the matter may be referred to law enforcement, and to the extent the identity of the third party is known, the University's Department of Public Safety will issue a "No Trespass" letter to the third party denying access to the University's buildings or grounds for acting in a manner that disrupts or disturbs the normal educational functions of the institution.

## D. Interim Remedies

The University offers a wide range of interim remedies for students and employees designed to stop the alleged sexual misconduct, and/or to protect the safety and wellbeing of the individuals involved and the University Community. Interim remedies may be temporary or permanent and are available regardless of whether a complainant chooses to report the crime to law enforcement or pursues a complaint or investigation under this Policy. Such remedies include, but are not limited to: adjustments to housing or living arrangements or academic or University work schedules; transportation assistance including security escorts; issuing No Contact Orders and No Trespass Orders; and interim suspension and suspension from employment (with or without pay).

Requests for interim remedies in connection with an incident of sexual misconduct should be made to the University's Title IX Coordinator, or a designee. The University will grant such interim remedies, provided they are reasonable and available. The Title IX Coordinator, or a designee, may also initiate interim remedies to immediately respond to a situation.

The Title IX Coordinator may impose a "No Contact Order," which typically will include a directive that the parties refrain from having contact with one another, directly or indirectly, including personal contact, e-mail, telephone, text message, social media, or by means of a third party.

Both the complainant and respondent may request a prompt review, reasonable under the circumstances, of the need for and terms of a No Contact Order, interim suspension or other interim remedies. Such a request may be made in writing to the Title IX Coordinator, providing the basis for that request and any evidence to support the request. Upon receipt of such a request, the Title IX Coordinator will inform the other party of the request and allow the other party to respond, including the submission of evidence if desired. The Title IX Coordinator, or a designee, will determine within a reasonable time frame, but generally no later than one calendar week from when the request was made (including the parties' submission of any evidence), whether there will be any modification.

An individual who wishes to report a violation of a No Contact Order can contact the Title IX Coordinator. If the complainant and the respondent observe each other in a public place, it shall be the responsibility of the respondent to leave the area immediately. Any individual who violates a No Contact Order is subject to disciplinary action.

## E. Time Frame for Investigation and Resolution

While the time to resolve a reported incident will vary from case to case, depending on the specific facts and circumstances, it is expected that in most cases complaints will be resolved within 60 days. If the process will take longer than 60 days, both the complainant and the respondent will be notified.

## F. Notice of Outcome

Both the Complainant and Respondent will receive simultaneous written notice of the outcome to the extent permitted by law.

## G. Possible Sanctions

### For Employees

Possible sanctions for employees can include, but are not limited to, a letter of reprimand, a warning letter, demotion, suspension or termination from the University, or other appropriate sanctions.

### For Students

Possible sanctions for students can include, but are not limited to, a formal warning, housing probation, University premises restriction, suspension or expulsion from the University's housing, student life probation, University disciplinary probation and suspension or expulsion from the University. For a complete listing of the possible sanctions for a violation of the Code of Conduct, refer to: https://www.stjohns.edu/life-st-johns/student-conduct/student-conduct-process

If the University concludes that the respondent is responsible for a violation of this policy, based on a preponderance of the evidence, both the complainant and respondent shall have the opportunity to submit a written impact statement to the decision-maker prior to a determination of an appropriate sanction(s). In making a determination regarding sanctions, the decision-maker may consider the parties' impact statements, if any, and may also consult with the Title IX Coordinator and other appropriate University officials. The respondent's disciplinary history, including, but not limited to, past findings of domestic violence, dating violence, stalking or sexual assault, may be considered for purposes of determining an appropriate sanction.

For those crimes of violence that the University is required by federal law to include in its Annual Security Report, the transcripts of students found responsible after a hearing and appeal, if any, shall include the following notation:

- Suspended after a finding of responsibility for a code of conduct violation;
- Expelled after a finding of responsibility for a code of conduct violation; or
- Withdrew with conduct charges pending.

Transcript notations for suspensions may be removed at the discretion of the University; but no earlier than one (1) year after the conclusion of the suspension. Transcript notations for expulsion shall not be removed.

## H. Appeals

If either the complainant or the respondent is a student, he or she may appeal the decision.

## I. Adjudication

The University has distinct procedures for the investigation and resolution of:

- Complaints against students (Student Code of Conduct);
- Complaints against faculty (Investigation and Resolution as set forth below, and applicable University procedures as provided in the Collective Bargaining Agreement and University Statutes in taking any disciplinary action);
- Complaints against staff and administrators (as set forth below).

Any community member may make a complaint pursuant to these policies. The applicable procedure for remedying a complaint depends on whether the accused is a student, member of the faculty, or staff or administrator. For instance, a complaint brought by a faculty member against a student would be processed pursuant to the Student Code of Conduct; a complaint by a student against an administrator would be processed pursuant to this Policy; and a complaint by an administrator against a faculty member would be investigated in accordance with this Policy and the resolution process outlined in the University Statutes; and so on.

In cases where the person accused of sexual misconduct is neither a student nor an employee of the University, the University's ability to take responsive action is extremely limited. However, the University shall take all appropriate steps within its control to ensure a safe and nondiscriminatory campus community such as restricting the visitor's access to campus, and/or referring the matter to local law enforcement for legal action, where appropriate.

^ Back to top

# VIII. Adjudication of Complaints Against Faculty, Administrators and Staff

## A. Process for Investigation and Resolution

Within fourteen (14) days after receipt of a complaint, the Title IX Coordinator or designee will assign a specially trained investigator (or team of investigators) to investigate the complaint unless the complainant has requested that the University refrain from such an investigation and the University has determined that it may do so. The nature and extent of the investigation will vary based on the specific circumstances of the incident. While the complainant is not required to provide a written statement regarding the complaint, such a written statement or other written materials related to the complaint will be reviewed, if made available to the investigator(s).

Whenever possible, and as appropriate, the investigator(s) will interview the complainant, respondent and any witnesses. The investigator(s) will gather any pertinent evidence. The investigator(s) will not interview any witnesses for the sole purpose of obtaining character information. At the conclusion of the investigation, the investigator(s) will prepare a written report detailing the relevant content from the interviews and any documentary evidence gathered.

The procedures for Investigation will comply with the following:

- Timely notice of meetings will be provided to the parties, and both parties are entitled to the same opportunities to have an advisor of his/her choice present during any meeting, investigation or disciplinary proceeding.
- Throughout the investigation, the complainant and the respondent will have an equal opportunity to present relevant witnesses and other evidence,
- The investigator(s) will direct the complainant, respondent, witnesses and other interested individuals to preserve any relevant evidence.
- Participants in an investigation shall be advised to refrain from discussing the matter during the pendency of the investigation in order to protect the privacy of the individuals involved and to maintain the integrity of the investigation.
- Information related to or concerning the romantic or sexual history of either the complainant or the respondent will not be considered except from either the complainant or respondent regarding their shared sexual history. If

- either offers such information, the other will have the right to respond.
- At any stage of the investigation, the investigator(s) may consult with the Office of General Counsel or other University officials, as appropriate.
- Any University officials involved will not have a conflict of interest or bias for or against any party.
- Investigations will be conducted by administrators who receive annual training on the issues related to sexual misconduct.
- Both the complainant and the respondent will be simultaneously informed, in writing of: a) the outcome of any investigation that arises from an allegation of sexual misconduct; and b) if either the complainant or the respondent is a student, the University's procedures for the complainant and respondent to appeal the findings.

At the conclusion of the investigation, the investigator(s) makes a determination of the facts and a recommendation for resolution, including possible disciplinary sanctions, to the Associate Vice President of Human Resources, or designee, as to whether, based upon careful review of all the information collected during the investigation, the respondent more likely than not engaged in sexual misconduct. The Associate Vice President, along with the Title IX Coordinator and/or her designee, shall determine whether or not the respondent is responsible for sexual misconduct in violation of this policy. Any employee who, upon investigation, has been found to have violated this policy, will be subject to disciplinary action including, but not limited to: letter of reprimand or warning; probation; suspension (with or without pay); termination; or other discipline or resolution deemed appropriate based on the circumstances and severity of the findings of fact. The University will follow applicable University procedures, including those provided in the Collective Bargaining Agreement and University Statutes, in taking any disciplinary action.

^ Back to top

## IX. Prohibition on Retaliation

- The University prohibits retaliation against any person who reports sexual misconduct or participates in the investigation of any allegation of sexual misconduct, including participating as a witness. Prohibited retaliation

may include taking adverse action or treatment that leads to a negative impact on an individual's employment or educational experience.

- Any member of the University community or third party who attempts either directly or indirectly to intimidate, threaten, retaliate, interfere with, restrain, coerce, discriminate against, violate a University No Contact Order, or harass any person for reporting, attempting to report, or responsibly pursuing a complaint, or is a witness cooperating in a University investigation regarding possible violations of any of the University's policies regarding sexual misconduct, will be subject to prompt and appropriate disciplinary action, including possible termination or expulsion from the University.

- Retaliation should be reported promptly to the University's Title IX Coordinator. Reports of retaliation will be investigated, and such conduct may result in disciplinary action independent of the sanction(s) or interim remedies imposed in response to the underlying allegations of sexual misconduct.

^ Back to top

# X. Prevention and Awareness Education Programs

Creating a safe and respectful environment is the responsibility of all members of the community. To promote and maintain this environment, the University engages in comprehensive educational programming to prevent sexual misconduct. The University provides primary prevention and awareness programs for all incoming students and employees, and ongoing prevention and awareness campaigns for all students and employees.

The University educates the student community about sexual misconduct through its mandatory new student orientation program that includes an online learning component and interactive peer theater and ongoing programming initiatives throughout the students' time at the University. Such programming and courses provide students with information about safety and security procedures, the University's procedures for responding to reports of sexual misconduct, options for safe and positive bystander intervention, and information on risk reduction to recognize warning signs of abusive behavior and how to avoid potential attacks. Public awareness events, such as "Take Back the Night" candlelight vigils or other forums in which students disclose incidents of sexual violence, are not considered notice to the University of sexual misconduct for purposes of triggering its obligation to investigate any particular incident(s). Such events may, however, inform the need for further campus-wide education and

prevention efforts, and the University will provide information about an individual's Title IX rights at these events. For additional information about the University's sexual misconduct prevention and awareness programming, please contact the University's Title IX Coordinator.

˄ Back to top

## XI. Clery Act Compliance

The University is required to include for statistical reporting purposes the occurrence of certain incidents in its Annual Security Report (ASR). Names of individuals involved in incidents are not reported or disclosed in the ASR. In the case of an emergency or ongoing dangerous situation, the University will issue a timely warning to the campus. In such circumstances, the name of the alleged perpetrator may be disclosed to the community, but the name of the Complainant will not be disclosed. The University's ASR is publicly available and posted to the St. John's University website, via a link on the Public Safety webpage.

˄ Back to top

## XII. Policy Compliance

Questions regarding Title IX, the Campus SaVE Act and/or Article 129-B of the New York State Education Law may be referred to the University's Title IX Coordinator, or a designee. Questions regarding Title IX may also be referred to the U.S. Department of Education's Office for Civil Rights. OCR may be contacted at 400 Maryland Avenue, SW, Washington, DC 20202-1100 or (800) 421-3481.



*St. John's University, New York*
*Human Resources Policy Manual*

**Contact Us**

Admission: 718-990-2000

8000 Utopia Parkway, Queens, NY 11439

© 2020 St. John's University. All rights reserved.

St. John's University

# EXHIBIT 2

St. John's Memes on Twitter: ↑   |was allowed to stay abroad after raping me with no travel restrictions. Only got half a semest…

 **St. John's Memes** @vincentianteens · Jan 4
#SurvivingSJU : a thread

💬 8      ⟳ 68      ♡1

 **St. John's Memes**
@vincentianteens                                           Follow

"|_____ was allowed to stay abroad after raping me with no travel restrictions. Only got half a semester suspension"

## PICTURE
## OMITTED

3:44 PM - 4 Jan 2019

**11** Retweets  **34** Likes

   

# EXHIBIT 3

**The Torch** • January 8, 2019 • https://www.torchonline.com/news/2019/01/08/university-to-investigate-sexual-misconduct-claims-that-students-raised-on-survivingsju/

# University To Investigate Sexual Misconduct Claims That Students Raised on #SurvivingSJU

## Student Government Inc., Spectrum, NAACP and BSU among organizations that have voiced their support of fellow students who came forward

Derrell Bouknight, News Editor

St. John's University is in the process of contacting students who posted accusations of sexual misconduct amid a flurry of social media posts last Friday, according to University spokesperson Brian Browne.

In a statement to the Torch, Browne addressed the hashtag #SurvivingSJU on Twitter – which was trending on Friday – and added that they will investigate all claims.

"The University has made direct and individual outreach to any student who raised concerns through social media about conduct covered by University policies, and the University will investigate all claims," Browne said.



TORCH PHOTO/RACHEL JOHNSON

St. John's University came in at No. 406 in the Wall Street Journal's recent list of top 500 colleges in the United States.

More than 2,000 tweets surfaced on Friday, Jan. 4 with most of them detailing alleged experiences of different forms of sexual misconduct that have taken place in St. John's – either personal or of other accounts from members of the St. John's community.

The Torch is not referencing any specific claim or identifying anyone who posted because the accusations are of a sensitive nature and are not immediately substantiated.

Some students also wrote about negative encounters they had with University administrators when they attempted to report their incidents. As a result, many called for changes to protocol and the way in which the school handles accusations.

"We recognize the use of social media as a forum for individuals to express opinions," Browne said. "However, the most effective method for raising concerns about violations of University policies is through established University reporting procedures."

The string of tweets began after the premiere of "Surviving R. Kelly," a six-part Lifetime documentary series that detailed the allegations of sexual misconduct and abuse by prominent R&B singer-songwriter R. Kelly.

In response to the claims, several campus organizations, including Student Government Inc. (SGI), posted statements on Twitter in support of students.

"We stand with the individuals of the St. John's community who are affected by this crisis," said SGI president Atemkeng Tazi in a statement from SGI that was published on Monday, Jan. 7. "We want to make it very clear that SGI does not support, nor does SGI condone acts of sexual misconduct, sexual harassment, sexual assault, rape, and/or any other form of sexual acts without consent."

The statement from SGI also included a link to an anonymous survey created by Students of Consciousness, the NAACP chapter at St. John's and the Black Student Union. The survey says it will evaluate "the effectiveness of campus resources for sexual violence."

"As a Vincentian, Global, Catholic and Metropolitan institution that prides itself on promoting truth, love, respect, opportunity, excellence and service, our university cannot claim to hold these values while disrespecting survivors by burying their truths and failing to provide adequate support through accommodations," the NAACP said in its statement.

Spectrum, a student group that strives to "strengthen, foster, and affirm" an inclusive and welcoming campus environment, released its own statement also standing with those who shared their stories.

"St. John's CANNOT [sic] continue to disrespect survivors – especially those who are Black, LGBTQ+, and/or belong to other marginalized communities – by sweeping these cases under the rug," the statement said. "These students are the most vulnerable and continuously face oppression every day."

Spectrum also mentioned that list of demands that they outlined and shared in the fall, many of which focus on reforming Title IX and advocating for changes to the way it handles situations such as these.

Browne said that the University is reviewing Spectrum's demands under the requirement of New York State pertaining to New York Education Law Article 129-B – which Browne called the "most aggressive law in the nation to protect students from sexual assault" – and Federal Law as it relates to Title IX, as well as St. John's own policies.

In 2017, the New York State Office of Campus Safety released a report detailing an audit of all 244 colleges and universities in New York State that assessed their compliance with Article 129-B. The report recognized St. John's University as one of only 95 schools in the state to be fully compliant with the law, according to Browne.

Browne added that a key component to protecting students from sexual assault is promoting resources available both on and off campus through posters, events and social media. Part of this is the "Sexual violence Outreach, Awareness, and Response" (SOAR) Office, which is responsible for hosting the annual Take Back the Night and Turn Off the Violence Week events.

"At St. John's University, the health, safety, and well-being of every student are of the utmost importance," he said. "Our work is ongoing and must include the active participation and support of our students and all members of the St. John's family."

For students who have experienced any kind of sexual assault and want another avenue of reporting the incident, visit stjohns.callistocampus.org. More information on the website can be found in last year's Torch article on the University's partnership with Callisto, which is an online sexual assault reporting system that offers a survivor-centered and trauma-informed process for reporting and documenting sexual assault.

# EXHIBIT 4

# Memo



## ST. JOHN'S
## UNIVERSITY™

| | | |
|---|---|---|
| Date: | JANUARY, 7TH 2019 | **Office of Student Conduct**<br>Division of Student Affairs |
| To: | | |
| | | Tel.  (718) 990-6878<br>Fax  (718) 990-7905 |
| Cc: | Jack Flynn,<br>Joshua Rich,<br>Eric Finklestein | Bent Hall, Garden Level |

Subject:    NO CONTACT ORDER

You are restricted from having any contact with ████████ ██████ until otherwise instructed by the Office of Student Conduct. Examples of unauthorized contact include, but are not limited to: phone calls, written or electronic correspondence, personal visits or messages sent through social networking sites. This restriction applies to both on- and off-campus interactions, as well as contact initiated by a third party on your behalf or at your request. You are prohibited from speaking with this person at any time and you must make accommodation in your academic and social pursuits to avoid being in the same room with this person.

The primary purpose of this order is to mandate civil conduct between the involved parties. For example, entering a common area or classroom/study space where this person is present should not be considered a violation of this order.) Intentional contact with the above person(s) must be reported to the Director of Student Conduct immediately.

Please note that failure to comply with these directives will be considered a potential violation of the Student Code of Conduct regarding Compliance with the Student Conduct Process. This may result in your temporary suspension from St. John's University until the conclusion of the student conduct process.

If you have any questions or concerns regarding this matter, please contact the Director of Student Conduct, Mr. Jack Flynn at 718-990-5036 or at flynnj@stjohns.edu.

# EXHIBIT 5

**Pete Eikenberry**

| | |
|---|---|
| **From:** | Larry Cunningham <cunninl1@stjohns.edu> |
| **Sent:** | Tuesday, January 8, 2019 11:31 AM |
| **To:** | Jack Flynn; Jackie Lochrie; Peter Eikenberry; ██████████ |
| **Cc:** | Joshua Hurwit |
| **Subject:** | ██████████ - final decision on appeal |
| **Attachments:** | ████████ final decision.pdf |

Good morning:

Attached is the final decision of the University Conduct Appeals Board in the matter of ████████ This concludes the appeal and the University Conduct Appeal Board's role in the matter.

Sincerely,

**Larry Cunningham**
Associate Dean for Assessment & Institutional Effectiveness
Director, Center for Trial and Appellate Advocacy
Professor of Legal Writing
St. John's University School of Law
(718) 990-7616 | Bio | Publications | Twitter
Law School Assessment Blog
New York Criminal Law and Procedure Blog

This email may contain proprietary, confidential and/or privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

ST. JOHN'S UNIVERSITY
UNIVERSITY CONDUCT APPEALS BOARD

| | |
|---|---|
| In the matter of <br><br> ██████████ <br><br> Respondent. | ) <br> ) <br> ) <br> )   ID # 93137863 <br> ) <br> ) <br> ) |

Before:    Larry Cunningham, Chair
           Mary Pelkowski[1]
           Frank Peluso[2]

<u>Final Decision</u>

After a University Conduct Board hearing, Respondent was found in violation of one provision of the St. John's Code of Student Conduct. Among other sanctions, a one-semester suspension was imposed. Through counsel, he filed a timely appeal, which is now before us. On December 10, 2018, we issued an interim decision requesting additional information from Dean Jackie Lochrie and providing Respondent an opportunity to file a supplementary submission, which he did. For the reasons set forth below, the decisions of the University Conduct Board (adjudicating Respondent in violation of the Code of Student Conduct) and the Student Conduct Administrator (imposing sanctions) are affirmed in all respects.

I.

In the Spring of 2018, Respondent, an undergraduate student, was studying abroad at St. John's Paris Campus. As relevant to this appeal, Respondent was accused of "non-consensual sexual contact" with a female student during the early morning hours of April 13, 2018 in her dorm room.[3] The Student Conduct Administrator, Jack Flynn, described the allegation as follows: "At approximately 6:30 AM, the Complainant reported that she awoke to find the Respondent in her bed without permission or knowledge of how he got there. The Complainant stated that the Respondent was laying in the bed and touching her breasts and that she could feel his erect penis touching her back" (Notice, Sep. 14, 2018, p. 2).

The matter proceeded to a University Conduct Board hearing. The Board found the Respondent to have violated the Code of Student Conduct provision relating to non-consensual sexual contact but found him not in violation of other charges. The Board's rationale was: "The respondent admitted in engaging in physical contact of a sexual nature with the complainant, and the evidence demonstrated a lack of affirmative consent to engage in such contact. Such

---

[1] Associate Dean for Student Engagement.
[2] Assistant Director of Academic Support for Student-Athletes.
[3] Respondent was also accused of several other violations relating to the same complainant, but he was found in violation only as to this charge. Therefore, the other charges will not be discussed in this decision.

evidence included the complainant's intoxication, as described by multiple witnesses, and the respondent's assertion, which was not disputed, that he was not impaired by alcohol" (Decision Letter, Oct. 15, 2018, p. 2).

Following the Board's decision, the Student Conduct Administrator imposed the following sanctions: (1) disciplinary probation, (2) restriction from participating in further global studies programs, (3) trespass from all University-managed living properties and prohibition from being present on the grounds of the Resident Village, and (4) a one-semester suspension (Fall 2018) (Decision Letter, Oct. 15, 2018, pp. 1-2). A timely appeal followed.

II.

St. John's Code of Student Conduct is an outgrowth of its educational mission and its core values. The process is designed to promote a healthy learning environment and human dignity and potential. The Code sets forth numerous types of prohibited conduct and a procedure for adjudicating violations. *See* Student Conduct (https://www.stjohns.edu/student-life/student-conduct).

When an incident report is filed against a student, a Student Conduct Administrator meets with the accused student in what is known as a "behavioral hearing." At the hearing, the student can review what happened, respond to the charges, and discuss the circumstances of the alleged violation. *See* Student Conduct Process § iv ("Behavioral Hearings").[4] If a student is charged with sexual misconduct or similar allegations, the matter must then be referred to the University Conduct Board. *See id.* § iv(C). The Board makes findings of facts with respect to the allegations. *See* Student Conduct Process § v(B) ("University and Student Conduct Board Hearings").

A respondent has a right to appeal a finding of violation; in Title IX matters, a complainant has a similar right. *See* Student Conduct Process § vi ("Appeals of University and Student Conduct Hearings"). Appeals from the University Conduct Board go before the University Conduct Appeal Board, which may reverse or modify a decision only if "the student has submitted or presented information that indicates an omission in the Student Conduct Process that may have affected the final outcome of the board's decision" or "there is new evidence which did not exist at the time of the hearing that would have a bearing on the Board's original findings." *See id.* § vi(C). The appealing student has the burden of proof. *See id.* § vi(F). If the decision being appealed is upheld, the matter is considered concluded. *See id.*

III.

Respondent argues that there were three omissions in the Student Conduct Process that may have affected the final outcome of the decision and, thus, warrant reversal or modification: (1) he was denied an opportunity to present a written impact statement before sanctions were imposed, (2) the sanctions were not appropriate, and (3) he was denied his right to present witnesses at the University Conduct Board hearing (Appeal, pp. 2-3).

---

[4] The Student Conduct Process is found here: https://www.stjohns.edu/student-life/student-conduct/student-conduct-process.

A.   <u>Written Impact Statement</u>

*First,* Respondent argues that the "Conduct Board mandated sanctions simultaneously with the finding of his misconduct" and, therefore, he did not have the opportunity to submit a written impact statement (Appeal, p. 2). Respondent's argument is premised on application of Section VII(G) of University Policy 703. *See* https://www.stjohns.edu/about/administrative-offices/human-resources/hr-policy-manual/policy-703-sexual-misconduct-policy-and-procedures. Generally stated, Policy 703 sets forth the University's policies to implement Title IX of the Education Amendments of 1972, the Clery Act, and other state and federal laws. *See id.* As such, it is not part of the Code of Student Conduct or its processes. As explained by Dean Lochrie in her response to our interim decision, the Code of Student Conduct provides that only a complainant in a Title IX-related student conduct matter has a right to present a written impact statement. *See* Student Conduct Process § vii(A) ("University Sanctions) ("The complainant may provide an impact statement to the Dean of Students or designee when there is a finding of responsibility regarding an allegation of violence, including but not limited to domestic violence, dating violence, stalking or sexual assault. This statement may be provided while the Dean of Students or designee is deliberating on appropriate sanctions.").

Therefore, as an initial matter, we conclude that any purported violation of Policy 703 would not constitute a ground for appeal. Apart from claims of new evidence, our jurisdiction is limited to determining whether there was "an omission in the *Student Conduct Process*" (emphasis added). To the extent that Respondent claims that Policy 703 was not followed, his argument is beyond our purview.

As an alternative ruling, we also find that Respondent has not met his burden of showing a procedural error that may have affected the outcome. He mistakenly states in his appeal that the University Conduct Board "mandated sanctions simultaneously with the finding of his misconduct" (Appeal, p. 2). To the contrary, when a matter is referred to the University Conduct Board, it is for the purpose of that body making a determination whether a violation of the Code of Student Conduct occurred. If so, the matter is referred back to the Office of Student Conduct for the imposition of sanctions. *See* Student Conduct Process § v(B) ("University and Student Conduct Board Hearings") ("The purpose of the hearing is to make findings of fact with respect to the matter before the panel"); Student Conduct Process § vii(A) ("University Sanctions") ("The sanctions listed below are imposed by the Office of Student Conduct to hold students accountable for conduct violations."). There is no evidence that Respondent attempted to submit a written impact statement before the Student Conduct Administrator imposed sanctions. The hearing was on October 3, but the Student Conduct Administrator issued a letter detailing sanctions on October 15. There was, thus, ample time for Respondent to submit whatever impact statement he wished. Although the Respondent may not have known of the Board's decision, he had admitted to the physical touching at issue here and, thus, should have expected a sanction of some kind.

In any event, Respondent has not carried his burden of showing that the failure to consider a written impact statement may have impacted the result. Respondent asserts that his impact statement would have presented his "sterling academic record," lack of disciplinary history, an A he received on a proposal for a police/youth program to reduce gang influence, and volunteering he has done during his suspension with a nonprofit organization (Appeal, p. 4). We find that none of these would have impacted the sanctions imposed by the Student Conduct

3

Administrator.  Respondent was found to have violated a serious provision of the Code of Student Administrator by engaging in non-consensual sexual contact with another person.  Under the circumstances, a one-semester suspension and related sanctions were generous.  His academic history and police/youth program proposal, while commendable, do not excuse his behavior towards the complainant.  Further, his lack of disciplinary history was known to the Student Conduct Administrator.  Finally, his volunteer work, while also laudatory, appears to have begun after his suspension and, thus, would not have had a bearing on the sanctions imposed for his conduct.

      B.    <u>Sanction</u>

*Second,* Respondent challenges the appropriateness of the sanctions imposed.  To the contrary, we find that the sanctions were fair and appropriate under the circumstances.  The evidence before the University Conduct Board showed that Respondent, while sober, engaged in physical conduct of a sexual nature with the complainant, who was intoxicated, but that he lacked affirmative consent to do so.  Such behavior is inconsistent with that expected of St. John's students and demonstrated a lack of respect for the complainant and her rights.  A separation from the University was, at a minimum, reasonable under the circumstances.  Given that this behavior occurred abroad in St. John's housing, restrictions from further Global Studies programming and campus housing and related property were both appropriate.

      C.    <u>Right to Call Witnesses</u>

*Third,* Respondent contends that he was denied his right to call witnesses at the University Conduct Board hearing.  He references a "rul[ing]" from Dean Jackie Lochrie, the deputy Title IX officer assigned to the matter, to this effect.  He attaches affidavits from himself and his attorney.  Dean Lochrie, in response to a question from this Board, explained that she met with the Respondent and his lawyer on September 28, 2018.[5]  She provided the following account of what transpired:

> During the meeting on 9/28/18, with his lawyer, Mr. Almeida noted that several witnesses had chosen not to respond to the investigator's inquiries. At one point, he pulled out his cell phone, and suggested that he would connect me to those witnesses directly. However, I was not the investigator assigned to this matter and it was not appropriate for me to conduct interviews with witnesses. I did not discuss the concept of calling witnesses at the University Conduct Board hearing itself with Mr. Almeida.

> I was not present at the Conduct Board hearing and cannot speak to the question of whether Mr. Almeida was advised regarding calling witnesses by the Chair.

(Response from Dean Lochrie).  Respondent's attorney, however, affirmed:

> While in Dean Lochrie's office, the issue of the hearing procedure was discussed. I was informed that I would not be able to ask any questions of any kind at the hearing or participate in any meaningful way. I was informed that the panel members would be utilizing the investigation report for the hearing and only Byron and the complainant

---

[5] This was the second meeting Dean Lochrie had with the Respondent.  The previous one occurred on August 21, 2018, at which time Respondent and his mother were present.  Respondent read the incident report at that time.

would be permitted to participate.  I was further informed that while Byron and the complainant would be permitted to participate, the panel members would be the only people permitted to ask questions of the complainant and Byron, but both Byron and the complainant would be permitted to write questions down that they wanted the panel members to ask.  At no point in time was I informed that witnesses could be called on his behalf.

(Affirmation of Lance Meyer, Esq.).

We credit Dean Lochrie's explanation of the conversation for several reasons. *First*, Respondent was provided with written notice of his rights by the Student Conduct Administrator, Jack Flynn, in his letters of September 5 and 14, 2018.  The letters included links to the Code of Student Conduct and its processes.  Several sections clearly set forth a respondent's right to present witnesses at a University Conduct Board hearing. *See, e.g.*, Student Conduct Process § v(D) ("Witnesses"); General Provision § E ("Rights of St. John's Students Participating in the Student Conduct Process") (https://www.stjohns.edu/student-life/student-conduct/code-conduct/general-provision).  Therefore, it is inconceivable to us that Dean Lochrie, an experienced student affairs administrator, would say something so inconsistent with the Code or its procedures.  To the contrary, we credit her specific account of what transpired: that she told Respondent he could not phone (i.e. "call") witnesses during their meeting on September 28. *Second*, there is no evidence in the record that the Respondent attempted to present witnesses at the hearing itself but was denied that right.  Dean Lochrie was meeting with the Respondent and his attorney in her capacity as deputy Title IX officer, which is a role separate and apart from the Student Conduct Process.  She had no authority to bind the Chair of the University Conduct Board, who is designated under the Code with conducting the hearing in a fair and orderly manner.  Respondent does not allege, let alone establish, that the Chair denied him an opportunity to present witnesses. *Third*, Respondent does not state what witnesses he would have called at the hearing; as such, he is not able to sustain his burden of showing that the failure to call the witnesses would have had an impact on the decision. *Fourth*, Respondent's own attorney's affirmation undermines his factual argument that Dean Lochrie stated that he would be unable to call witnesses.  The key is the last sentence, in which Respondent's counsel writes, "At no point in time was I informed that witnesses could be called on his behalf" (Affirmation of Lance Meyer, Esq.).  This is a far cry from an assertion that Dean Lochrie affirmatively stated that witnesses could not be called.  As noted above, Respondent was on notice of his rights. Nothing about the rest of the conversation, as related by Respondent's attorney, was inconsistent with the Code of Student Conduct or its processes.  Advisors are, indeed, not permitted to be active participants in a University Conduct Board hearing. *See* University and Student Conduct Board Hearings § C ("Advisors").  It was also correct that only the panel members would ask questions but that both parties could submit written questions to the panel. *See* University and Student Conduct Board Hearings § F ("Procedure").

5

IV.

       Accordingly, the decisions of the University Conduct Board, dated October 3, 2018, and the Student Conduct Administrator, dated October 15, 2018, are AFFIRMED in all respects. This constitutes the final decision on appeal, and the matter is now closed.  All concur.

                            For the University Conduct Appeals Board:

Dated: January 8, 2019
       Queens, NY

                            LARRY CUNNINGHAM, Chair
                            Associate Dean for Assessment
                               and Institutional Effectiveness
                            Professor of Legal Writing
                            School of Law

# EXHIBIT 6



## ST. JOHN'S UNIVERSITY

**Office of Student Conduct**
St. John's University

Tel. (718) 990-6878
Bent Hall, Garden Level
Student Affairs Suite
www./stjohns.edu/studentconduct

January 8, 2019



Sent electronically to ███████████████

**PERSONAL AND CONFIDENTIAL**

███████

Mr ███████████

This document will serve as a formal notification that you are immediately suspended from St. John's University, pending the results of a non-academic disciplinary investigation. The suspension stems from an incident you were involved in on January 5, 2019. Suspension from the university means that you are not permitted to be in class, participate in any St. John's University-sponsored programs or events or be on any St. John's University property.

In order to address this matter, you are directed to contact me at (718) 990-5036 in order to schedule an appointment for us to meet as soon as possible.

Regards,

Jack Flynn
Director of Student Conduct

CC:   Jackie Lochrie, Acting Dean of Students
      Denise Vencak, Executive Director, Public Safety
      Joanne Llerandi, University Registrar

# EXHIBIT 7



**ST. JOHN'S UNIVERSITY**™

**Office of the Title IX Coordinator**
St. John's University

Tel. (718) 990-2660
University Center
Human Resources Suite

January 8, 2019



Sent electronically to

**PERSONAL AND CONFIDENTIAL**

Mr.

As we discussed on the phone, today, the University is beginning an investigation into an incident in which you were named as being involved. As such, you will be notified by Mr. John Breheny, the investigator assigned to this case. In addition, you have the right to the following:

•Academic and/or housing accommodations.
•Counseling support through the Center for Counseling and Consultation and/or Campus Ministry.
•Participate in the University investigation/hearing processes.
•Right to an advisor of your choice at any time during the process.
•Right to appeal the outcome determination.

**Understand that retaliation, in any form, is not tolerated.**

I advise you to review the following St. John's University websites for all the information you may need.

Student Bill of Rights
Student Wellness Resources
SJU Sexual Misconduct Policy

You may contact me with any questions.

Sincerely,

Jackie Lochrie
Acting Dean of Students, Associate Dean for Student Services, Deputy Title IX Coordinator

CC:   John Breheny, Director, Public Safety

# EXHIBIT 8



## ST. JOHN'S UNIVERSITY

**Office of the Dean of Students**
St. John's University

Tel. (718) 990-6568
Fax  (718) 990-2767
Bent Hall, G023
Garden Level

January 8, 2019

████████████
Sent electronically to ██████████████

**PERSONAL AND CONFIDENTIAL**

████████████

Mr. ████████

You are indefinitely restricted from having any contact with ████████. Examples of unauthorized contact include, but are not limited to: phone calls, written or electronic correspondence, personal visits or messages sent through social networking sites. This restriction applies to both on- and off-campus interactions, as well as contact initiated by a third party on your behalf or at your request. You are prohibited from speaking with this person at any time and you must make accommodation in your academic and social pursuits to avoid being in the same room with this person.

The primary purpose of this order is to mandate civil conduct between the involved parties. For example, entering a common area or classroom/study space where this person is present should not be considered a violation of this order.) Intentional contact with the above person(s) must be reported to the Director of Student Conduct immediately.

Please note that failure to comply with these directives may be considered a violation of the Student Code of Conduct and may result in your temporary suspension from St. John's University.

If you have any questions or concerns regarding this matter, please contact the Director of Student Conduct, Jack Flynn, directly at (718) 990-5036 or flynnj@stjohns.edu.

Sincerely,



Jackie Lochrie
Acting Dean of Students, Associate Dean for Student Services, Deputy Title IX Coordinator

# EXHIBIT 9

**Peter G. Eikenberry**
52 Duane Street, 5th Flr
New York, New York 10007
TEL: (212) 385 1050
FAX: (212) 385 1017
CELL: (917) 596 4168
Pete@eikenberrylaw.com

January 7, 2019

By Email
Joshua S. Hurwit, Esq.
Associate General Counsel
8000 Utopia Parkway
Queens, New York 11439

████████ St. John's

Dear Mr. Hurwit:

I am attorney for ████ ████████ Thank you for speaking with me today. I have forwarded a tweet- apparently from ████████████ As a result of the tweet, ████████ has received a calls and messages from someone threatening to "fuck up" ████████

I ask for University action to protect ████████ from a violation of policy and false allegations.

Very truly yours,

PGEikenberry

# EXHIBIT 10



# ST. JOHN'S
## UNIVERSITY

EQUAL OPPORTUNITY & COMPLIANCE
OFFICE OF HUMAN RESOURCES

TEL.:   718-990-1865
FAX:   718-990-2311

January 16, 2019

<u>VIA EMAIL</u>


@stjohns.edu

Dear Mr. ████████

   Thank you for bringing to the University's attention the tweet that was recently posted about you.  Although the University cannot sanction the individual who posted the tweet because we cannot confirm their identity, we recognize that it has deeply affected you and other students in the St. John's University community.  Attached is the University's "You are Not Alone" guide, which contains a wealth of on and off campus resources to support you.

   If you have any concerns about your safety or well-being, please contact John Breheny in Public Safety at (718) 990-6915 or brehenyj@stjohns.edu.  Please also feel free to contact me at (718) 990-2660 or wongk1@stjohns.edu if you have any additional information or questions.

         Sincerely,

         Keaton Wong
         Director of Equal Opportunity,
         Compliance and Title IX

# EXHIBIT 11



# TABLE OF CONTENTS

St. John's University does not tolerate any incidents of sexual assault, dating violence, intimate partner violence or stalking, and wants to support you. We are proud that you have reached out to take care of yourself.  It takes a lot of courage to share your experiences, and you have taken the necessary first step. This document will share with you available resources to further support your healing.

 In this document you will find helpful information regarding:

02   PREFACE

04   EMERGENCY MEDICAL ASSISTANCE

09   COUNSELING AND SUPPORT

18   REPORTING OPTIONS AT-A-GLANCE

21   STUDENTS' BILL OF RIGHTS

23   INTERIM REMEDIES

25   REPORTING OPTIONS

31   LEGAL ORDERS OF PROTECTION AND
     TEMPORARY RESTRAINING ORDERS

# PREFACE

St. John's University is committed to supporting survivors of sexual violence, dating violence, domestic violence, and/or stalking by providing the necessary safety and support services so that students can remain at St. John's University, meet academic standards, obtain necessary health/mental health treatment, and maintain social relationships. This document is written for survivors of sexual misconduct, including sexual assault, stalking, and relationship violence, to provide support as well as important information about prohibited conduct, available resources on and off campus, and ways to file a complaint in order to assist survivors in the recovery process and in their efforts to heal from this unacceptable form of violence. If you have survived sexual misconduct or know someone who has, please be assured that there are people who care about what you have endured.

You are not alone in what happened to you, or in how you feel, no matter what form your experience took.  It is important for you to know that the feelings, reactions, and questions you may be experiencing are similar to those of other people who have been victimized through no fault of their own.  Sexual misconduct is never the fault of the victim.  You are not to blame for what another person has done to you.  You, as others have, can learn to regain a sense of power over your life.  You may feel very isolated and alone, but there are resources and support available and people ready and able to help you.

While the needs and issues of different populations on campus may be unique, the resources, support and procedures apply to all students. Whether you are an undergraduate student, a graduate student, a woman or man, identify as LGBTQ or cisgender or straight, you receive the same dedicated support and services at St. John's University.  Emotional support, counseling, advisement regarding your options, medical treatment, and academic assistance are all available.  Please review this document as the first step in understanding how St. John's University can support you.  If you have questions about this document please ask them of any of the support resources listed.

You have the right to make a report to Public Safety, the local law enforcement and state police or choose not to report; to report the incident to St. John's University; to be protected by the University from retaliation for reporting an incident; and to receive assistance and resources from the University.

# EMERGENCY MEDICAL ASSISTANCE

The first step in taking care of yourself is making sure you are physically well. Even if you do not have any visible physical injuries following an incident of any form of sexual assault, dating violence, intimate partner violence and/or stalking, there may be physical injuries that you cannot see. Medical and health centers can provide additional services such as testing for sexually transmitted diseases, evidence collection, and/or counseling. New York State has a network of hospitals with Sexual Assault Forensic Examiner (SAFE) Programs. SAFE Programs have specially trained health professionals who provide medical care to patients who report sexual assault, including evaluation, treatment, referral and follow-up. Trained advocates may also be available to provide you with additional support and to guide you through the experience at the hospital.

Since evidence dissipates quickly, you may wish to preserve evidence and are encouraged to seek medical attention within 48 hours (and no more than 96 hours) of the incident. Preservation of evidence is important for possible use in legal actions or requests for civil no-contact orders and/or orders of protection. If you choose to preserve evidence, it is important that you do not bathe, douche, brush your teeth or comb your hair.



Also, the clothes you were wearing may be held as evidence, so it is recommended that you bring a change of clothes with you to the hospital.  Additionally, photographs may be taken of you, including anywhere there are bruises, scrapes or cuts.  If you are unsure about participating in criminal prosecution, having the evidence preserved will help keep your options open. Taking the step to gather evidence immediately will not commit you to a specific course of action; you do not have to make a police report.

If you would like to receive medical care, you may call 911, call Public Safety at 1-718-990-5252, or visit one of the hospitals with SAFE programs listed on the next page. The University offers free transportation to and from a hospital for a SAFE examination.

## SAFE PROGRAMS - NEW YORK HOSPITALS

# QUEENS

NYC Health &
Hospitals / Elmhurst
79-01 Broadway
Elmhurst, New York 11373
**1-718-334-4000**

NYC Health &
Hospitals / Queens
82-68 164th Street
Jamaica, New York 11432
**1-718-883-3000**

# BROOKLYN

NYC Health &
Hospitals / Coney Island
2601 Ocean Parkway
Brooklyn, New York 11235
**1-718-616-3000**

NYC Health &
Hospitals / Kings County
451 Clarkson Avenue
Brooklyn, New York 11203
**718-245-3131**

NYC Health &
Hospitals / Woodhull
760 Broadway
Brooklyn, New York 11206
**718-963-8000**

# BRONX

NYC Health &
Hospitals / Jacobi
1400 Pelham Parkway South
Bronx, New York 10461
**718-918-5000**

NYC Health &
Hospitals / North Central Bronx
3424 Kossuth Avenue
Bronx, New York 10467
**718-519-5000**

NYC Health &
Hospitals / Lincoln
234 East 149th Street
Bronx, New York 10451
**718-579-5000**

**6**

# MANHATTAN

Mount Sinai Medical Center
1 Gustave L. Levy Place
New York, NY 10029
**1-212-241-7005**

New York-Presbyterian
Medical Center - Weill Cornell
525 East 68th Street
New York, NY
**1-212-746-5454**

New York-Presbyterian
Hospital – The Allen Pavilion
5141 Broadway
New York, NY 10034
**1-212-932-4000**

NYC Health &
Hospitals / Harlem
506 Lenox Avenue
New York, NY 10037
**1-212-939-1000**

New York-Presbyterian /
Columbia University Medical Center
622 West 168th Street
New York, NY 10032
**212-305-9060**

Mount Sinai-St. Luke's Hospital
1111 Amsterdam Avenue
New York, NY 10025
**1-212-523-4000**

Mount Sinai-Beth Israel Hospital
1st Avenue at 16th Street
New York, NY 10016
**1-212-562-4141**

NYC Health &
Hospitals / Metropolitan
1901 First Avenue
New York, NY 10029
**1-212-423-6262**

SAFE PROGRAMS - NEW YORK HOSPITALS

# SUFFOLK COUNTY

Good Samaritan Hospital
Medical Center
1000 Montauk Highway
West Islip, NY 11795
**1-631-376-3000**

# NASSAU COUNTY

Nassau University
Medical Center
2201 Hempstead Turnpike
East Meadow, NY 11554
**1-516-572-0123**

North Shore University Hospital
300 Community Drive
Manhasset, NY 11030
**1-516-562-0100**

# STATEN ISLAND

Richmond University Medical Center
355 Bard Avenue
Staten Island, NY 10310
**1-718-818-1234**

**8**

# COUNSELING AND SUPPORT

Experiencing sexual assault, dating violence, intimate partner violence and/or stalking may bring up many different types of feelings that can be painful, confusing, and/or overwhelming. Obtaining support from family and friends can be very beneficial to your healing. In addition, enlisting support from a professional who is specially trained in working with survivors of sexual assault can also be helpful for recovery.

Often survivors may experience acute stress that may include a range of difficulties such as nightmares, flashbacks, numbness, and withdrawal from family and friends. In addition, survivors may sometimes blame themselves, feel upset about the reactions of their friends and/or family, feel ashamed and/or angry about what happened. These responses can make it difficult for some survivors to manage these feelings alone. Many survivors find comfort in sharing their story in a supportive and confidential environment. It is also possible to learn new coping skills and facilitate returning to activities that you find meaningful and important. You have a number of options if you would like to receive support. Both on and off campus resources are available to all survivors.

# ON-CAMPUS RESOURCES

## CENTER FOR COUNSELING AND CONSULTATION (CCC)

The Center for Counseling and Consultation (CCC) has mental health professionals available to provide support and assistance. Services at the CCC are free and confidential.

**Queens Campus**

Marillac Hall Room 130
**1-718-990-6384**

**Staten Island Campus**

Spellman Hall Room 101
**1-718-390-4451**

## CAMPUS SUPPORT ADVISOR (CSA)

The Campus Support Advisor is a trained SJU Administrator who serves as a confidential resource to survivors.  The CSA will provide information on SJU procedures, discuss all remedies available to you, and facilitate referrals for other needs you might have.

**All Campuses**
**1-718-990-8484**

**10**

## ON-CAMPUS RESOURCES

### CAMPUS MINISTRY

Campus ministers are available for spiritual support and follow-up referrals.

**Queens Campus**

Marillac Hall Room 239
**1-718-990-6255**

**Staten Island Campus**

Notre Dame House
**1-718-390-4475**

---

### STUDENT HEALTH SERVICES

Student Health Services also has staff available to provide medical assistance and support. Services are free and confidential.

**Queens Campus**

DaSilva Hall First Floor
**1-718-990-6360**

**Staten Island Campus**

Campus Center Room B-17
**1-718-390-4447**

# OFF-CAMPUS RESOURCES

## 24 HOUR FREE AND CONFIDENTIAL HOTLINES

### New York State Sexual Assault and Domestic Violence Hotline

Provides crisis intervention, shelter services, and referrals
**English: 1-800-942-6906**
**Spanish: 1-800-942-6908**

---

### New York City Domestic Violence Hotline

**1-800-621-HOPE (4673)**

---

### LifeNet

Provides multilingual helpline for crisis intervention, mobile crisis team, and mental health referrals
**English: 1-800-LIFENET**
**Spanish: 1-877-AYUDESE**
**Mandarin/Cantonese/Korean: 1-877-990-8585**

---

### National Suicide Prevention Hotline
**1-800-273-8255**

### National Sexual Assault Hotline
**1-800-656-HOPE (4673)**

### Safe Horizon Rape and Sexual Assault Hotline
**1-212-227-3000**

### Safe Horizon Domestic Violence Hotline
**1-800-621-4673**

### LGBTQ and HIV-affected victims Anti-Violence Project
**1-212-714-1141**

### Coalition Against Domestic Violence Hotline
**1-800-779-SAFE (7233)**

# QUEENS

### Sexual Assault and Violence Intervention Program (SAVI) at Elmhurst Hospital

SAVI provides free & confidential support services for female and male victims of rape, sexual assault, domestic violence and relationship abuse.

**1-718-334-1418**

### Safe Horizon

Safe Horizon's community program offers crisis intervention, case management, practical/emergency assistance, information and referrals, individual counseling, support groups, advocacy, and community/public education presentations.

**1-212-227-3000**

### Queens Rape Counseling Center

Not-for-profit center providing individuals (ages 4+) who are victims of sexual assault, domestic violence, and/or other trauma with outpatient psychotherapy, play/art therapy, and group counseling.

**1-718-263-2013**

### Turning Point

Turning Point is a community based, nonprofit organization addressing the needs of Muslim women and children. Culturally and religiously sensitive staff provide free and confidential counseling, advocacy, and referral services for women and children affected by domestic violence.

**1-718-886-9500 | www.tpny.org**

### WomanKind

Womankind helps women and their children overcome domestic violence and other forms of abuse by empowering them to govern their own lives. Womankind provides a safe haven through multi-lingual support programs and shelter services.

**1-888-888-7702**

**13**

OFF-CAMPUS RESOURCES

# BROOKLYN

### New York City Children's Centers (NYCCC):
### NYCCC Brooklyn Behavioral Health Clinic
The BHC provides services to youth ages 5-21 that have exhibited mental health and/or behavioral challenges. The BHC also provides services to children and adolescents who have committed sexual crimes.
**1-718-613-3055**
**1-718-613-3056**

### CAMBA: Rape Crisis Services
CAMBA's Rape Crisis Services & Hotline (RCS) helps victim survivors of rape and sexual assault and their families residing in Brooklyn. RCS offers services including accompanying victim survivors and family members to hospitals and/or police precincts (if requested) and to mental health counseling facilities.
**1-800-310-2449 | www.camba.org**

### Coney Island Hospital - Rape Crisis Program
Public hospital-based program offering counseling and medical services to victims of rape and sexual abuse who enter through Coney Island Hospital's ER.
**1-718-616-4209**

### Wyckoff Heights Medical Center - Rape Crisis Program
WHMC serves clients who are primary or secondary victims of domestic violence, sexual assault/rape or other crime. All services are free and confidential regardless of sex, gender expression or immigration status.
**1-718-906-3846**

# MANHATTAN

### Bellevue Hospital Center: Adult Survivors Of Rape And Sexual Assault Counseling Program
This is an outpatient clinic for adult (18+) survivors of rape or sexual assault that offers free individual counseling.
**1-212-562-3755**

### Beth Israel Medical Center: Rape Crisis & Domestic Violence Intervention
Program also offers long and short-term counseling with social workers who have many years of experience working with trauma survivors and groups for survivors that meet periodically.
**1-212-420-4516**

### Harlem Hospital: Center For Victim Support
Services include crisis counseling, advocacy, therapy, support groups, and information (referrals).
**1-212-939-4613**

### Mount Sinai Medical Center: Adolescent Victims Program
An outpatient comprehensive mental and medical health service for adolescent survivors (ages 10-21) of sexual abuse and their family members.
**1-212-423-2900**

### Mount Sinai Medical Center: Mt. Sinai SAVI: Survivors Of Rape
This is part of the SAVI Rape Crisis program of Mt. Sinai Hospital. Offers individual counseling and groups sometimes.
**1-212-423-2140**

OFF-CAMPUS RESOURCES

# MANHATTAN

### New York Presbyterian Hospital Domestic and Other Violent Emergencies (DOVE) Program

The DOVE Program provides free crisis intervention as well as short and long term individual and family counseling, and support groups.

**1-212-305-9060 | www.nyp.org/dove/**

### Safe Horizon: Rape Crisis Center

Provide short-term crisis counseling and advocacy for crime and trauma survivors. Advocacy includes entitlements assistance and assistance within the criminal justice system.

**1-855-234-1042 | www.safehorizon.org**

### Violence Intervention Program (VIP) Inc.

This organization specializes and focuses on Latina victims of domestic violence who are in need of culturally sensitive services to free themselves from their abusive relationships.

**1-800-664-5880**

### Gay and Lesbian Anti-Violence Project

AVP empowers lesbian, gay, bisexual, transgender, queer, and HIV-affected communities and allies to end all forms of violence through organizing and education, and supports survivors through counseling and advocacy.

**1-212-714-1141 | www.avp.org**

### New York City Alliance Against Sexual Assault

The Alliance Helpline for advocacy, referrals, and confidential counseling, Monday through Friday from

**9AM to 5PM: 212-514-SAFE(7233) or email us at survivorsupport@vfreenyc.org**

**16**

**OFF-CAMPUS RESOURCES**

# BRONX

### Fordham-Tremont Community Mental Health Center
### Family Crisis Services/Crime Victim Assistance Program
Not-for-profit mental health center that provides trauma survivors with therapeutic counseling, case management, crisis intervention, and psychiatric care.
**1-718-960-0300**

### North Central Bronx Hospital:
### Sexual Assault Treatment Program
This is a 24 hour service that provides help to those who have been recently raped or sexually assaulted and reside in Bronx.
**1-718-519-2121**

### Jacobi Medical Center–Family Advocacy Center
The Family Advocacy Center is dedicated to the identification, assessment and treatment of children and adolescents who have been sexually abused or physically abused and/or neglected.
**1-718-918-4184 | www.familyadvocacy.net**

# NASSAU COUNTY

### Nassau County Coalition Against Domestic Violence, Inc.
### at the Safe Center
The Safe Center offers a broad spectrum of services from counseling to housing, from advocacy to referrals, etc. through a highly trained, compassionate staff of professionals qualified to provide the highest level of services to enhance the recovery of trauma victims and their non-offending family members.
**1-516-542-0404 | www.tscli.org**

**17**

**I have been a victim of sexual harassment, sexual assault, dating violence, domestic violence, or stalking.**

# ST. JOHN'S UNIVERSITY

# WHAT ARE MY OPTIONS?

*Student survivors, witnesses, and bystanders who report, in good faith, any incident of sexual assault, domestic violence, dating violence, or stalking, will NOT be charged with an alcohol or drug violation of the Student Code of Conduct.*

## CONFIDENTIAL OPTIONS

**The Center for Counseling and Consultation**
Queens Campus
718-990-6384
Staten Island Campus
718-390-4451

**Campus Support Advisor**
718-990-8484

**Want to learn more about University resources?**
Please visit stjohns.edu/titleix.

**Off-campus resources:**
**Sexual Assault Violence Intervention (SAVI) Program**
212-423-2140

**Womankind**
888-888-7702



Choose to report to local law enforcement.

Choose to be connected with a **campus support advisor**. These are trained and confidential St. John's administrators who will offer support.

## NONCONFIDENTIAL REPORTING OPTIONS

**Local Law Enforcement**
In an EMERGENCY, or to file a report, please contact local law enforcement at 911. SJU global campuses call 112.

**SJU Employee**
(Faculty, Staff, or Administrator)
If you decide to tell any St. John's staff, administrator, or faculty member (except for confidential services*), they are required to notify Public Safety.

**Public Safety**
Queens
718-990-5252
Staten Island
718-390-4487
Available 24/7

**Title IX Coordinator**
718-990-2660 or
titleix@stjohns.edu

### Activates Campus Response

*The Title IX coordinator leads the University response, which may include a University investigation by Public Safety or Title IX investigators. The Title IX coordinator or designee will inform you of your rights and options.*

Interim remedies may be taken, including
• A no-contact order
• Classroom and housing adjustments
• Access to on- and off-campus support services

*The Title IX coordinator or designee will conduct a thorough investigation of the incident. The Office of Student Conduct will review all relevant information and determine if the matter should go through the student conduct process.*

## YOU ALWAYS HAVE A RIGHT TO

**Choose to either participate** in the Title IX and student conduct investigation, or not. You may decide to no longer participate at any time.

Request specific **remedies** including
• Adjustments to class schedule
• Room change requests
• Adjustments to your work schedule
• Transportation assistance
• Support for reporting to local law enforcement

**Additional Reporting Resource**
stjohns.callistocampus.org

## HAVE A CONCERN OR COMPLAINT?

Concerns or complaints regarding the University's response may be filed with the St. John's Title IX Coordinator, at 718-990-2660 or titleix@stjohns.edu.
stjohns.edu/sexualassault

OFF-CAMPUS RESOURCES

# SUFFOLK COUNTY

### Victims Information Bureau of Suffolk (VIBS)
### Family Violence and Rape Crisis Center
VIBS provides hotline intervention, counseling, advocacy, court accompaniment, outreach, and community education.
**1-631-360-3606 | www.vibs.org**

### The Retreat – Domestic Violence Services
Services include a residential shelter, a 24/7 domestic violence crisis hotline, individual and group counseling, legal advocacy, and a violence prevention education program taught in local area schools. All services are provided free of charge.
**1-631-329-2200 | www.theretreatinc.org**

# STATEN ISLAND

### Safe Horizon Community Programs
Safe Horizon's Community Programs offer crisis intervention, case management, practical/emergency assistance, information and referrals, individual counseling, support groups, advocacy, and community/public education presentations.
**1-718-720-2591 | www.safehorizon.org**

### Seamen's Society for Children and Families: Safe Passage Program
Safe Passage is a non-residential domestic violence intervention program on Staten Island. Services include crisis intervention, counseling, advocacy, legal services and parent/child support groups.
**1-718-447-7740 | www.seamenssociety.org**

**20**

# STUDENTS' BILL OF RIGHTS

In compliance with NYS Law 129-B addressing sexual assault, dating violence, domestic violence, and stalking, St. John's University students have the following rights:

1. Make a report to local law enforcement and/or NY State Police

2. Have disclosures of domestic violence, dating violence, stalking, and sexual assault treated seriously

3. Make a decision about whether or not to disclose a crime or violation and participate in the judicial or conduct process and/ or criminal justice process free from pressure by the University

4. Participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard

5. Be treated with dignity and receive from the University courteous, fair, and respectful health care and counseling services, where available

6. Be free from any suggestion that the reporting individual is at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violations

7. Describe the incident to as few University representatives as practicable and not be required to unnecessarily repeat a description of the incident

## STUDENTS' BILL OF RIGHTS

8   Be protected from retaliation by the University, any student, the accused and/or the respondent, and/or their friends, family, and acquaintances within the jurisdiction of the University

9   Access to at least one level of appeal of a determination

10   Be accompanied by an advisor of choice who may assist and advise a reporting individual, accused, or respondent through the conduct process including during all meetings and hearings related to such process

11   Exercise civil rights and practice of religion without interference by the investigative, criminal justice, or judicial or conduct process of the University

Find out more about the resources available at St. John's University as well as details on how to make a report by visiting: **st.johns.edu/sexualassault.**

22

# INTERIM REMEDIES

The following interim remedies are available to all students who are
victims of sexual assault, dating violence, domestic violence and/or
stalking regardless if he or she chooses to file a report or discloses
the incident confidentially to members of the Center for Counseling
and Consultation, Health Services, or Campus Support Advisor:

Adjustments to class schedule, course load,
postponed exams/assignments

Excused absences, immediate withdrawal, options
for independent study

University housing/room change requests

Adjustments to your campus work schedule

Transportation assistance including security escorts

Rearranging dining and study schedules

Support for reporting to local law enforcement

Referral to Health Services, Counseling Services

Access to Community Resources

**23**

## INTERIM REMEDIES

Students that report an incident to any mandated reporter (Public Safety, Employee or Faculty member) may also receive the following Interim Remedies:

### No Contact Order

A University document restricting either party from having any contact with each other until the conclusion of the Student Conduct process.  Examples of unauthorized contact include, but are not limited to: phone calls, written or electronic correspondence, personal visits or messages sent through social networking sites.  This restriction applies to both on and off campus interactions, as well as contact initiated by a third party on your behalf or at your request.

### Protection From Retaliation

Retaliation for reporting any allegations of student misconduct is in itself a violation of the Student Code of Conduct.

### Guidance through the University Conduct Process

### Limited access to specific University housing when the accused presents a continuing threat to the health and safety of the community or the complainant

### Interim suspension of the accused when he/she presents a continuing threat to the health and safety of the community or the complainant

24

# REPORTING OPTIONS

You have the right to make a report to Public Safety, local law enforcement and State Police or choose not to report; to report the incident to St. John's University; to be protected by the University from retaliation for reporting an incident; and to receive assistance and resources from the University.

As an international student, you have the same rights as all students to report and to receive support and resources for sexual violence, dating violence, domestic violence and/or stalking regardless of your immigration or visa status.  The University will not retaliate against you or treat you differently.  Furthermore, as an international student, you may obtain additional support and information about your immigration or visa status, including options for U and T visas, through the International Students and Scholars Office at 718-990-6083.

You also have the right to file a report with Human Resources if the accused is an employee and to have an employee confidentially assist you with filing that report.

## REPORTING OPTIONS

### Faculty, Staff, and Administrators

If you share an incident of sexual violence, dating violence, domestic violence, and/or stalking with a St. John's employee (excluding members of the Center for Counseling and Consultation, Health Services and the Campus Support Advisors working in their respective capacities), they are required by University policy to report this information to Public Safety and/or the Title IX Coordinator. Reports made to a St. John's administrator or faculty will trigger a University response which may involve an investigation by Public Safety and/or the Title IX Coordinator.

### Title IX Coordinator

Reports of sexual violence can also be made to St. John's Title IX Coordinator. Keaton Wong, Director of Employee Relations, Compliance and Title IX, serves as the Title IX Coordinator for overall campus compliance for the University. The Title IX Coordinator's office is located on the Queens campus in the Office of Human Resources in the University Center. The Title IX Coordinator can be contacted by phone, **718-990-2600**.

**Jackie Lochrie**, Associate Dean for Student Services, serves as the Title IX Deputy Coordinator for the Division of Student Affairs. Ms. Lochrie's office is located on the Queens campus in Bent Hall, and she can be contacted at **1-718-990-6568**.

**Kathleen F. Meehan**, Associate Vice President for Athletics, serves as the Title IX Deputy Coordinator for Athletics. Ms. Meehan's office is located on the Queens campus in Carnesecca Arena, and she can be contacted at **1-718-990-6173**.

## REPORTING OPTIONS

### When Should I Contact a Title IX Coordinator?

If you have concerns about sex discrimination including sexual harassment, sexual violence, or misconduct please seek the assistance of a Title IX Coordinator. For example, we encourage you to contact a Title IX Coordinator if you:

> Think you may have encountered sex discrimination or sexual misconduct and wish to understand your options

> Learn of a situation that you feel may warrant a University investigation

> Need help on how to handle a situation by which you are indirectly affected

> Seek guidance on possible methods of de-escalating or alleviating a difficult situation

> Have questions on St. John's policies and procedures

### St. John's Department of Public Safety

St. John's Department of Public Safety is available 24 hours a day, 7 days a week at **1-718-990-5252**. Public Safety Officers are available to assist you with contacting or reporting an incident to local law enforcement and/or to the local District Attorney's Office. You also have a right to decline to report incidents to law enforcement. Reports made to Public Safety will trigger a University response which may involve an investigation by Public Safety and/or the Title IX Coordinator. There may be times when the Department of Public Safety or another administrator may contact local law enforcement regarding the nature of an alleged incident, however, it is always your decision whether or not to cooperate with any law enforcement investigation.

## REPORTING OPTIONS

### St. John's University – Disciplinary Actions

When an allegation of dating violence, domestic violence, sexual assault or stalking is reported to a non-confdential university official, the report will be forwarded to the Department of Public Safety.  The Title IX Coordinator will lead the university response and coordinate an investigation into this allegation.  This investigation may include Public Safety or Title IX investigators.  As a result of the investigation, this allegation may be forwarded to the Office of Student Conduct.  In addition, the Title IX Coordinator or designee will take action to remediate and address the allegation. The investigation will be conducted by officials who, at a minimum, receive annual training on the issues related to dating violence, domestic violence, sexual assault and stalking and who do not have a conflict of interest or bias for or against the complainant or the accused, and is prompt, fair and impartial to all students involved. Investigations shall be completed within 60 days, although an investigation may be extended for good cause.  The complainant and the accused are both permitted to participate in the investigation.  They are also able to have an advisor of their choice present during any institutional disciplinary proceeding.  Both the victim and the accused will be notified in writing, simultaneously, of the results of a disciplinary proceeding, procedure to appeal the results, any change to the result and when the results become final.  The University uses a preponderance of the evidence standard to reach conclusions. i.e., whether the evidence demonstrates that it is more likely than not that the conduct occurred.

### Reporting Incidents to Law Enforcement

To report incidents of sexual assault, dating violence, domestic violence, and/or stalking or conduct that may constitute a crime while attending St. John's Queens, Staten Island or Manhattan campuses please contact the St. John's University's Department of

## REPORTING OPTIONS

Public Safety, local law enforcement, or the law enforcement agency in the applicable jurisdiction. Please note that St. John's and standards necessary to deem someone in violation of sexual misconduct, are different than those used by the criminal justice system. If you have specific questions about potential violation of criminal law we will assist you with connecting with the NYPD and/or local district attorney's office.

**New York City Police Department**
The New York City Police Department can be reached by calling 911 or one of the following:

The New York Police Department Special Victims Report Line
**1-212-267-RAPE (7273)**

Domestic Violence Unit
**1-212-335-4308**

**Prosecutor's Office**
Queens District Attorney's Office
Special Victims Bureau
**1-718-286-6505**

Manhattan District Attorney's Office
Sex Crimes Unit
**1-212-335-9373**

**29**

## REPORTING OPTIONS

To report criminal actions or emergencies while attending a global site, promptly contact the onsite Resident Director, the Queens campus Department of Public Safety, or local law enforcement personnel by calling 112.

## GLOBAL CAMPUSES

| | | |
|---|---|---|
| **Rome, Italy**<br>**Security Desk**<br>**+39-06-393-84299** | Local Law<br>Enforcement<br>112 | Public Safety (Queens)<br>1-718-990-5252 |
| **Paris, France**<br>**Security Desk**<br>**+33-(0)-1-7745-8901** | Local Law<br>Enforcement<br>112 | Public Safety (Queens)<br>1-718-990-5252 |
| **Seville, Spain**<br>**Assistant Director**<br>**+34-954-235-919** | Local Law<br>Enforcement<br>112 | Public Safety (Queens)<br>1-718-990-5252 |

**30**

# LEGAL ORDERS OF PROTECTION & TEMPORARY RESTRAINING ORDERS

In addition, you might be interested in obtaining an "Order of Protection" or "Temporary Restraining Order." An Order of Protection is a document issued by a public court to limit the behavior of someone who harms or threatens to harm another person. It is used to address various types of safety issues, including, but not limited to, situations involving domestic violence. For example, it can require a person not to assault, threaten, harass or stalk you; it can forbid a person from having any contact with you and/or your family or it can require a person to stay away from your home or the University (where you study, work and live).

Upon request, Public Safety Officers within St. John's Department of Public Safety are available to provide you with assistance in seeking an Order of Protection or a Temporary Restraining Order, but a Public Safety Office cannot request an Order of Protection or Temporary Restraining Order on your behalf.

In New York, Family Courts, Criminal Courts and Supreme Courts can all issue Orders of Protection.

## LEGAL ORDERS OF PROTECTION

### Family Court Order of Protection

This is issued as part of a civil proceeding.  Its purpose is to stop violence within a family, or within an intimate relationship, and provide protection for those individuals affected.

To obtain an order of protection in the Family Court, your relationship to the other person must fall into one of the following categories:

> ### Current or former spouse
>
> ### Someone with whom you have a child in common
>
> ### A family member to whom you are related by blood or marriage
>
> ### Someone with whom you have or have had an "intimate relationship."  An intimate relationship does not have to be a sexual relationship.  A relationship may be considered intimate depending on factors such as how often you see each other, or how long you have known each other.  (After a petition is filed, the court will decide if it is an intimate relationship).

To start a proceeding in Family Court, you need to file a form called a Family Offense Petition.  You can contact the Family Court in your county for help completing and filing the petition.

### Criminal Court Order of Protection

A criminal court order of protection may only be issued against a person who has been charged with a crime.  There does not need to be a relationship between the complaining witness and the defendant.

**32**

## LEGAL ORDERS OF PROTECTION

### Supreme Court Order of Protection

This can only be issued as part of an ongoing divorce proceeding. If you have an ongoing divorce case and would like to request an order of protection, you may do so by making a written request by Motion or Order to Show Cause; or you may make an oral request at a court appearance.

In addition, there are many community resources available to assist in matters relating to sexual assault, such as the New York City Alliance Against Sexual Assault on the web at www.svfreenyc.org.

Through contact with the University Resources listed above, members of the University community can get help to identify appropriate resources.

## NOTICE OF NON-DISCRIMINATION AND EQUAL OPPORTUNITY

St. John's University does not discriminate on the basis of race, color, national or ethnic origin, sex (including sexual harassment and sexual violence), gender identity, sexual orientation, disability, religion, age, status in the uniformed services of the United States (including veteran status), marital status, status as a victim of domestic violence, citizenship status, genetic predisposition or carrier status in its programs and activities as required by Title IX of the Educational Amendments of 1972, the Americans with Disabilities Act of 1990 and the Amendments Act, Section 504 of the Rehabilitation Act of 1973, Title VI or Title VII of the Civil Rights Act of 1964, and other applicable statutes and University policies.

# NOTES

# NOTES

# NOTES



ST. JOHN'S
UNIVERSITY

*This project was supported by Grant No. 2014-WA-AX-0002 awarded
by the Office on Violence Against Women, U.S. Department of Justice.
The opinions, findings, conclusions, and recommendations expressed in
this publication/program/exhibition are those of the author(s) and do
not necessarily reflect the views of the Department of Justice, Office on
Violence Against Women.*

# EXHIBIT 12

**PETER G. EIKENBERRY**
75 Maiden Lane, Room 402
New York, New York 10038
CELL: (917) 596 4168
Pete@eikenberrylaw.com

**CONFIDENTIAL**

June 12, 2019

By email
Josh Hurwit, Esq.
Associate General Counsel
St. John's University
8000 Utopia Parkway
Jamaica, New York 11439

█████ **St. John's University**

Dear Josh:

I write as attorney for ████████ (I attach a copy of my cv.) I am puzzled that you have not returned my latest telephone call or email.

As you are informed, Mr. █████ was the subject of a 2018 complaint to the University by ████████ which was adjudicated administratively. On January 4, Ms. ████ tweeted that, "████████.. after raping me … only got half a semester suspension." The tweet was a clear defamation of Mr. █████ She never accused him of rape in connection with the complaint which led to his first suspension. The hearing body found only that 1) Mr. █████ had not drunk, 2) upon her invitation, he put his hand on her fully clothed breast, and, 3) that she had been drinking. There was no finding that she was intoxicated.

After investigation, I have reliable information that the tweet "went viral" at the University with faculty members and students almost universally aware of its content. Since the proceedings resulting in Mr. █████'s suspension were confidential, he may not himself "set the record straight." Upon my advice, he raised his concerns with the University. Yet on January 16, Keaton Wong, its Director of Equal Opportunity, responded that, "The University cannot sanction the individual who posted the tweet because we cannot confirm their identity." However, the evidence is clear and without contradiction that Ms. █████ was the author of the tweet. He is defenseless to avoid repercussions from the tweet since he is bound by University confidentiality rules. Yet Ms. █████ apparently is not since the University took no action against her.

1

As a result of the tweet, Mr. ████████ has been threatened with bodily harm and was punched in the face by a female student. A day after the tweet, Mr. ████████ was accused of sexual misconduct in a second complaint (the "second complaint"). It will be impossible for him to receive a fair hearing regarding the second complaint. At a hearing, the faculty members on the panel will have most probably heard of or reviewed the defamatory allegations of the tweet-- without there having been a contradiction of it by the University. The University is complicit in the tweet's defamation of Mr. ████████, and in the physical attacks he has been threatened with or experienced.

As you may remember, ████████ ████████ is a minority "A" student at the University. His future has been very substantially jeopardized because of a tweet by another student. Her defamatory statements have not been corrected by the University officials who know of their falsity.

I write to demand that the University take such action as shall be appropriate on behalf of Mr. ████████. I also write to request a conference on how the faculty committees are put together and operate in the area of student misconduct.

Thank you for your cooperation. I await your timely response.

Very truly yours,

Peter G. Eikenberry

cc

President Conrado Gempesaw (by mail)

Dean Jackie Lochrie (by email)

Mr. Byron Almeida (by email)

Enclosure

2

# EXHIBIT 13



**ST. JOHN'S UNIVERSITY**

**Joshua S. Hurwit**
Associate General Counsel
(718) 990-5699
hurwitj@stjohns.edu
8000 Utopia Parkway
Queens, New York 11439

July 18, 2019

**BY EMAIL**
Peter G. Eikenberry, Esq.
75 Maiden Lane, Room 402
New York, New York 10038

Re:    ███████

Dear Mr. Eikenberry:

This letter responds to yours dated July 18, 2019.

First, your letter grossly mischaracterizes the substance of our conversation.  I never indicated that St. John's University was in a position to offer ███████ a "deal."  Rather, I explained to you that: (1) if Mr. ██████ withdraws from St. John's University prior to the University Conduct Board hearing now scheduled for August 5, 2019, St. John's University shall note on his transcript that he "withdrew with conduct charges pending"; and (2) if the University Conduct Board finds Mr. ██████ in violation of the Student Code of Conduct, St. John's University shall note on his transcript that he was either "suspended after a finding of responsibility for a code of conduct violation," or "expelled after a finding of responsibility for a code of conduct violation," whichever the case may be.  I provided this explanation to you because it was clear from our conversation that you did not understand the University's disciplinary process or New York Education Law Article 129-B.  I trust that you will familiarize yourself with both before the hearing on August 5, 2019.

Second, your requests regarding the "tweet" are self-serving and inaccurate.  As I have explained to you on multiple occasions, the "tweet" was made anonymously, St. John's University has no evidence whatsoever that ███████ is the author of the "tweet," and there will be no reference to the "tweet" at the University Conduct Board hearing unless your client opens the door.  Mr. ██████ has received, and will continue to receive, a fair and impartial process.

Very truly yours,

*[signature]*

Joshua Hurwit

# EXHIBIT 14

**Pete Eikenberry**

---

**From:** Thomas J. Foley <tom@foleygriffin.com>
**Sent:** Thursday, October 3, 2019 10:09 AM
**To:** Pete Eikenberry
**Cc:** Joshua Hurwit
**Subject:** RE: ███████ St. John's

Good morning Pete. I have cc'd Josh Hurwit from St. John's on my response. I was only the Chair for the conduct board hearing. I do not have a role in this lawsuit. As such, I am not authorized to grant you an extension. Thank you. Tom

**From:** Pete Eikenberry <pete@eikenberrylaw.com>
**Sent:** Wednesday, October 2, 2019 4:37 PM
**To:** Thomas J. Foley <tom@foleygriffin.com>
**Subject:** ███████ St. John's

Hi Tom,

We received the decision from the university board on Mr. ███████'s case. It appears that we have until October 11 to submit an appeal. May we please have an extension to submit the appeal until October 25.

Thanks for your courtesy,

Very truly yours,

**Pete**

75 Maiden Lane, Room 402
NY, NY 10038

pete@eikenberrylaw.com

# EXHIBIT 15



# ST. JOHN'S UNIVERSITY™

**Jack Flynn**
Director of Student Conduct

Tel. (718) 990-5036
Bent Hall, Garden Level, G014
Student Affairs Suite
www./stjohns.edu/studentconduct

October 2, 2019



Sent electronically to ███████████@stjohns.edu

**PERSONAL AND CONFIDENTIAL**

Mr. ████████

The University Conduct Board has completed a review of your alleged infraction(s) of the Student Code of Conduct. The decision on this case is listed below:

**Incident date:** December 15, 2018
**Incident location:** Off campus
**Incident Summary:** The complainant reported to the University that she was sexually assaulted while spending the night at an off-campus private house. The complainant reported falling asleep on the living room couch and awaking to discover the respondent lying behind her on the couch with his hand inside her pants. The complainant reports that the respondent was penetrating her vagina with his fingers and that she did not consent to the activity.

**Alleged violation - Decision**

1. Non-Consensual Sexual Contact -- In Violation
2. Non-Consensual Sexual Penetration -- Not In Violation

After completing the review of this case, the Office of Student Conduct has issued the following sanction(s):

> **Expulsion from University**: You have been expelled from St. John's University effective immediately. Expulsion is a permanent separation from the University and means that you are not allowed to attend class, participate in any University programs or events, or be on University property. You shall not hereafter visit any University owned or managed grounds. Expelled students forfeit any tuition and fees they may have paid and are not permitted to apply to St. John's University for student admission or employment at any time in the future.

All University Conduct Board decisions and associated sanctions remain in place during the period of appeal.

The following rationale has been provided by the hearing board: "The Panel determined, by a preponderance of the evidence, that the Respondent engaged in non-consensual sexual contact with the

Complainant. Evidence supporting the Panel's determination include: (1) key inconsistencies in the Respondent's testimony; (2) the accounts of the Respondent's housemates; and (3) key aspects of Respondent's account of the events lacked credibility, including his testimony that he turned the Complainant's face toward the couch in the event she vomited."

If you wish to appeal this decision, you must contact me by October 11, 2019. Appeals MUST include an explanation of the incident in question and your rationale for appealing. Incomplete appeals will NOT be considered.

Appeals will only be considered based on the following criteria: (1) information that indicates an omission in the Student Conduct procedure occurred that may have affected the final outcome of the decision; or (2) there is new evidence which did not exist at the time of the hearing that would have had a bearing on the original findings.

If you have any other questions pertaining to this matter, please do not hesitate to contact me at flynnj@stjohns.edu.

Regards,

Jack Flynn
Director of Student Conduct

CC:    Jackie Lochrie, Associate Dean/Deputy Title IX Coordinator
       Denise Vencak, Executive Director, Public Safety
       Joanne Llerandi, Registrar

# EXHIBIT 16

**PETER G. EIKENBERRY**
75 Maiden Lane, Suite 402
New York, New York 10038
CELL: (917) 596 4168
Pete@eikenberrylaw.com

October 25, 2019

By email
Ms. Jackie Lochrie
Associate Dean of Students
St. John's University

███████ St. John's

Dear Dean Lochrie:

I hereby submit ████████'s written appeal of the October 2, 2019, decision of the University Conduct Board ("The Conduct Board") and of the University's sanction of expulsion.

**The Board's October 2 findings:**

A) Finding of violation of the Student Code of Conduct

Mr. ██████ was found in violation of one of two alleged violations. The University Conduct Board found Mr. ██████ in violation of "Non-Consensual Sexual Contact." The following rational was provided by the hearing board:

> "The Panel determined, by a preponderance of the evidence, that the Respondent engaged in non-consensual sexual contact with the Complainant. Evidence supporting the Panel's determination include: (1) key inconsistencies in the Respondent's testimony; (2) the accounts of the Respondent's housemates; and (3) key aspects of Respondent's account of the events lacked credibility, including his testimony that he turned the complainant's face toward the couch in the event she vomited."

B) The Sanction

After the board's finding of a violation of Student Conduct, the University sanctioned Mr. ██████ as follows:

> 1. **Expulsion from University**: You have been expelled from St. John's University effective immediately. Expulsion is a permanent separation from the University and means that you are not allowed to attend class, participate in any University programs or events, or be on University property. You shall not hereafter visit any University owned or managed grounds. Expelled students forfeit any tuition and fees they may have paid and are not permitted to apply to St. John's University for student admission or employment at any time in the future.

1

C) Relevant Provisions of the University's "General Provisions," "Student Conduct Process" and "Policy 703"

**1. "General Provisions"**

a. *Section F: Rights of St. John's Students Participating in the Student Conduct Process*

**A Fair and Unbiased Hearing**: Students have the right to have their conduct matter heard by a fair, impartial hearing body.

**Non Discrimination:** Students have the right to be free from discrimination or bias related to their gender… in the conduct process.

b. *Section G: Students Bill of Rights*

All Students have the right to… participate in a process that is fair, impartial, and provides…a meaningful opportunity to be heard.

**2. "Student Conduct Process"**

a. *Behavioral Hearings:*
The behavioral hearing is a meeting with the Student Conduct Administrator where the student may review the incident, respond to the charges and discuss the circumstances… The following are possible outcomes of the behavioral hearing: Not in Violation, In Violation, Referral to Student Conduct Board or University Conduct Board.

b. *University Conduct Board Hearings:*
University Conduct Board: Each University Conduct Board hearing may be conducted before a hearing panel consisting of a minimum of three (3) members of the University Conduct Board. **The Dean of Students or designee [Jack Flynn] shall select the hearing panel from those available for service.**

c. *University and Student Conduct Board Hearings:*
The Chair shall be responsible for conducting the hearing in an orderly and efficient manner and, for that purpose, may make decisions related to admission of evidence and witness testimony. The purpose of the hearing is to make **findings of fact** with respect to the matter before the panel. Student Conduct Board: The Dean of Students [Jack Flynn] shall select the hearing panel…a voting Chair shall be selected from among the members.

d. *General Provisions for Hearings of University Conduct Board:*
A Student Conduct Administrator or Title IX investigator may serve as the complainant or reporting individual. Hearings are…not open to members of the University…

e. *General Provisions for Hearings of University Conduct Board:*
All students shall be given the opportunity to address issues related to potential conflicts of interest regarding the panel members selected for the hearing.

f. *Section G: Deliberation:*

2

Upon conclusion of all testimony the Conduct Board **shall meet in private** to deliberate the matter. The determination of responsibility for violations is decided by a majority vote of the Conduct Board.

h. *Section H: Notification:*
After the hearing and deliberations have been completed, the Chair shall send written notification of the results of the hearing to the Dean of Students or designee [Jack Flynn].

i. *Section I: Hearing Records*
All written records of proceedings are confidential and are property of the University... retained by the Division of Student Affairs.

j. *Section C: Standard for Appeals:*
The student has submitted or presented information that indicates an omission in the Student Conduct Process that may have affected the final outcome of the board's decision.

**3. Policy 703- Sexual Misconduct Policy and Procedures**

a. *Paragraph II: Scope of the Policy*

This Policy applies to all members of the University Community...

This Policy **applies to any allegation of sexual misconduct** that takes place on University property, any other property on which a University-sponsored program or activity takes place. This Policy also **covers conduct that takes place off-campus...**

This **Policy supersedes any other University policy** to the extent that such policy applies to **sexual misconduct.**

This policy...describes the University's procedures for responding to complaints of sexual misconduct, **including** the investigation and **adjudication process.**

b. *Paragraph III: Definitions Within The Policy:*

"**Non-consensual sexual contact**" means any **intentional sexual touching**... with any body part or object by an individual upon another individual without consent.

c. *Paragraph G: Possible Sanctions:*

If the University concludes that the respondent is responsible for a violation of this policy, based on a preponderance of the evidence, both the complainant and **respondent shall have the opportunity to submit a written impact statement** to the decision-maker prior to a determination of an appropriate sanction(s).

D) Grounds for Appeal

**I. Omission #1: St. John's Failed to Provide a Process that was "Fair and Impartial," "Free from Discrimination" as to respondent's "gender in the Conduct Process," and failed to provide a "fair and unbiased" hearing.**

1. *The Facts:*

After a student tweeted that respondent had been suspended for raping her on January 4, a fact known to be false by Jack Flynn and other St. John's officials, complainant filed a complaint against respondent the following day, January 5. Jack Flynn was party to a "no-contact" letter to respondent on January 7. After several major news articles were published, including St. John's student newspaper, "The Torch", reporting tweets criticizing St. John's for allowing "perpetrators" to remain on campus, the following day, January 8, Jack Flynn suspended respondent from the University without explanation. Thus, Jack Flynn's conduct reflected his bias against respondent commencing at least on January 8.

Nevertheless, Jack Flynn selected the members of the University Conduct Board, attended the hearing, and supervised the supposed impartial investigator who prepared the report and gave his opinions to the Board. There was no transparency at any time during the conduct process, *e.g.,* as to what conversations Jack Flynn conducted with the panel members before or after the hearing, or conversations he had with the investigator. Jack Flynn also issued the sanction of expelling the respondent.

Although the Student Conduct Process refers to a "written record" of the proceedings, the lawyer at the hearing retained by the University stated there was no written record; thus, none of the improprieties which may have occurred at the hearing were recorded for use by respondent in his appeal.

For instance, the investigator gave his opinion, "that there was inconsistencies between respondent's reasons from moving from his off campus residence for his convenience when he was leaving to live with his mother miles away." In fact, respondent moved from his off campus residence to his father's home minutes away. Not only was the investigator wrong- it was wrong for him to give his opinion.

**II. Omissions and new evidence in the process relevant to the Conduct Board's finding of non-consensual sexual contact**

a. The Conduct Board found Respondent to have "engaged in non-consensual sexual contact with complainant." However, the Conduct Board did not describe the actual physical contact. Rather, the Board only stated the standard.

b. There was no opportunity for respondent to explore the conflict of interest of the Conduct Board members. Jack Flynn selected the panel members, presumably, discussed the

4

issues with the panel members before and after the hearing and probably discussed the issues with the investigator before the hearing.

     c. At the hearing Jack Flynn was present with the investigator who made the report while St. John's rules provide, "Hearings are to be private and not open to members of the University." Since the investigator made the report, Jack Flynn had no reason to be at the hearing.

     d. The Board did not elect the chair from among their members in violation of the process that required one of the panel members be elected as chair. Subsequent to the meeting, Tom Foley informed respondent's attorney that he was the "chair" (see attached).

### III. Unfair and biased determination of sanction

     Respondent had no "opportunity to submit written impact statement" before he was sanctioned by the Student Conduct Administrator Jack Flynn. He was expelled in the same document notifying him that he was found "in-violation" by the Conduct Board.

Respectfully submitted,

PGEikenberry

cc by email

Mr. ▬▬▬ ▬▬▬

Enclosures

**AFFIDAVIT**

STATE OF NEW YORK    )
                             ) ss.:
COUNTY OF NEW YORK  )

███████ ██████ being duly sworn, says:

    1.     I make this affidavit in support of my appeal of the finding of the October 2,

2019, University Conduct Board, and my appeal of the October 2, 2019, sanction by Jack Flynn

as a representative of the University.

    2.     All of the factual matters stated in the appeal letter of my attorney as to what

occurred in my presence at the University Board Hearing are true as are the facts concerning the

letters I received from Jack Flynn and statements about where I lived after I left off campus

residence.

Sworn to me before this

25th day of October 2019

Notary Public

NEAL B. KATZ
NOTARY PUBLIC - STATE OF NEW YORK
No. 02KA4697726
Qualified in New York County
My Commission Expires March 30, 20__

6

# EXHIBIT 17

ST. JOHN'S UNIVERSITY
UNIVERSITY CONDUCT APPEALS BOARD

| | |
|---|---|
| In the matter of | ) |
| | ) |
| ████████████ | )   ID # 93137863 |
| | )   Incident # 20182464 |
| Respondent. | ) |
| | ) |

Before:     Larry Cunningham, Chair
            Nigel Gretton[1]
            Amber Steiger[2]

To:         Jack Flynn, Assistant Dean of Students and Director of Student Conduct
            Peter Eikenberry, Esq., counsel for Respondent

Final Decision

After a University Conduct Board hearing, Respondent was found to have violated St. John's Code of Student Conduct's prohibition against non-consensual sexual contact. He was expelled. Through counsel, he filed a timely appeal, which is now before us. On November 21, 2019, we issued an interim decision requesting additional information from Dean Jack Flynn and providing Respondent an opportunity to file a supplementary submission. For the reasons set forth below, the decisions of the University Conduct Board (adjudicating Respondent in violation of the Code of Student Conduct) and the Student Conduct Administrator (imposing sanctions) are affirmed in all respects.

I.

Respondent was charged with "non-consensual sexual contact" and "non-consensual sexual penetration" in reference to an incident that occurred on December 15, 2018. After a hearing on September 17, 2019, the University Conduct Board found the Respondent to have violated the Code's provision against non-consensual student contact. The evidence showed that the Respondent digitally penetrated the Complainant's vagina while she was asleep at an off-campus private house (Decision Letter, p. 1). The Complainant did not consent to this contact. The University Conduct Board noted that the following evidence supported its finding: "(1) key inconsistencies in the Respondent's testimony; (2) the accounts of the Respondent's housemates; and (3) key aspects of Respondent's account of the events lacked credibility, including his testimony that he turned the Complainant's face toward the couch in the event she vomited."

---

[1] Director of Performing Arts.
[2] Director of Graduate Admissions.

(Decision Letter, pp. 1-2.)  As the sole sanction, Respondent was expelled from the University (Decision Letter, p. 1).  A timely appeal followed.

Since one of the Respondent's claims on appeal is that the sanction was "[u]nfair and biased" (Appeal, p. 5), we describe here his disciplinary history.  This is the *second* disciplinary proceeding against this same Respondent in a year.  In his previous case, he was found to have also engaged in "non-consensual sexual contact" but against a *different* female student.  That case also involved an unconscious victim.  He received a one semester suspension for that conduct, and the University Conduct Appeals Board[3] affirmed.  The events involved in his second case—the one presently before this Appeals Board—occurred in December 2018, while the Respondent was serving his suspension and his first appeal was being decided.

II.

St. John's Code of Student Conduct is an outgrowth of its educational mission and its core values.  The process is designed to promote a healthy learning environment and human dignity and potential.  The Code sets forth numerous types of prohibited conduct and a procedure for adjudicating violations.

When an incident report is filed against a student, a Student Conduct Administrator meets with the accused student in what is known as a "behavioral hearing."  At the hearing, the student can review what happened, respond to the charges, and discuss the circumstances of the alleged violation.  *See* Student Conduct Process, Behavioral Hearings § A.[4]  If a student is charged with sexual misconduct or similar allegations, the matter must then be referred to the University Conduct Board for a hearing to determine whether the Code was violated.  *See id.* § C.

A respondent has a right to appeal a finding of violation; in Title IX matters, a complainant has a similar right.  *See* Student Conduct Process, Appeals of University and Student Conduct Hearings.  Appeals from the University Conduct Board go before the University Conduct Appeal Board, which may reverse or modify a decision only if "the student has submitted or presented information that indicates an omission in the Student Conduct Process that may have affected the final outcome of the board's decision" or "there is new evidence which did not exist at the time of the hearing that would have a bearing on the Board's original findings."  *See id.* § C.  The appealing student has the burden of proof.  *See id.* § F.  If the decision being appealed is upheld, the matter is considered concluded.  *See id.* § G.

III.

Respondent raises a litany of alleged omissions in the Student Conduct Process.  In general, they can be grouped into three categories of allegations: (1) he did not receive process that was fair, impartial, and free from gender discrimination, (2) the University Conduct Board's

---

[3] The previous appeal was decided by Larry Cunningham, Chair; Mary Pelkowski; and Frank Peluso.  Neither party has requested the Chair's recusal from this matter and, for the reasons stated in his concurring opinion, the Chair has not done so *sua sponte*.
[4] The Student Conduct Process is found online: https://www.stjohns.edu/life-st-johns/student-conduct/student-conduct-process.

hearing did not follow established procedure, and (3) the sanction was unfair and biased (Appeal, pp. 4-5). These claims and their various sub-issues will be addressed in turn.

A.     The Pre-Hearing Process

Respondent argues that the pre-hearing process reflected gender discrimination. In support, Respondent alleges that the Student Conduct Administrator's imposition of an interim suspension reflected the latter's "bias" against him and that the Student Conduct Administrator was seemingly motivated to do so because the University had received negative press after a series of anonymous tweets a few days prior about the University's handling of Respondent's first case. Respondent further alleges that this bias continued when the same Student Conduct Administrator selected the University Conduct Board members, supervised the investigation, gave opinions to the Conduct Board, and later imposed the sanction.

Respondent's claims are unsubstantiated and without merit. He does not offer any evidence that the Student Conduct Administrator treated him differently because of gender. Indeed, all of the Student Conduct Administrator's actions were appropriate under the circumstances. The interim suspension, for instance, was warranted given that the alleged conduct in question took place while the Respondent was serving a suspension for another sexual contact-related incident. In any event, an interim suspension is not an appealable decision. Regarding the other actions taken by the Student Conduct Administrator, Respondent offers not a shred of evidence that the Administrator treated the Respondent differently from other students because of gender. To succeed on his claim, he must show that similarly situated female respondents have been treated more leniently than males in the conduct process. Without any proof that this is the case, his claim of gender discrimination must fail. That the Student Conduct Administrator took actions that the Respondent takes issue with, such as the interim suspension, does not establish bias on the Administrator's part.

Further, there was no requirement that the Student Conduct Administrator recuse himself from this case, and there is no evidence of any improper contact between the Student Conduct Administrator and the members of the University Conduct Board. In his response to our interim decision, the Administrator described his communications with the members of the panel, all of which were of a scheduling nature. Respondent has offered no evidence to refute the Student Conduct Administrator's written response and to show improper contact with the panel members. Indeed, his own appeal letter surmises that the Administrator "presumably" (Appeal, p. 4) had discussions with the panel members and the investigator. Presumptions and conjecture are not enough to carry the burden of proof required under the Code for appeals.

Relatedly, there is no proof that Respondent was denied an opportunity to address any potential conflicts of interest among the panel members. The Code provides that an accused student "shall be given the opportunity to address issues related to potential conflicts of interest regarding the panel members selected for the hearing." But this does not require the Chair to pause the proceedings and ask a respondent if he wishes to raise any challenges to the panel. If a respondent raises an objection, *then* the Code requires an opportunity to be heard. If the Respondent had offered evidence that he attempted to raise a recusal argument but was stymied by the chair of the hearing, then he would have a claim. But there is no evidence that this is what

happened.  Even, now, on appeal the Respondent does not allege who among the panel members had a conflict of interest that warranted recusal.  As it is his burden to establish a violation, this claim must fail.  We note that none of the members of Respondent's first University Conduct Board were on the panel in the second case.

B.    The Hearing

With respect to the University Conduct Board hearing itself, Respondent alleges that there was a defect, first, in the failure to maintain a written record of the hearing.  However, none is required by the Code.  The only reference to a "written record" in the Code is in Section I, Hearing Records, which states that "all written records of proceedings" are confidential.  But this provision cannot be read to require a transcript or other recording of the hearing.  Instead, a plain reading of the provision is that any documents in connection with the proceeding, such as the adjudication report or written evidence, are confidential.

Relatedly, Respondent argues that the absence of a written record—which he takes to mean a transcript of some kind—makes it impossible for him to make a full case on appeal (Appeal, p. 4).  As an example, he cites an alleged factual inaccuracy in the testimony about whether the Respondent had moved back home with his mother or whether it was his father's residence.  But this would not have been a germane issue on appeal anyway, since it attacks the factual basis of the University Conduct Board's decision, which is not a valid basis for appeal.  Claims on appeal are limited to procedural violations or new evidence, and these can be decided without a transcript.

Next, Respondent argues that the University Conduct Board did not describe the actual physical contact committed by the Respondent in its findings (Appeal, p. 4).  Once again, there is no requirement for such detail in the Code.  The chair of the panel reported the Conduct Board's finding that the Respondent violated the Code.[5]  At issue in the hearing was whether the contact occurred at all, not the precise physical detail of the touching.  Thus, the adjudication report rightly focused on the facts that pertained to the contested issue: who was more believable, the Complainant or the Respondent.  The panel unanimously credited the Complainant and listed reasons why.  Moreover, the Respondent was on notice of the physical act that was alleged from the Student Conduct Administrator's pre-hearing notices.

Respondent contends that the Student Conduct Administrator's presence in the hearing room was unwarranted, noting the general confidentiality of such proceedings (Appeal, p. 4).  There was nothing improper with the Student Conduct Administrator being present for the hearing.  He was not a member of the public or a mere casual observer.  The role of student conduct administrator is central to the entire student conduct process at St. John's.  As stated in the Code, "The Student Conduct Administrator is responsible to ensure that all student conduct proceedings are carried out in accordance with the Student Conduct Process."  *See* Code of Conduct, General Provision § B.  It is difficult for a Student Conduct Administrator to carry out this function if he or she cannot be present for the hearing itself.  In addition, the Administrator is

---

[5] In the summary portion of the report, "NIV" (not in violation) was listed in the summary section for the charge in question, but the findings section states "IV" (in violation).  The summary notation appears to have been a typographical error.

4

the one responsible for imposing sanctions if a violation is found.  The ability to do so fairly is impacted if he or she is not able to see and hear all of the testimony.  We conclude, therefore, that the Student Conduct Administrator does not fall within the category of "witnesses" who must be excluded from the hearing room except while testifying.  As an alternative ruling, we also conclude that Respondent has not sustained his burden for purposes of this appeal that the Student Conduct Administrator's presence at the hearing "may have affected the final outcome of the board hearing."

Respondent's supplemental filing (p. 2) invites us to question the Student Conduct Administrator "as to the amount of time he and St. John's attorneys spent preparing the investigator to testify."  In addition to being beyond the scope of his initial appeal papers, this request misunderstands the nature of this appeal and the Respondent's burden of proof under the Code.  As stated in the Code, "The burden is on the appealing student, not on the Appeal Board to justify the original finding."  *See* Student Conduct Process, Appeals of University and Student Conduct Hearings § F.

Respondent next alleges that the Chair of the University Conduct Board, an attorney, was not selected from the membership of the University Conduct Board.  While the Code states, "A voting Chair shall be selected from among the members" (*see* Student Conduct Process, University and Student Conduct Board Hearings § B), this provision is contained only in the section that pertains to the *Student* Conduct Board, which is a different entity from the *University* Conduct Board.  There is not a requirement that the Chair of the University Conduct Board be selected from its membership.

C.     The Sanction

In the final section of his appeal, entitled "[u]nfair and biased determination of sanction" (Appeal, p. 5), Respondent argues that he had did not have an opportunity to submit a written impact statement before the sanction was imposed.

Respondent also raised this issue in connection with his first appeal, and the reasons for denial are similar here.  Respondent's argument is premised on application of Section VII(G) of University Policy 703.  *See* https://www.stjohns.edu/about/administrative-offices/human-resources/policy-703-sexual-misconduct-policy-and-procedures.  Generally stated, Policy 703 sets forth the University's policies to implement Title IX of the Education Amendments of 1972, the Clery Act, and other state and federal laws.  *See id.*  As such, it is not part of the Code of Student Conduct or its processes.  Therefore, as an initial matter, we conclude that any purported violation of Policy 703 would not constitute a ground for appeal here.  Apart from claims of new evidence, our jurisdiction is limited to determining whether there was "an omission in the *Student Conduct Process*" (emphasis added).  To the extent that Respondent claims that Policy 703 was not followed, his argument is beyond our purview.

As an alternative ruling, we also find that Respondent has not met his burden of showing a procedural error that may have affected the outcome of his case.  There is no evidence that Respondent attempted to submit a written impact statement before the Student Conduct Administrator imposed sanctions but was somehow prevented from doing so.  The hearing was

5

on September 17, but the Student Conduct Administrator did not issue a letter detailing sanctions until October 2. There was, thus, ample time for Respondent to submit whatever impact statement he wished. Although the Respondent may not have known of the Board's decision, he knew—from his prior appeal—that any finding of violation would result in the imposition of sanctions shortly thereafter. Respondent also does not state what would have been in any such impact statement if he had submitted one and, thus, he has not carried his burden of showing a different result would have occurred.

To the contrary, the sanction in this case—expulsion—was the only one justified by the evidence and the record. Respondent *twice* committed violations of a sexual nature. Both instances occurred while the complainants were unconscious. The Respondent has now a demonstrable history of preying on women while they were in a vulnerable state. Moreover, the violation that is the subject of this appeal occurred while he was serving a suspension and on disciplinary probation for his first case. Far from being rehabilitated, Respondent has engaged in repeated behavior that is abhorrent, contrary to St. John's values, and shows dangerousness towards his fellow students. His permanent separation from St. John's University is necessary and proper.

Although he does not elaborate or provide any evidence to support his claim, we address Respondent's contention in his heading that the sanction of expulsion was "biased." As with his other claims of discrimination on the basis of gender, Respondent has offered no evidence that a similarly situated woman—in other words, one who had twice committed non-consensual sexual contact, the second while serving a suspension for the first—would have been treated differently.

D.     Remaining Claims

All other remaining claims have been considered and rejected.

IV.

Accordingly, the decisions of the University Conduct Board, dated September 17, 2019, and the Student Conduct Administrator, dated October 2, 2019, are AFFIRMED in all respects. This constitutes the final decision on appeal, and the matter is now closed. All concur.

For the University Conduct Appeals Board:

Dated: January 15, 2020
      Queens, NY

LARRY CUNNINGHAM, Chair
Associate Dean for Assessment
   and Institutional Effectiveness
Professor of Legal Writing
School of Law

6

LARRY CUNNINGHAM, Chair, Concurring.

I was the Chair of the University Conduct Appeals Board panel that decided the appeal from the Respondent's first conduct case. Both parties in this second matter were aware that I was also chairing this second panel when we issued our interim decision requesting additional information from Dean Flynn. Neither party has requested my recusal based on my service on the prior panel. Nevertheless, I write separately and individually to explain the decision not to recuse myself *sua sponte*.

As with all questions in a student conduct appeal, I begin with the Code itself. It provides that the University Conduct Appeals Board consists of three members: the chair and two members. The Code speaks to potential conflicts of interest for this body in a single sentence: "The two additional panel members cannot have served on the panel that issued the decision being appealed." This provision makes perfect sense, as it would be impossible for a person to review objectively and independently his or her own decision from the hearing itself. [6] The Code is otherwise silent as to recusals. Thus, as a preliminary matter, nothing in the Code would require my recusal just because I sat on the first appeal panel.

A respondent in a conduct process, of course, has a right to a fair and impartial hearing body, which includes the panel constituted for an appeal. However, there is no reason why an appeal board member cannot be impartial just because he or she heard a respondent's previous disciplinary appeal. Under the St. John's Code, the University Conduct Appeals Board does not function as fact finder. Therefore, it does not evaluate the credibility of witnesses. It determines, instead, whether an appellant has met the burden under the Code to establish a violation of process or new evidence. Knowledge of prior cases involving the same respondent is, therefore, not likely to impact the appeal board's ability to evaluate the process in the current matter. Indeed, in a case like this one—where the Respondent claims that his sanction was improper— the appeal board would necessarily learn the facts of the prior case anyway, since prior disciplinary history is grounds for an enhanced sanction.

An analogy to criminal cases is helpful. A potential juror would not be selected to serve on a case if he or she had been on a previous jury involving the same defendant. So, too, members of the University Conduct Board must be fair and impartial, a right that is ingrained in the Code itself. *See* Code of Conduct, General Provision § F. As fact finders, Conduct Board members must not have independent knowledge of the facts. Any conflicts of interest on their part would be subject to a request for recusal. For example, it would have been improper for a member of the Respondent's first University Conduct Board panel to serve on the panel in the second case, and none of them did.

But things are different on appeal. If a criminal defendant has had multiple cases over the years, there would be no requirement of recusal just because the trial judge or appellate panel heard the previous cases. The only applicable section of the American Bar Association's Model Rules of Judicial Conduct provides, "A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including but not

---

[6] Since the Dean of Students or designee cannot be on the University Conduct Board, it is logical why this provision only pertains to the "two additional members" of the Appeal Board.

limited to the following circumstances … The judge … previously presided as a judge *over the matter in another court*." *See* ABA Model Rules of Judicial Conduct, Canon 2.11(6)(d) (emphasis added). Thus, if I was the Chair of the University Conduct Board in this matter, I would have recused myself. But just as an appellate judge would not recuse just because a party previously had a different appeal before him or her, there is no basis to recuse here.

I write separately for several reasons. First, I wish to make a record for purposes of this matter of my thinking, especially given the seriousness of the sanction. Second, I hope that this concurrence might serve as guidance in future matters with other designees of the Dean of Students.

LARRY CUNNINGHAM, Chair