UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
RICHARD ROE,

                                    Plaintiff,

                                                            **MEMORANDUM & ORDER**
                    - against -                                19-CV-4694 (PKC) (RER)

ST. JOHN'S UNIVERSITY and JANE DOE,

                                    Defendants.
--------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

Plaintiff Richard Roe[1] brings this action pursuant to Title IX of the Education Amendments of 1972 ("Title IX") and state law against Defendants St. John's University ("SJU") and Jane Doe in connection with his expulsion from SJU following allegations that he had sexually assaulted Doe and another female student.  Before the Court is SJU's motion, joined by Doe, to dismiss Plaintiff's Second Amended Complaint ("SAC") or, in the alternative, to amend the caption to reflect Plaintiff's legal name.  For the reasons discussed below, the motion to dismiss is granted in its entirety, and this action is dismissed.

## BACKGROUND[2]

Prior to 2019, Plaintiff was a student at SJU, a private university in New York.  (SAC Ex. 1, Dkt. 23, ¶¶ 1, 3.)  In 2018, Plaintiff was suspended after being accused by Doe of sexual misconduct.  (*Id.* ¶¶ 22, 27.)  In 2019, Plaintiff was expelled after being accused by a second

---

[1] "Richard Roe" is a pseudonym.  (Second Amended Complaint ("SAC"), Dkt. 23, ¶ 2.)

[2] For purposes of this Memorandum and Order, the Court assumes the truth of Plaintiff's well-pleaded allegations, *Kiobel v. Royal Dutch Petrol. Co.*, 621 F.3d 111, 123 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), and references both exhibits attached to Plaintiff's SAC and SJU's exhibits upon which the SAC heavily relies, *see infra*.

student of sexual misconduct. (*Id*. ¶¶ 108, 121.) Plaintiff alleges that, in finding him to have violated SJU's prohibition against sexual misconduct, SJU engaged in gender-based discrimination in violation of Title IX and SJU's own Sexual Misconduct Policy and Procedures.

## I.   Factual Allegations

### A.   SJU's Sexual Misconduct Policy and Procedures

In 2016, SJU enacted its Sexual Misconduct Policy and Procedures ("Policy 703" or the "Policy") in accordance with, *inter alia*, Title IX. (SAC Ex. 1, Dkt. 23, at ECF[3] 31, 33.) The Policy "applies to any allegation of sexual misconduct that takes place on [SJU] property," as well as "conduct that takes place off-campus if the conduct creates a threatening or uncomfortable environment on [SJU]'s campus or within a[n] [SJU] program, or if the incident causes concern for the safety or security of [SJU]'s campus." (*Id.* at ECF 36.) The Policy states that it "applies to all members of the [SJU] Community," which "includes, but is not limited to, all faculty, administrators, staff (including student workers), students, alumni, interns, members of the Board of Trustees, and members of University-sponsored advisory committees," and that "[n]on-community members . . . who are visiting campus, participating in a program or activity or interacting with [SJU] Community members may also be subject to th[e] Policy." (*Id.*) Though the "Policy supersedes any other [SJU] policy to the extent that such policy applies to sexual misconduct[,] [a] particular situation may potentially invoke one or more [SJU] policies and processes," in which case "[SJU] reserves the right to determine the most applicable policy or process and to utilize that policy or process." (*Id.*)

---

[3] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

The Policy also defines the prohibited conduct (*id.* at ECF 36–42); sets forth the available resources and reporting options (*id.* at ECF 42–51); describes SJU's procedures for responding to complaints of sexual misconduct, including the investigation, adjudication, and appeals process (*id.* at ECF 52–59); and describes programs implemented by SJU to educate and increase awareness among the SJU community regarding sexual misconduct (*id.* at ECF 59–60).

Throughout the Policy, references to "consent" refers to "affirmative consent," which

> is defined as a knowing, voluntary and mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate consent. The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity or gender expression.

(*Id.* at ECF 36–37.) The Policy further clarifies that

> [c]onsent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity. Incapacitation may be caused by the lack of consciousness or being asleep, being involuntarily restrained, or if an individual otherwise cannot consent. Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be intoxicated and therefore unable to consent.

(*Id.* at 37.)

The Policy prohibits sexual misconduct, which includes, as relevant here, sexual assault and sexual harassment. (*Id.* at ECF 41.) Sexual assault "includes non-consensual sexual intercourse and non-consensual sexual contact." (*Id.* at ECF 39.) Non-consensual sexual intercourse refers to "any form of sexual penetration or intercourse (vaginal, anal, or oral), however slight, with any body part or object by an individual upon another individual without consent and/or by force." (*Id.*) Non-consensual sexual contact refers to

> any intentional sexual touching, however slight, with any body part or object by an individual without consent. Intentional sexual contact includes contact with the breasts, buttocks, or groin, or touching another with any of these body parts; making another person touch any of these body parts; and any intentional bodily contact in a sexual manner.

(*Id.*)

Sexual harassment "means unwelcome conduct, based on sex or gender stereotypes, that a reasonable person would find intimidating, hostile, or offensive." (*Id.* at ECF 40.) "Sexual harassment[4] includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, graphic or physical conduct of a sexual nature, when" such conduct creates a hostile environment, *i.e.*, "the conduct is sufficiently severe, persistent, or pervasive that it unreasonably interferes with, limits, or deprives an individual from participating in or benefitting from [SJU]'s education or employment programs and/or activities when judged against a reasonable person standard." (*Id.*) Factors that SJU will consider when evaluating whether a hostile environment exists include, but are not limited to, (1) "[t]he frequency, nature[,] and severity of the conduct;" (2) "[w]hether the conduct was an isolated incident or repeated"; (3) "[w]hether the conduct was physically threatening;" (4) "[t]he effect of the conduct on the complainant's mental or emotional state;" (5) "[w]hether the conduct was directed at more than one person;" (6) "[t]he relationship of the individuals involved in the conduct;" (7) "[w]hether the conduct arose in the context of other discriminatory conduct;" (8) "[w]hether the conduct unreasonably interfered with the complainant's educational or work performance and/or [SJU] programs or activities; and" (9) "[w]hether the conduct implicates concerns related to academic freedom or protected speech." (*Id.* at ECF 40–41.)

---

[4] The Policy lists several examples of sexual harassment, including (but not limited to) "posting sexually explicit or offensive material that does not serve an academic purpose; obscene or sexually offensive gestures and comments; lewdness; repeatedly subjecting a person to unwelcome sexual attention or sexual advances; requesting sexual favors; conditioning a benefit on submitting to sexual advances; engaging in inappropriate or unnecessary touching or rubbing against another; or making sexually suggestive or degrading jokes." (SAC Ex. 1, Dkt. 23, at ECF 41.)

In the section entitled "Process for Investigating and Resolving Complaints of Sexual Misconduct," the Policy states that SJU "will take all available steps to promptly, thoroughly, and impartially investigate and address complaints of sexual misconduct . . . in order to stop prohibited conduct, prevent its recurrence[,] and address any effects on campus." (*Id.* at ECF 52.) "Once a complaint or notice of any allegation of sexual misconduct is received, the Title IX Coordinator, or a designee, will make an initial assessment of the reported information and respond to any immediate health or safety concerns raised by the report, including interim remedies." (*Id.*) An investigator will then

> conduct a preliminary investigation[,] and the Title IX Coordinator, or a designee, will assess whether th[e] Policy or the Student Code of Conduct may have been violated. If the Title IX Coordinator, or a designee, determines that [there has been such a violation], [they] will notify the respondent in writing that a complaint has been filed and provide the factual allegations concerning the alleged violation, and possible sanctions.

> The Title IX Coordinator[] or [] designee will [then] schedule a meeting with the respondent, within a reasonable amount of time, and ensure the respondent is provided with a written explanation of all available resources and options, and is offered the opportunity to meet to discuss those resources and options.

(*Id.* at ECF 53.) After the preliminary investigation, "the Title IX Coordinator, or a designee," may implement interim remedies such as no-contact orders; separating or placing limits on the parties; adjusting schedules or student housing or living arrangements; or making "reasonable academic adjustments." (*Id.*; *see also id.* at ECF 53–54.) As for adjudication, the Policy makes clear that "[t]he applicable procedure for remedying a complaint depends on whether the accused is a student, member of the faculty, or staff or administrator."[5] (*Id.* at ECF 56.) When the

---

[5] Regardless of whom the complaint is brought against, however, the Policy states that "most [] complaints will be resolved within 60 days" (SAC Ex. 1, Dkt. 23, at ECF 54), and that "[t]he evidentiary standard in determining the facts will be based upon a preponderance of the evidence, i.e., a finding that it is more likely than not that the alleged sexual misconduct occurred or did not occur" (*id.* at ECF 52).

complaint is brought against a student, the Student Code of Conduct (the "Student Code") will apply to the investigation and resolution of the complaint.[6] (*Id.*) As relevant here, where the Conduct Board conducts a hearing regarding an allegation of student-on-student sexual misconduct, the Student Code allows for the respondent to "submit lists identifying the witnesses they expect to present at the hearing," and witnesses may either "appear at the hearing in person, or may submit a written statement for the panel's consideration." (Declaration of Joshua Hurwit ("Hurwit Decl.") Ex. A, Dkt. 37-3, at ECF 20.) Upon "a finding of responsibility" regarding sexual misconduct, the Student Code provides that only the complainant, and not the respondent, may provide an impact statement "while the Dean of Students or designee is deliberating on appropriate sanctions." (*Id.* at ECF 24.) Sanctions against students may "include, but are not limited to, a formal warning, housing probation, University premises restriction, suspension or expulsion from the University's housing, student life probation, University disciplinary probation[,] and suspension or expulsion from the University." (SAC Ex. 1, Dkt. 23, at ECF 55 (citing SJU Code of Conduct, https://www.stjohns.edu/life-st-johns/student-conduct/student-conduct-process); Hurwit Decl. Ex. A, Dkt. 37-3.)

### B. Incident in Paris

In April 2018, Plaintiff and Defendant Doe were students at SJU, studying abroad at SJU's Paris campus (the "Paris campus") and staying at the same dorm. (SAC, Dkt. 23, ¶¶ 1, 13–15; Jane Doe's Answer & Counterclaims ("Doe Answer"), Dkt. 27, ¶¶ 173–74.) On the evening of April 12, 2018, Plaintiff and Doe met at a local club, Duplex. (SAC, Dkt. 23, ¶¶ 13–14; Doe

---

[6] When the complaint is brought against faculty, administrators, or staff members, on the other hand, Policy 703 itself details a process for investigation and resolution, rather than referring to a process outlined by another document such as the Student Code. (*See* SAC Ex. 1, Dkt. 23, at ECF 57–58.)

Answer, Dkt. 27, ¶¶ 177, 179–80.) Plaintiff and Doe offer completely different factual accounts of the aftermath of their meeting, which gave rise to the instant action. (*Compare, e.g.*, SAC, Dkt. 23, ¶¶ 13–21, *with* Doe Answer, Dkt. 27, ¶¶ 173–215.) Though the Court must assume the truth of Plaintiff's non-conclusory, factual allegations for purposes of evaluating the instant motion to dismiss, *see Kiobel*, 621 F.3d at 124 (citing *Iqbal*, 556 U.S. at 678), the Court nonetheless separately summarizes Doe's allegations to add context to her counterclaims.

### 1. Plaintiff's Account of the Events

According to Plaintiff, when he and Doe met at the club, Doe asked him to dance, "and they did." (SAC, Dkt. 23, ¶¶ 13–14.) Later in the evening, Doe told Plaintiff that she was taking an Uber back to her dorm, told Roe her room number, and asked him to "check on her" when he returned to the dorm. (*Id.* ¶¶ 15, 17.) Once Plaintiff returned to the dorm hours later, he went to Doe's room, where she was "awake and on her phone." (*Id.* ¶ 18.) Doe invited him in, and sometime later, "took [Plaintiff]'s right hand and placed it upon her fully clothed breast." (*Id.* ¶ 19.) Plaintiff responded that he was "not interested in sex," and Doe replied, "[t]hen, get the hell out of here." (*Id.* ¶¶ 20–21.) Plaintiff left thereafter. (*Id.* ¶ 21.)

### 2. Defendant Doe's Account of the Events

According to Doe, when she and Plaintiff were studying abroad at the Paris campus, she "had seen him on campus in passing but had not spent extensive time with him," and did not consider them acquaintances. (Doe Answer, Dkt. 27, ¶ 176.) On April 12, 2018, Doe and her friends took the train to Duplex at around 11:40 p.m. (*Id.* ¶ 178.) Plaintiff arrived at the club later, with a different group of SJU students. (*Id.* ¶ 179.) While Doe was dancing with her friends at the club, Plaintiff "pulled Doe over to dance with him[,] and then he kissed her." (*Id.* ¶ 180.) Doe did not want to kiss Plaintiff, and signaled to one of her friends that she was uncomfortable. (*Id.*

¶¶ 181–82.) Doe's friend "came over and pulled Doe away from [Plaintiff]," and the two "rushed to the bathroom together to get away from [Plaintiff]." (*Id.* ¶ 182.)

Doe and her friend decided to leave the club soon after, and Doe's friend left to retrieve their jackets. (*Id.* ¶ 183.) While Doe was waiting for her friend, Plaintiff approached her and tried to kiss her again. (*Id.* ¶ 184.) Doe "did not allow [Plaintiff] to kiss her," and did not respond when he asked why she had left him on the dance floor earlier. (*Id.* ¶¶ 185–86.) At around 2:30 a.m., Doe and her friend took an Uber back to campus. (*Id.* ¶¶ 187–88.) They returned to Doe's room, where Doe's roommate was in the top bunk, watching a movie on her computer. (*Id.* ¶ 188.) After Doe's friend left, Doe fell asleep on the bottom bunk. (*Id.* ¶ 188.)

Plaintiff entered the dorm room at some point after Doe had fallen asleep, but while Doe's roommate was still watching the movie with headphones. (*Id.* ¶ 189.) Doe awoke to find Plaintiff on top of her in her bed, with her pants pulled down and Plaintiff "digitally penetrating her vagina." (*Id.* ¶ 191.) Plaintiff tried to kiss Doe, but Doe turned over and told him to stop. (*Id.* ¶ 194.) She "then felt [Plaintiff] begin to masturbate against her back." (*Id.* ¶ 195.) Doe "told [Plaintiff] to stop and to leave her room," after which he "got up and left." (*Id.* ¶ 196.)

After Plaintiff left the room, "Doe got out of bed and showed her roommate her disheveled clothing and dropped pants[,] and told her roommate that [Plaintiff] had just sexually assaulted her while she was asleep." (*Id.* ¶ 197.) Doe and her roommate informed SJU, the Paris campus security guard and administrators, as well as the Residence Assistant and Residence Director, about Plaintiff's entry into her room while she was asleep, and her waking up to him sexually assaulting her. (*Id.* ¶¶ 198–200.) In response, SJU placed a "no-speaking, no-contact order" between Plaintiff and Doe the next day. (*Id.* ¶ 201 (internal quotation marks omitted).) A few days later, on April 16, 2018, SJU placed additional restrictions on the no-contact order, whereby

neither Plaintiff nor Doe were permitted on each other's dorm floors.  (*Id.* ¶ 203.)  That same day, Doe reported the incident to the Paris police, and Plaintiff was arrested.  (*Id.* ¶¶ 206–07.)  When Doe completed a rape kit five days after the incident, the results were inconclusive.  (*Id.* ¶ 208.) Paris police eventually "dismissed the case due to the contradictory stories that they received from Doe and [Plaintiff]."  (*Id.* ¶ 209.)

Notwithstanding the no-contact order, Plaintiff "repeatedly ran into Doe on the Paris campus and at social outings with friends during their time abroad."  (*Id.* ¶ 211.)  In Paris, Plaintiff "continued to attend the same classes [as Doe]," and "actively and intentionally spread false and malicious stories and rumors about Doe to poison all of the fellow students on their study abroad program against Doe," which "worked"; Doe was "constantly taunted, yelled at, and emotionally abused by the other students who . . . accused her of lying about [Plaintiff]."  (*Id.* ¶¶ 212–13.) Eventually, SJU removed Plaintiff from the Paris campus, though he continued to study abroad. (*Id.* ¶ 210.)

After Plaintiff and Doe returned to the United States in May 2018, and even after Plaintiff's suspension from SJU, Plaintiff "constantly showed up to places and attended events where Doe was present in order to further intimidate and distress her."  (*Id.* ¶ 214; *see also id.* ¶ 211.)  As a result of Plaintiff's "sexual assault and continuous campaign to harass, discredit[,] and distress Doe," Doe suffered a "severe impact to her health" "to the point that she missed school and work, and eventually had to drop classes."  (*Id.* ¶¶ 227, 229, 231.)  Since returning from studying abroad, Doe has been diagnosed with post-traumatic stress disorder ("PTSD") and has attended counseling 22 times.  (*Id.* ¶¶ 228, 230, 232.)  Doe was twice hospitalized as a result of suicide attempts due to PTSD triggers related to Plaintiff—once between May 12 and May 23, 2019, and once in December 2019 in part as a result of the instant lawsuit against her.  (*Id.* ¶¶ 233–34.)

### C.  SJU Hearing

On September 4, 2018, SJU notified Plaintiff that Doe had filed a complaint against him, alleging four violations of SJU's Code of Conduct: (1) non-consensual sexual contact on April 12, 2018, (2) sexually inappropriate conduct on April 13, 2018, (3) non-consensual sexual conduct on April 13, 2018, and (4) non-consensual sexual penetration on April 13, 2018.  (SAC, Dkt. 23, ¶ 22; *see also* Hurwit Decl. Ex. G, Dkt. 38-5, at ECF 2.)  Doe reported that, around 6:30 a.m. on April 13, 2018, she had "awoke[n] to find [Plaintiff] in her bed without permission or knowledge of how he got there.  [Doe] stated that [Plaintiff] was laying in the bed and touching her breasts and that she could feel his erect penis touching her back."  (*See* SAC Ex. 5, Dkt. 23, at ECF 71.)

On October 3, 2018, SJU's University Conduct Board (the "Conduct Board") held a conduct hearing (the "Doe hearing") concerning Doe's complaint.[7]  (SAC, Dkt. 23, ¶ 26.)  At the hearing, Plaintiff admitted that he and Doe kissed on the dance floor,[8] but stated that later, in Doe's dorm room, it was Doe who "took [Plaintiff's] right hand and placed it upon her fully clothed breasts."[9]  (*Id.* ¶ 29.)  Around two weeks after the hearing, on October 15, 2018, SJU's Director of Student Conduct, Jack Flynn, sent Plaintiff a letter (the "October 15, 2018 decision letter") informing him that, following the Doe hearing, the Conduct Board had found him in violation of

---

[7] Prior to the Doe hearing, Plaintiff met with a Student Conduct Administrator at a "behavioral hearing" to review the charges and "discuss the circumstances of the alleged violations."  (*See* SAC Ex. 5, Dkt. 23, at ECF 72; *see also* Hurwit Decl. Ex. G, Dkt. 38-5, at ECF 2 (noting that the Office of Student Conduct reviewed "all relevant information from [Plaintiff's] Behavioral Hearing"); *id.* Ex. A, Dkt. 37-3, at ECF 17–18.)

[8] The Court notes that Plaintiff admitted to "kissing on the dance floor" at the Conduct Hearing, despite alleging in his SAC only that "[Plaintiff] was asked by Doe to dance, and they did."  (SAC, Dkt. 23, ¶ 29; *see also id.* ¶ 14.)

[9] Plaintiff notes that any record of the Doe hearing was "unavailable to [him] as 'confidential.'"  (SAC, Dkt. 23, ¶ 29.)

SJU's prohibition on non-consensual sexual contact on April 13, 2018, but not in violation of the other three allegations.  (Hurwit Decl., Ex. G, Dkt. 38-5; *see also* SAC, Dkt. 23, ¶¶ 27, 31.)  The Conduct Board's rationale for its finding was explained as follows:

> [Plaintiff] admitted [to] engaging in physical contact of a sexual nature with [Doe], and the evidence demonstrated a lack of affirmative consent to engage in such contact.  Such evidence included [Doe]'s intoxication, as described by multiple witnesses, and [Plaintiff]'s assertion, which was not disputed, that he was not impaired by alcohol.

(Hurwit Decl., Ex. G, Dkt. 38-5, at ECF 3; *see also* SAC, Dkt. 23, ¶ 28.)  The letter stated that SJU's Office of Student Conduct issued the following sanctions against Plaintiff: (1) disciplinary probation,[10] (2) ineligibility to participate in the study abroad program, (3) indefinite restriction from entering all SJU-managed living properties, and (4) suspension for "no less than one semester," after which Plaintiff may re-apply "for admission to an academic program."  (Hurwit Decl., Ex. G, Dkt. 38-5, at ECF 2–3.)

The October 15, 2018 decision letter also outlined the appeals procedure, stating that appeals must "include an explanation of the incident in question and [Plaintiff's] rationale for appealing," and that appeals would be considered only

> on the following criteria: (1) information that indicates an omission in the [Student Code's] Student Conduct procedure occurred that may have affected the final outcome of the decision; or (2) there is new evidence which did not exist at the time of the hearing that would have had a bearing on the original findings.

(*Id.* at ECF 3.)  On November 7, 2018, Plaintiff submitted a counseled appeal of his suspension to the University Conduct Appeals Board (the "Appeals Board") on the grounds that, *inter alia*, (1) he was not given the opportunity to submit a written impact statement "to the decision-maker prior to

---

[10] Being on disciplinary probation means that any violation of the Student Code "will result in additional sanctions," including but not limited to "suspension or expulsion." (Hurwit Decl. Ex. G, Dkt. 38-5, at ECF 2.)

a determination of an appropriate sanction(s)," as required by Policy 703, (2) the sanctions were inappropriate, and (3) he was denied the opportunity to present witnesses at the Doe hearing. (SAC Ex. 5, Dkt. 23, at ECF 71–72; *see also* SAC, Dkt. 23, ¶ 35.)

About a week later, on November 13, 2018, after application, Plaintiff was readmitted to resume classes at SJU starting January 24, 2019. (SAC, Dkt. 23, ¶ 36.)

### D.  Incident in New York

On December 15, 2018, Plaintiff was at a bar in Queens with his housemates and friends, along with non-party Mary Smith.[11]  (SAC, Dkt. 23, ¶¶ 95–96.)  Plaintiff had met Smith once before, "when she had an affair with [Joe Jones],[12] one of [Plaintiff's] roommates."  (*Id.* ¶ 96.) When the bar closed around 2:00 a.m., Plaintiff's friend drove Plaintiff and Smith back to Plaintiff's house.  (*Id.* ¶ 97.)  At that time, "Smith was visibly intoxicated."  (*Id.*)  They arrived at Plaintiff's house around 2:30 a.m., and Smith asked to see Jones.  (*Id.* ¶ 98.)  When Jones came downstairs, "Smith asked if she could sleep on his floor, but he said that could not happen since he was entertaining another woman in his room."  (*Id.* ¶¶ 98–99.)  Around 3:00 a.m., "Smith went outside to sleep on the concrete patio."  (*Id.* ¶ 100.)  Plaintiff "asked Jones to bring [Smith] in and he refused," so Plaintiff "went outside and invited [Smith] in to sleep on the couch in the living room."  (*Id.* ¶ 102.)  After Smith came inside, Plaintiff sat at "one end of the long couch in the living room, [] [Smith] stretched out next to him and fell asleep," and one of Plaintiff's male friends "fell asleep on a couch less than 6 feet away."  (*Id.* ¶¶ 103–04.)

Plaintiff was concerned "that Smith might vomit due to her intoxication, [so] he propped her up on her side with her back against the sofa to ensure that she could not choke."  (*Id.* ¶ 105.)

---

[11] "Mary Smith" is a pseudonym.  (SAC, Dkt. 23, ¶ 46.)

[12] "Joe Jones" is a pseudonym.  (SAC, Dkt. 23, ¶ 96.)

He "then sat at the foot of the long couch, with the intent to ensure that Smith did not vomit and choke, and subsequently fell asleep." (*Id.* ¶ 106.)  At dawn, Smith woke up and walked home. (*Id.* ¶ 107.)

### E.  The Tweet and Its Aftermath

On January 4, 2019, the hashtag #SurvivingSJU was created on Twitter, becoming the number one trending hashtag for the next two days.  (*Id.* ¶¶ 37–38.)  That day, at 3:44 p.m., a twitter account with the name "St. John's Memes" and the user handle @vincentianteens tweeted a photo of Plaintiff (the "Tweet") under that hashtag, quoting:

> [Plaintiff] was allowed to stay abroad after raping me with no travel restrictions.
> Only got half a semester suspension.

(*Id.* Ex. 2, Dkt. 23, at ECF 63; *see also* SAC, Dkt. 23, ¶ 39.)

Plaintiff believes that the Tweet was submitted to the @vincentianteens twitter account by Doe, as "Doe almost instantly 'liked' the anonymously posted tweet, and less than 30 minutes later, posted in another tweet from her personal account that she had written a 'final statement' for the University Conduct Hearing . . . instead of 'writing essays' for her classes."[13]  (SAC, Dkt. 23, ¶¶ 39–40.)  Plaintiff alleges that, by authoring the Tweet submitted to @vincentianteens, Doe violated SJU's rules mandating confidentiality in connection with hearings on sexual misconduct. (*Id.* ¶¶ 43–44.)

On January 5, 2019, the day after the Tweet, "a male student threatened to 'fuck [Plaintiff] up' via phone calls and text messages." (*Id.* ¶ 45.)  Sometime later, a female SJU student punched Plaintiff in the face at a bar.  (*Id.* ¶ 47.)

---

[13] Doe states in her Answer that, at 7:29 p.m. on January 4, 2019, she tweeted from her personal account: "I should have been writing essays but instead I was writing my final statement #survivingsju." (Doe Answer, Dkt. 27, ¶ 223.)

Smith submitted a complaint to SJU (the "Smith complaint") on January 5, 2019, accusing Plaintiff of sexual misconduct three weeks prior. (*Id.* ¶¶ 46, 108.) Smith alleged that Plaintiff had violated SJU's prohibition on non-consensual sexual contact and non-consensual sexual penetration on December 15, 2018, reporting that she had "fall[en] asleep on the living room couch and aw[oke] to discover [Plaintiff] lying behind her on the couch with his hand inside her pants. [Smith] reports that [Plaintiff] was penetrating her vagina with his fingers and that she did not consent to the activity." (*See id.* Ex. 15, Dkt. 23, at ECF 133.) On January 7, 2019, SJU's Office of Student Conduct emailed Plaintiff a memorandum entitled "NO CONTACT ORDER," restricting Plaintiff "from having any contact with [Smith] until otherwise instructed."[14] (*Id.* Ex. 4, Dkt. 23, at ECF 68; *see also* SAC, Dkt. 23, ¶ 50.)

On January 8, 2019, the SJU student newspaper reported that more than 2,000 tweets had been posted to the #SurvivingSJU hashtag, and that in response, an SJU spokesperson stated that "they will investigate all claims." (*Id.* Ex. 3, Dkt. 23, at ECF 65; *see also* SAC, Dkt. 23, ¶ 49.)

At 11:31 a.m. on January 8, 2019, SJU's Associate Dean for Assessment and Institutional Effectiveness, Larry Cunningham, emailed Plaintiff the Appeals Board's final decision on his appeal of the Doe complaint, affirming both the determination that Plaintiff had violated the Student Code, and the sanctions imposed. (*Id.* Ex. 5, Dkt. 23, at ECF 70–76; *see also* SAC, Dkt.

---

[14] The memorandum specified that prohibited contact included, but was not limited to, "phone calls, written or electronic correspondence, personal visits[,] [and] messages sent through social networking sites," and applied both on- and off-campus, as well as to contact initiated by a third party on Plaintiff's behalf. (SAC Ex. 4, Dkt. 23, at ECF 68.) It stated that Plaintiff was "prohibited from speaking with [Smith] at any time," and that he "must make accommodations in [his] academic and social pursuits to avoid being in the same room" as her. (*Id.*) The letter clarified that the "primary purpose of th[e] order [wa]s to mandate civil conduct," and that "entering a common area or classroom/study space where [Smith] is present should not be considered a violation of th[e] order," while "[i]ntentional contact with [Smith] must be reported to the Director of Student Conduct immediately." (*Id.*)

23, ¶ 50.) In affirming the Conduct Board's decision, the Appeals Board explained, *inter alia*, that (1) Policy 703 did not provide grounds for appealing the Conduct Board's decision, the procedures for which were governed by the Student Code, and that, regardless, Plaintiff did not attempt to submit a written impact statement or demonstrate that the any statement would have impacted the sanctions imposed (SAC Ex. 5, Dkt. 23, at ECF 73–74); (2) the sanctions were appropriate under the circumstances (*id.* at ECF 74); and (3) Plaintiff was permitted to present witnesses at the hearing pursuant to SJU's Student Conduct Process, of which Plaintiff was provided a copy, and Plaintiff failed to explain which witnesses he would have called, thereby failing to sustain his burden of demonstrating that the witnesses would have impacted the decision (*id.* at ECF 75).

Around 12:00 or 1:00 p.m. on January 8, 2019, SJU's Deputy Title IX Coordinator, Jackie Lochrie,[15] notified Plaintiff by phone "that he would be receiving formal notification of suspension from [SJU]."[16] (SAC, Dkt. 23, ¶ 50; *see also id.* Ex. 7, Dkt. 23, at ECF 80.) At 1:38 p.m., Flynn emailed Plaintiff a letter serving as the "formal notification that [he] [was] immediately suspended from [SJU][] pending the results of a non-academic disciplinary investigation" regarding "an incident [Plaintiff] w[as] involved in on January 5, 2019."[17] (*Id.* Ex. 6, Dkt. 23, at ECF 78; *see also* SAC, Dkt. 23, ¶ 50.) At 3:16 p.m., Lochrie emailed Plaintiff a letter stating that SJU was "beginning an investigation into an incident in which [Plaintiff] w[as] named as being involved,"

---

[15] In addition to being SJU's Deputy Title IX Coordinator, Lochrie served as the Acting Dean of Students and Associate Dean for Student Services. (*See, e.g.*, SAC Ex. 7, Dkt. 23, at ECF 80; *id.* Ex. 8, Dkt. 23, at ECF 82.)

[16] Plaintiff points out that his suspension pending the investigation of the Smith complaint was instituted even though he had been permitted to attend classes during the investigation of the Doe complaint. (SAC, Dkt. 23, ¶¶ 52–53.)

[17] The letter specified that Plaintiff was "not permitted to be in class, participate in any [SJU-sponsored programs or events[,] or be on any [SJU] property." (SAC Ex. 6, Dkt. 23, at ECF 78; *see also* SAC, Dkt. 23, ¶ 50.)

and that he would "be notified by Mr. John Breheny, the investigator assigned to th[e] case."[18] (SAC Ex. 7, Dkt. 23, at ECF 80; *see also* SAC, Dkt. 23, ¶ 50.)  At 3:26 p.m., Lochrie emailed Plaintiff a letter stating that he was "indefinitely restricted from having any contact with [Smith]."[19]  (*Id.* Ex. 8, Dkt. 23, at ECF 82; *see also* SAC, Dkt. 23, ¶ 50.)

### F.  Plaintiff's Complaints to SJU about the Tweet

On January 7, 2019, Plaintiff's attorney contacted Lochrie and SJU's attorney, Joshua S. Hurwit, explaining that Plaintiff had "received phone calls and messages from someone threatening to 'fuck [him] up'" as a result of the Tweet, and that Plaintiff had requested that SJU take "action to protect [Plaintiff] from a violation of policy and false allegations." (*Id.* Ex. 9, Dkt. 23, at ECF 84; *see also* SAC, Dkt. 23, ¶ 61.)  According to Plaintiff, the Tweet violates SJU's "rules against 'verbal conduct of a sexual nature . . . sufficiently severe' to 'limit' [Plaintiff]'s 'ability to participate in the University's activities,'" as demonstrated by Plaintiff having "been punched in the face, banned from social events, suspended from [SJU][,] and [having] had his reputation destroyed." (SAC, Dkt. 23, ¶ 64 (ellipsis in original).)  Plaintiff further claims that, since January 4, 2019, he "has been subjected to a hostile educational environment permeated with discriminatory intimidation, ridicule and insult sufficiently severe or pervasive that it altered the conditions of and destroyed his educational environment." (*Id.* ¶ 65.)

---

[18] The letter emailed by Lochrie on January 9, 2018 further stated that Plaintiff had the right to (1) academic and/or housing accommodations, (2) counseling support, (3) participate in the investigation/hearing processes, (4) an advisor of his choice "at any time during the process," and (5) appeal the outcome determination.  (SAC Ex. 7, Dkt. 23, at ECF 80; *see also* SAC, Dkt. 23, ¶ 50.)

[19] The letter contained the same restrictions as the memorandum emailed to Plaintiff the day prior.  *See supra* note 6 (citing SAC Ex. 4, Dkt. 23, at ECF 68).

In response to Plaintiff's complaints, SJU's Director of Equal Opportunity, Compliance, and Title IX, Keaton Wong, responded on January 16, 2019 that SJU could not "sanction the individual who posted the tweet because [SJU] cannot confirm their identity, [but] recognize[s] that it has deeply affected [Plaintiff] and other students in the [SJU] community." (*Id.* ¶ 66; *see also id.* Ex. 10, Dkt. 23, at ECF 86.) Wong attached to his email a copy of SJU's "You are Not Alone" guide (the "Guide"). (SAC, Dkt. 23, ¶ 66; *see also id.* Ex. 11, Dkt. 23, at ECF 88–124.) The Guide provides in its preface, *inter alia*:

> This document is written for survivors of sexual misconduct, including sexual assault, stalking, and other relationship violence, to provide support as well as important information about prohibited conduct, available resources on and off campus, and ways to file a complaint in order to assist survivors in the recovery process and in their efforts to heal from this unacceptable form of violence. If you have survived sexual misconduct or know someone who has, please be assured that there are people who care about what you have endured.

(*Id.* Ex. 11, Dkt. 23, at ECF 90; *see also* SAC, Dkt. 23, ¶ 67.)

### G. The Smith Hearing

On June 6, 2019, Flynn notified Plaintiff about the Smith complaint, wherein Smith alleged violations of SJU's prohibitions on non-consensual sexual contact and non-consensual sexual penetration by Plaintiff on December 15, 2018. (Hurwit Decl. Ex. L, Dkt. 38-9; *see also* SAC, Dkt. 23, ¶ 108.) The incident was summarized as follows:

> [Smith] reported to the University that she was sexually assaulted while spending the night at an off-campus private house. [Smith] reported falling asleep on the living room couch and awakening to discover [Plaintiff] lying behind her on the couch with his hand inside her pants. [Smith] reports that [Plaintiff] was penetrating her vagina with his fingers and that she did not consent to the activity.

(Hurwit Decl. Ex. L, Dkt. 38-9, at ECF 2; *see also* SAC, Dkt. 23, ¶ 108.) Flynn informed Plaintiff in the letter that Plaintiff was "scheduled to participate in a Behavioral Hearing with a student conduct administrator to address" the alleged incident. (Hurwit Decl. Ex. L, Dkt. 38-9, at ECF 2.)

On June 12, 2019, Plaintiff's attorney emailed the SJU attorney, Hurwit, stating that "[i]t will be impossible for [Plaintiff] to receive a fair hearing regarding the [Smith] complaint," as "faculty members on the panel will have most probably heard of or reviewed" the Tweet about Plaintiff. (SAC Ex. 12, Dkt. 23, at ECF 127; *see also* SAC, Dkt. 23, ¶ 111.) He "demand[ed] that the University take such action as shall be appropriate on behalf of [Plaintiff]." (*Id.* Ex. 12, Dkt. 23, at ECF 127.) Hurwit responded on June 17, 2019 that Plaintiff's attorney "offer[ed] no information that the individuals who will adjudicate the [Smith complaint] have knowledge of the tweet or the prior matter involving [Plaintiff], or that even if these individuals had such knowledge, they would be unable to adjudicate the matter fairly and impartially." (Hurwit Decl. Ex. O, Dkt. 37-8, at ECF 2–3; *see also* SAC, Dkt. 23, ¶ 112.) He concluded that the "belief that [Plaintiff] will not receive a fair hearing is based on speculation and conjecture," and that SJU "will adjudicate [Plaintiff]'s matter fairly and impartially based on the evidence developed during the investigation." (Hurwit Decl. Ex. O, Dkt. 37-8, at ECF 3; *see also* SAC, Dkt. 23, ¶ 112.)

By email on July 18, 2019, Plaintiff's attorney asked whether SJU would "correct the defamatory statement in the [] [T]weet" or "sanction Doe." (SAC, Dkt. 23, ¶ 71.) Hurwit responded that "the 'tweet' was made anonymously, [and] [SJU] ha[d] no evidence whatsoever that [Doe] [wa]s the author of the 'tweet.'" (*Id.* Ex. 13, Dkt. 23, at ECF 129; *see also* SAC, Dkt. 23, ¶ 72.) He stated that "there will be no reference to the 'tweet' at the [Conduct Hearing regarding the Smith complaint ("Smith hearing")] unless [Plaintiff] opens the door." (*Id.* Ex. 13, Dkt. 23, at ECF 129; *see also* SAC, Dkt. 23, ¶ 113.)

The Smith hearing was held on September 17, 2019. (SAC, Dkt. 23, ¶ 109.) Attorney Thomas J. Foley, who had chaired the Doe hearing, also chaired the Smith hearing. (*Id.* ¶ 117.) Panel members consisted of Sharod Tomlinson, Mansoor Khan, and Cheresa Fewell. (*Id.* ¶ 116.)

Flynn and Breheny, the investigator, were also present. (*Id.* ¶ 116.) Plaintiff alleges that, "[u]pon information and belief, Flynn conferred with [Breheny], Foley[,] and members of the panel[] both in advance of the hearing and thereafter." (*Id.* ¶ 118.)

On October 2, 2019, Flynn informed Plaintiff by letter that the Conduct Board found Plaintiff to be in violation of the prohibition on non-consensual sexual contact on December 15, 2018, but not of the prohibition on non-consensual sexual penetration. (*Id.* Ex. 15, Dkt. 23, at ECF 133–34; *see also* SAC, Dkt. 23, ¶ 119.) The Conduct Board's rationale for its finding was explained as follows:

> The Panel determined, by a preponderance of the evidence, that [Plaintiff] engaged in non-consensual sexual contact with [Smith]. Evidence supporting the Panel's determination include: (1) key inconsistencies in [Plaintiff]'s testimony; (2) the accounts of [Plaintiff]'s housemates; and (3) key aspects of [Plaintiff]'s account of the events lacked credibility, including his testimony that he turned [Smith]'s face toward the couch in the event she vomited.

(*Id.* Ex. 15, Dkt. 23, at ECF 133–34.) As a result of the violation, SJU's Office of Student Conduct issued the sanction of expulsion. (*Id.* at ECF 133; *see also* SAC, Dkt. 23, ¶ 121.)

On October 25, 2019, Plaintiff appealed the decision, arguing, *inter alia*, that (1) the involvement of Flynn, who had "suspended [Plaintiff] from [SJU] without explanation," in selecting the members of the Conduct Board and supervising the impartial investigator had biased the proceedings against Plaintiff on the basis of his gender, and (2) the Office of Student Conduct determined Plaintiff's sanction in an "[u]nfair and biased" way because Plaintiff "had no opportunity to submit a written impact statement" before the sanction was imposed, as required by Policy 703. (*Id.* Ex. 16, Dkt. 23, at ECF 136–41; *see also* SAC, Dkt. 23, ¶¶ 122–23.) On January 15, 2020, the Appeals Board affirmed the matter "in all respects." (*Id.* Ex. 17, Dkt. 23, at ECF 143–50; *see also* SAC, Dkt. 23, ¶ 124.) In making this determination, the Appeals Board explained, *inter alia*, that (1) the claim of gender discrimination failed because Plaintiff did not

"offer []a shred of evidence that [Flynn] [had] treated [Plaintiff] differently because of gender" and "there [was] no evidence of any improper contact between [Flynn] and the members of the [] Conduct Board" (*id.* Ex. 17, Dkt. 23, at ECF 145); (2) Policy 703 did not provide grounds for appealing the Conduct Board's decision, the procedures for which were governed by the Student Code, and that, regardless, Plaintiff did not attempt to submit a written impact statement (*id.* at ECF 147); and (3) the sanction of expulsion "was the only one justified by the evidence and the record," given that this was the second time Plaintiff was found to have "committed violations of a sexual nature," that "[b]oth instances occurred while the complainants were unconscious," and that the second violation occurred "while [Plaintiff] was serving a suspension and on disciplinary probation for his first case" (*id.* at ECF 148). (*See also* SAC, Dkt. 23, ¶¶ 125–27.)

## II.    The Instant Lawsuit

Plaintiff asserts the following claims in his SAC:

(1) <u>Title IX Against SJU</u>: SJU engaged in sex-based discrimination, in violation of Title IX and SJU's implementing Policy 703, by:

(a) finding that Plaintiff engaged in sexual misconduct in connection with the Doe complaint even though it was Doe who had allegedly initiated the sexual contact (*id.* ¶¶ 13–58),

(b) failing to investigate Plaintiff's complaint of sexual harassment via the Tweet (*id* ¶¶ 61–92), and

(c) failing to afford Plaintiff a fair and unbiased hearing in connection with the Smith Complaint (*id.* ¶¶ 95–135);

(2) <u>Breach of Contract Against SJU</u>: SJU breached various implied contracts with Plaintiff in connection with, *inter alia*, its investigation and adjudication of the Doe and Smith complaints, and its failure to investigate Plaintiff's complaints about the Tweet[20] (*id.* ¶¶ 138–48); and

---

[20] Specifically, Plaintiff alleges that SJU violated implied contracts to (1) adjudicate claims based on a preponderance of the evidence standard (SAC, Dkt. 23, ¶¶ 138–40); (2) address all claims of sexual misconduct (*id.* ¶ 142); (3) provide an opportunity for Plaintiff to provide a written impact statement prior to the determination of sanctions (*id.* ¶¶ 143, 148); (4) promptly investigate Plaintiff's complaint about the Tweet (*id.* ¶ 144); (5) prevent and remedy a hostile educational

(3) <u>Defamation Against Doe</u>:  Doe defamed Plaintiff by authoring the Tweet (*id.* ¶¶ 151–52).

As to SJU, Plaintiff seeks, *inter alia*, damages, the destruction of all records relating to the finding of sexual misconduct by Plaintiff, an injunction mandating an investigation into his complaint about the Tweet, an injunction restoring him as a full-time student and removal of all sanctions, and a declaration that SJU's procedures in handling complaints against Plaintiff violated Policy 703 and Title IX.  (*Id.* ¶¶ 59, 93, 136, 149.) As to Doe, Plaintiff seeks damages.  (*Id.* ¶ 153.)

Doe brings the following counterclaims against Plaintiff: (1) intentional infliction of emotional distress (Doe Answer, Dkt. 27, ¶¶ 237–41); (2) negligent infliction of emotional distress (*id.* ¶¶ 243–50); and (3) *prima facie* tort (*id.* ¶¶ 252–56).  She seeks damages.  (*Id.* at 37–38.)

## III.  Procedural History

Plaintiff commenced the instant action on August 14, 2019 (*see generally* Complaint, Dkt. 1), and amended his complaint on September 10, 2019 (*see* Amended Complaint, Dkt. 4).  On November 18, 2019, SJU filed a pre-motion conference request in connection with its anticipated motion to dismiss and motion to correct the caption to reflect Plaintiff's legal name.  (Dkt. 15.) On December 10, 2019, the Court denied SJU's request for a pre-motion conference as unnecessary, and granted Plaintiff leave to amend his Complaint following the appeal of the Smith decision.  (12/10/2019 Docket Order.)  On February 18, 2020, Plaintiff filed the SAC.  (SAC, Dkt. 23.)  Defendant Doe filed her Answer and Counterclaims on May 8, 2020 (Doe Answer, Dkt. 27), and Plaintiff filed his Answer to Doe's Counterclaims on June 7, 2020 (Dkt. 30).  Briefing in connection with SJU's motion to dismiss and motion to correct the caption completed on August

---

environment (*id.* ¶ 145); (6) thoroughly and impartially investigate the Smith complaint (*id.* ¶ 146); and (7) conduct a fair and unbiased hearing (*id.* ¶ 147).

14, 2020. (Dkts. 37–44.) On August 20, 2020, Plaintiff requested argument (Dkt. 45), which the Court now denies as unnecessary.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal citation omitted). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (internal citation omitted). In addressing a motion to dismiss, the court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citations omitted). "The role of the court at this stage of the proceedings is not in any way to evaluate the truth as to what really happened, but merely to determine whether the plaintiff's factual allegations are sufficient to allow the case to proceed." *Doe v. Columbia Univ.*, 831 F.3d 46, 59 (2d Cir. 2016).

## DISCUSSION

### I.      The Parties' Exhibits

"A motion brought under Rule 12(b)(6) challenges only the 'legal feasibility' of a complaint[,]" while "[t]he test of a claim's 'substantive merits' is 'reserved for the summary

judgment procedure, governed by [Rule] 56, where both parties may conduct appropriate discovery and submit the additional supporting material contemplated by that rule.'" *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558–59 (2d Cir. 2016) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)). Thus, "[i]n adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (quoting *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013)).

Where a complaint "relies heavily upon [a document's] terms and effect," the document is "'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss." *Goel*, 820 F.3d at 559; *see also Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ("'[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint,' the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment." (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991))). "A document is integral to the complaint where the plaintiff (1) has 'actual notice' of the document and its information and (2) has 'relied upon the[ ] document[] in framing the complaint.'" *McLennon v. City of New York*, 171 F. Supp. 3d 69, 89 (E.D.N.Y. 2016) (alteration in original) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

> Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering limited quotations from the document is not enough. In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in

its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint.

*Goel*, 820 F.3d at 559 (alteration, internal quotation marks and citations omitted).

Courts may also "take judicial notice of facts 'not subject to reasonable dispute' because such facts are 'generally known' or 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned' without converting a motion to dismiss into a motion for summary judgment." *In re Bayer Corp. Combination Aspirin Prod. Mktg. & Sales Prac. Litig.*, 701 F. Supp. 2d 356, 367 (E.D.N.Y. 2010) (quoting Fed. R. Evid. 201(b), (f)). Courts in this circuit routinely "take judicial notice of publicly available information," *Gonzales v. Nat'l Westminster Bank PLC*, 847 F. Supp. 2d 567, 569 n.2 (S.D.N.Y. 2012), including "information publicly announced on certain non-governmental websites, such as a party's official website," *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (collecting cases).

Plaintiff attached 17 exhibits to his SAC, comprising Policy 703 (SAC Ex. 1, Dkt. 23, at ECF 31–61); the January 4, 2019 tweet posted to the account @vincentianteens, *i.e.*, the Tweet (*id.* Ex. 2, Dkt. 23, at ECF 63); the January 8, 2019 SJU student newspaper article about the #SurvivingSJU hashtag (*id.* Ex. 3, Dkt. 23, at ECF 65–66); correspondence between SJU officials and Plaintiff and/or his attorney (*id.* Ex. 4, Dkt. 23, at ECF 68; *id.* Ex. 6, Dkt. 23, at ECF 78; *id.* Ex. 7, Dkt. 23, at ECF 80; *id.* Ex. 8, Dkt. 23, at ECF 82; *id.* Ex. 10, Dkt. 23, at ECF 86; *id.* Ex. 14, Dkt. 23, at ECF 131; *id.* Ex. 15, Dkt. 23, at ECF 133–34), including emails transmitting the Appeals Board's final decision regarding the Doe complaint (*id.* Ex. 5, Dkt. 23, at ECF 70–76), the Conduct Board's findings regarding the Smith complaint (*id.* Ex. 15, Dkt. 23, at ECF 133–34), and the Appeals Board's final decision regarding the Smith complaint (*id.* Ex. 17, Dkt. 23, at ECF 143–50); correspondence between Plaintiff's counsel and Hurwit (*id.* Ex. 9, Dkt. 23, at ECF 84;

*id.* Ex. 12, Dkt. 23, at ECF 126–127; *id.* Ex. 13, Dkt. 23, at ECF 129); and SJU's You are Not Alone Guide, *i.e.*, the Guide (*id.* Ex. 11, Dkt. 23, at ECF 88–124). These documents, attached as exhibits to Plaintiff's SAC, undisputedly may be considered for purposes of the instant motion. *ASARCO*, 756 F.3d at 198.

Consideration of SJU's exhibits is more contentious. In support of its motion to dismiss, SJU submitted 20 sealed and unsealed exhibits comprising SJU's Student Code and Conduct Process (Hurwit Decl. Ex. A, Dkt. 37-3); draft and final investigating officer reports prepared by SJU's Title IX office regarding the Doe and Smith complaints (*id.* Ex. C, Dkt. 38-1; *id.* Ex. E, Dkt. 38-3; *id.* Ex. I, Dkt. 38-6; *id.* Ex. K, Dkt. 38-8); correspondence between SJU officials and Plaintiff (*id.* Ex. B, Dkt. 37-4; *id.* Ex. D, Dkt. 38-2; *id.* Ex. G, Dkt. 38-5; *id.* Ex. H, Dkt. 37-5; *id.* Ex. L, Dkt. 38-9; *id.* Ex. M, Dkt. 37-6; *id.* Ex. Q, Dkt. 38-10; *id.* Ex. R, Dkt. 38-11; *id.* Ex. S, Dkt. 38-12; *id.* Ex. T, Dkt. 38-13); the Conduct Board's handwritten decision regarding the Doe complaint (*id.* Ex. F, Dkt. 38-4); a letter sent by Plaintiff and his counsel to Lochrie regarding the Smith investigation report (*id.* Ex. J, Dkt. 38-7); correspondence between Plaintiff's counsel and Hurwit (*id.* Ex. N, Dkt. 37-7; *id.* Ex. O, Dkt. 37-8); and an incident tracking report maintained by SJU's Department of Public Safety following Plaintiff's complaints about receiving threats after the Tweet (*id.* Ex. P, Dkt. 37-9).

SJU argues that the Court should consider these exhibits without converting the present motion into one for summary judgment because they "are integral to the pleading, Plaintiff had actual notice of the evidence, and the SAC heavily relies upon them." (SJU's Reply Memorandum in Support of its Motion to Dismiss, Dkt. 39, at 7 (arguing that the exhibits were integrated "by reference in the Complaint, and/or were in Plaintiff's possession or knowledge and relied on in drafting the Complaint").) SJU further argues that Plaintiff chose not to include them as exhibits

to his SAC because he "cherry-pick[ed] documents from the investigatory and adjudicative record to engage in artful pleading," and "ignore[d] [the] documents and information from that same record – all of which he possesse[d] or kn[ew] about, and which defeat his claims." (SJU's Memorandum of Law in Support of its Motion to Dismiss ("SJU's Br."), Dkt. 37-1, at 9–10.) Plaintiff asks the Court to strike all twenty of Defendants' exhibits on the basis that some were "not available to [him] or relied upon [by] him in drafting his complaint." (Plaintiff's Memorandum of Law in Opposition to SJU's Motion to Dismiss ("Pl.'s Opp."), Dkt. 43, at 15.) Plaintiff's counsel states in a declaration that although he and Plaintiff viewed the Doe and Smith final investigation reports on campus at SJU, they did not receive copies of these reports until the exhibits were served during briefing of the instant motion. (Affirmation of Peter G. Eikenberry ("Eikenberry Aff."), Dkt. 44, ¶ 4.) Plaintiff's counsel also states that he and Plaintiff were never permitted to review the attachments referenced in the Doe and Smith final investigation reports,[21] that he and Plaintiff never received copies of the Doe and Smith draft investigation reports prior to service of SJU's exhibits, and that they had never seen the handwritten Doe hearing decision prior to service. (Id. ¶¶ 8.)

However, most of Defendants' exhibits were clearly available to Plaintiff during the drafting of his complaint, as thirteen of them consist of correspondence between SJU officials and Plaintiff or his counsel. (E.g., Hurwit Decl. Ex. B, Dkt. 37-4 (April 13, 2018 letter to Plaintiff from Lochrie, establishing a no-contact order between Plaintiff and Doe); id. Ex. D, Dkt. 38-2

---

[21] The attachments include, inter alia, a copy of the police report Doe filed in Paris, text messages between Doe and a witness, video stills depicting Plaintiff entering and exiting Doe's dorm floor, a photo of Smith and two witnesses from the night at issue in the Smith complaint, photos the investigator took of the living room where the incident underlying the Smith complaint occurred, and a January 4, 2019 email that Smith sent to a witness. (See Hurwit Decl. Ex. E, Dkt. 38-2; id. Ex. K, Dkt. 38-8.)

(email correspondence between Plaintiff and Lochrie in August 2018 regarding the Doe complaint and draft investigation report); *id.* Ex. G, Dkt. 38-5 (October 15, 2018 email from Flynn to Plaintiff regarding the Conduct Board's decision regarding the Doe complaint); *id.* Ex. H, Dkt. 37-5 (March 18, 2019 email from an SJU official to Plaintiff regarding the online threats Plaintiff had received); *id.* Ex. J, Dkt. 38-7 (April 4, 2019 email from Plaintiff and his attorney to Lochrie regarding the Smith complaint and draft investigation report); *id.* Ex. L, Dkt. 38-9 (June 6, 2019 email from Flynn to Plaintiff regarding the Smith behavioral hearing); *id.* Ex. M, Dkt. 37-6 (June 13, 2019 email from Flynn to Plaintiff regarding his non-attendance to the Smith behavioral hearing); *id.* Ex. N, Dkt. 37-7 (June 18, 2019 email correspondence between Plaintiff's counsel and Hurwit regarding an adjournment to the Smith hearing); *id.* Ex. O, Dkt. 37-8 (June 17, 2019 letter from Hurwit to Plaintiff's counsel regarding the Tweet); *id.* Ex. Q, Dkt. 38-10 (June 15, 2019 letter from Flynn to Plaintiff regarding the Smith hearing); *id.* Ex. R, Dkt. 38-11 (August 12, 2019 letter from Flynn to Plaintiff regarding the Smith hearing); *id.* Ex. S, Dkt. 38-12 (September 11, 2019 letter from Flynn to Plaintiff regarding the Smith hearing); *id.* Ex. T, Dkt. 38-13 (October 2, 2019 letter from Flynn informing Plaintiff of the Conduct Board's finding of a violation following the Smith hearing, and Plaintiff's expulsion from SJU).)

The Court addresses the exhibits in turn.

      1.     SJU's Student Code of Conduct

SJU filed its Student Code as an exhibit to its motion. (*Id.* Ex. A, Dkt. 37-3.) Policy 703, incorporated into Plaintiff's SAC as Exhibit 1, references SJU's Student Code as providing the standard guiding SJU's investigation and adjudication of sexual misconduct complaints against students. (*See, e.g.*, SAC Ex. 1, Dkt. 23, at ECF 56 (noting that "a complaint brought . . . against a student would be processed pursuant to the Student Code of Conduct").) The Student Code is also publicly available on SJU's website, as indicated by Policy 703, which provides the URL.

(*See id.* at 55 (noting that "a complete listing of the possible sanctions of a violation of the Code of Conduct" is available on SJU's website (citing SJU Student Code of Conduct, https://www.stjohns.edu/life-st-johns/student-conduct/student-conduct-process).))

The Court thus finds that the Student Code (Hurwit Decl. Ex. A, Dkt. 37-3) may properly be considered for purposes of this motion as being heavily relied upon by Plaintiff in his SAC, or alternatively through judicial notice. *Cf. Dasrath v. Ross Univ. Sch. of Med.*, No. 07-CV-2433 (CBA) (RER), 2008 WL 11438041, at *1 (E.D.N.Y. Aug. 6, 2008) (taking judicial notice of the defendant university's student handbook where (1) the handbook was "integral to [plaintiff's] complaint because it sets forth the terms and conditions of his contractual relationship with" the university, and (2) "the [h]andbook [wa]s readily available on the [i]nternet"); *see also, e.g.*, *In re Bayer Corp.*, 701 F. Supp. 2d at 368 (taking judicial notice of a publicly available enforcement handbook); *Dobek v. Leanaweaver*, No. 15-CV-7497 (LGS), 2016 WL 8711737, at *4 (S.D.N.Y. Aug. 5, 2016) (taking judicial notice of Metropolitan Correctional Center's publicly available manual for pre-trial inmates); *Marcus v. Leviton Mfg. Co.*, No. 15-CV-656 (SJF) (GRB), 2016 WL 74415, at *1 n.1 (E.D.N.Y. Jan. 6, 2016) (taking judicial notice of "[d]efendant's employee handbook referenced in the amended complaint"), *aff'd*, 661 F. App'x 29 (2d Cir. 2016).

### 2. Investigation Reports

SJU attaches the Doe and Smith draft and final investigation reports as exhibits to its motion. (Hurwit Decl., Ex. C, Dkt. 38-1 (Doe draft investigation report); *id.* Ex. E, Dkt. 38-3 (Doe final investigation report); *id.* Ex. I, Dkt. 38-6 (Smith draft investigation report); *id.* Ex. K, Dkt. 38-8 (Smith final investigation report).) Plaintiff certainly had notice of both the draft and final investigation reports concerning the Doe and Smith complaints. As indicated by SJU's exhibits comprising the emails between Plaintiff and Lochrie following the initial drafting of the investigation reports, Plaintiff was given the opportunity to review the draft reports and submit

28

comments and corrections.[22]  (*See id.* Ex. D, Dkt. 38-2, at ECF 2–3 (Plaintiff's comments and corrections following his review of the Doe draft investigation report); *id.* Ex. J, Dkt. 38-7 (Plaintiff's comments and corrections following his review of the Smith draft investigation report); *see also id.* Ex. E, Dkt. 38-3, at 7 n.9 (Plaintiff's factual clarification following his review of the Doe draft investigation report), 7 n.10 (same); *id.* Ex. K, Dkt. 38-8, at 1 n.1 (noting that a witness was interviewed at Plaintiff's request following Plaintiff's review of the Smith draft investigation report requested), 2 n.2 (Plaintiff's requested edit following his review of the Smith draft investigation report), 3 n.3 (same), 3 n.4 (same), 3 n.5, 3 n.6 (same).)

However, Plaintiff's factual allegations do not rely on or concern the investigation reports,[23] and his SAC does not reference them, or his requested edits following his review of the draft reports.  The Court accordingly strikes Exhibits C, D, E, I, J, and K.

3.   Correspondence between SJU Officials and Plaintiff and/or his Counsel

Though Plaintiff certainly had notice of and access to correspondence between SJU officials and himself or his counsel while drafting the SAC, he relies on only some of them.  The SAC describes, for instance, the October 15, 2018 letter that Flynn sent Plaintiff regarding the Conduct Board's decision regarding the Doe complaint and Plaintiff's subsequent suspension (*Id.* Ex. G, Dkt. 38-5; *see* SAC, Dkt. 23, ¶¶ 27–28, 31); the June 6, 2019 letter Flynn sent Plaintiff regarding the behavioral hearing regarding the Smith complaint (Hurwit Decl. Ex. L, Dkt. 38-9;

---

[22] As indicated by the footnotes added in the final investigation reports, Doe was given the opportunity to do the same.  (*See* Hurwit Decl. Ex. E, Dkt. 38-3, at 1 n.1, 2 n.2, 2 n.3, 3 n.4, 3 n.5, 3 n.6, 4 n.7, 4 n.8).)  The Court assumes that Smith was also given the opportunity to review the draft investigation report regarding her complaint, though she does not appear to have suggested any edits.  (*See id.* Ex. K, Dkt. 38-8.)

[23] Though the reports might ultimately be relevant to, and even serve as evidence rebutting, Plaintiff's claim that he was denied an opportunity to submit a statement before sanctions were rendered by the Office of Student Conduct, that does not make them integral to the complaint.

*see* SAC, Dkt. 23, ¶ 108); and the June 17, 2019 email Hurwit sent Plaintiff's counsel regarding the Tweet and Smith hearing (Hurwit Decl. Ex. O, Dkt. 37-8; *see* SAC, Dkt. 23, ¶ 112). The Court further notes that SJU's Exhibit T, the October 2, 2019 letter from Flynn to Plaintiff regarding the Conduct Board's decision regarding the Smith complaint (Hurwit Decl. Ex. T, Dkt. 38-13) was attached to Plaintiff's SAC as Exhibit 15 (SAC Ex. 15, Dkt. 23, at ECF 133–34). These exhibits are thus admissible for purposes of considering the instant motion.

Plaintiff does not rely on or make mention of, however, the no-contact order established between himself and Doe (Hurwit Decl. Ex. B, Dkt. 37-4), the March 18, 2019 letter from an SJU official to Plaintiff regarding the investigation of the Tweet (*id.* Ex. H, Dkt. 37-5), the Conduct Board's handwritten decision regarding the Doe complaint (*id.* Ex. F, Dkt. 38-4), or the letters between Flynn and Plaintiff and his counsel regarding Plaintiff's failure to attend the Smith behavioral hearing, and subsequent adjournments thereof (*id.* Ex. M, Dkt. 37-6; *id.* Ex. N, Dkt. 37-7; *id.* Ex. Q, Dkt. 38-10; *id.* Ex. R, Dkt. 38-11; *id.* Ex. S, Dkt. 38-12). Thus, though these documents provide evidence as to the factual context surrounding the incidents discussed in the SAC, they are not "integral" or "heavily relied upon" by the SAC. The Court accordingly strikes Exhibits B, F, H, M, N, Q, R, and S.

### 4.   SJU Department of Public Safety's Incident Tracking Report

Plaintiff makes no mention of the incident tracking report maintained by SJU's Department of Public Safety following Plaintiff's complaint of having been threatened and punched following the Tweet (*id.* Ex. P, Dkt. 37-9), and does not rely on it in his SAC. The Court accordingly strikes Exhibit P.

*       *       *

In sum, the Court considers only Plaintiff's proffered exhibits and Defendants' Exhibits A, G, L, and O in resolving this motion.

## II.    Dismissal of Plaintiff's Title IX Claims Against SJU

Title IX provides, *inter alia*, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"   20 U.S.C. § 1681(a).   "Thus, 'Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.'"   *Doe v. Colgate Univ.*, 760 F. App'x 22, 30 (2d Cir. 2019) (summary order) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). Critically, "Title IX claims require evidence of intentional discrimination.   A [p]laintiff must therefore show the defendant discriminated against him or her because of his or her sex; that the discrimination was intentional; and that the discrimination was a substantial or motivating factor for the defendant's actions."   *Doe v. N.Y. Univ.*, 438 F. Supp. 3d 172, 181 (S.D.N.Y. 2020) (alteration, internal quotation marks, and citation omitted), *appeal dismissed* (June 8, 2020).

In evaluating intentional sex-based discrimination, courts in the Second Circuit apply a burden-shifting framework[24] whereby (1) "allegation of facts supporting a minimal plausible inference of discriminatory intent . . . entitles the plaintiff to the temporary presumption of [discriminatory motivation]," (2) "until the defendant furnishes its asserted reasons for its action against the plaintiff," in which case (3) "the plaintiff must demonstrate that the proffered reason was not the true reason (or in any event not the sole reason) for the [discrimination], which merges with the plaintiff's ultimate burden of showing that the defendant intentionally discriminated against [him]."   *Doe v. Columbia Univ.*, 831 F.3d 46, 54–55 (2d Cir. 2016) (internal quotation

---

[24] "It is [] well[-]established that courts interpret 'Title IX by looking to the body of law developed under Title VI, as well as the caselaw interpreting Title VII.'"   *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 363 (S.D.N.Y. 2016) (quoting *Yusuf*, 35 F.3d at 714); *see also Torres v. Pisano*, 116 F.3d 625, 630 n.3 (2d Cir.1997) ("We have held that Title VII principles apply in interpreting Title IX.").

marks and citations omitted).   Thus, to survive a motion to dismiss under Rule 12(b)(6), a complaint alleging sex-based discrimination in the imposition of university discipline must "plead[] specific facts that support a minimal plausible inference of such discrimination."   *Id.* at 56; *see also Feibleman v. Tr. of Columbia Univ. in City of N.Y.*, No. 19-CV-4327 (VEC), 2020 WL 882429, at *9 (S.D.N.Y. Feb. 24, 2020) ("The Second Circuit has established what it describes as a 'low standard' for pleading the existence of gender bias in Title IX cases." (quoting *Columbia Univ.*, 831 F.3d at 48)).

Claims brought under Title IX concerning disciplinary proceedings "generally follow either an 'erroneous outcome' theory or a 'selective enforcement' theory."   *Colgate Univ.*, 760 F. App'x at 30 (quoting *Yusuf*, 35 F.3d at 715).   To bring a claim under the "erroneous outcome" theory, a plaintiff must plead "(1) 'articulable doubt [as to] the accuracy of the outcome of the disciplinary proceeding,' and (2) that 'gender bias was a motivating factor behind the erroneous finding.'"   *Id.* (quoting *Yusuf*, 35 F.3d at 715).   To bring a claim under the "selective enforcement" theory, a plaintiff must allege that, "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Feibleman*, 2020 WL 882429, at *8 (quoting *Yusuf*, 35 F.3d at 715).

The Court finds that Plaintiff fails to plead sufficient facts giving rise to even a minimal plausible inference of sex-based discrimination as to SJU's conduct in connection with the Doe complaint, the Tweet, or the Smith complaint.

### A.      Doe Complaint

In connection with the Doe complaint, Plaintiff alleges that SJU engaged in sex-based discrimination against Plaintiff by (1) finding him in violation of SJU's prohibition on non-consensual sexual contact even though it was Doe who had initiated the contact by placing his hand on her breast, (2) asserting that Plaintiff "should have *expected* a sanction of some kind for

admitting that Doe, the female student, had initiated physical contact of a sexual nature,"[25] (3) "[d]enying his appeal in disregard of Policy 703," and (4) denying his appeal on January 8, 2019 because SJU was being publicly scrutinized in light of the #SurvivingSJU hashtag.  (SAC, Ex. 23, ¶ 56 (emphasis in original).)

SJU understands Plaintiff's claim in connection with SJU's adjudication of the Doe complaint to be brought under the selective enforcement theory, and argues that Plaintiff fails to plead that he was treated differently from a similarly situated student of a different gender.  (*See* SJU's Br., Dkt. 37-1, at 10–12.)  Plaintiff does not respond to this argument in the two pages[26] he devotes to addressing SJU's motion with respect to the Doe complaint, and instead asserts an erroneous outcome theory, *i.e.*, that SJU erroneously found Plaintiff to have engaged in sexual misconduct when it was Doe who had initiated the sexual contact.  (*See* Pl.'s Opp., Dkt. 43, at 12–13.)  Plaintiff further argues that he has plausibly pleaded discriminatory intent because the Appeals Board denied his appeal of the Doe decision in the days following the "tweet storm" in response to #SurvivingSJU hashtag.  (*Id.* at 12.)

As an initial matter, the Court agrees with SJU that if Plaintiff seeks to bring a selective enforcement claim, such a claim would fail in the absence of allegations that SJU treated a similarly situated student differently.  *See N.Y. Univ.*, 438 F. Supp. 3d at 182 ("[C]ourts in this circuit have consistently dismissed selective enforcement claims absent allegations that a school treated similarly situated members of the opposite sex — that is, members of the opposite sex facing

---

[25] Though baffled by Plaintiff's use of the word "admitting" in this context, the Court interprets him as asserting, in effect, that SJU punished Plaintiff for *accusing* Doe of initiating sexual contact with him.

[26] The Court notes that the argument section of Plaintiff's opposition brief is only seven pages in length.  (Pl.'s Opp., Dkt. 43, at 12–18.)

comparable disciplinary charges—differently." (internal quotation marks omitted) (collecting cases)).

Plaintiff's erroneous outcome claim in connection with Conduct Board's decision regarding the Doe complaint fails for a different reason: he fails to allege sufficient facts to support an inference that gender bias was the motivating factor behind any erroneous decision. *See Colgate Univ.*, 760 F. App'x at 30. Plaintiff's claim is grounded on the theory that the Appeals Board rejected Plaintiff's appeal of the Conduct Board's decision regarding the Doe complaint because of the Tweet and the flood of responses to the #SurvivingSJU hashtag. The Second Circuit has held that

> where a university (1) takes an adverse action against a student or employee, (2) in response to allegations of sexual misconduct, (3) following a clearly irregular investigative or adjudicative process, (4) amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex, these circumstances provide the requisite support for a *prima facie* case of sex discrimination.

*Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019); *see also id.* at 31 (noting that "procedural deficiencies in the university's investigation and adjudication of the sexual assault complaint raise[] an inference that the university was motivated, at least in part, by bias," and that this bias was likely motivated by sex where "the university had been criticized for 'not taking seriously complaints of female students alleging sexual assault by male students'" (quoting *Columbia Univ.*, 831 F.3d at 56–57)).

Here, although SJU took an adverse action against Plaintiff in response to Doe's allegations of sexual misconduct, the SAC fails to sufficiently allege, even drawing all reasonable inferences in Plaintiff's favor, a "clearly irregular investigative or adjudicative process," from which the Court can plausibly infer that SJU's decision was motivated by sex-based discrimination. *See Menaker*, 935 F.3d at 33. Though Plaintiff repeatedly claims that SJU violated Policy 703 by denying him the opportunity to present a written impact statement before the sanction was

imposed, Policy 703 makes clear that the procedures in the Student Code apply to adjudication of complaints of sexual misconduct against students, and the Student Code does not provide for the respondent to submit an impact statement while the appropriate sanction is being decided on. (SAC Ex. 1, Dkt. 23, at ECF 56; *see* Hurwit Decl. Ex. A, Dkt. 37-3, at ECF 24 ("The *complainant* may provide an impact statement . . . while the Dean of Students or designee is deliberating on appropriate sanctions.") (emphasis added).)  Flynn's October 15, 2018 decision letter also made explicit that appeals would be considered only upon discovery of new evidence, or allegations of "omission[s] in the *Student Conduct procedure*[27] [] that may have affected the final outcome of the decision."  (Hurwit Decl. Ex. G, Dkt. 38-5, at ECF 3 (emphasis added).)  In denying Plaintiff's appeal on these grounds, the Appeals Board explained that (1) the Student Code provided the opportunity for only *complainants* to provide a written impact statement prior to the imposition of sanctions, and (2) alternatively, Plaintiff "ha[d] not met his burden of showing a procedural error that may have affected the outcome," as there was no evidence he had even attempted to submit a written impact statement.  (SAC Ex. 5, Dkt. 23, at ECF 73.)  There is nothing procedurally irregular about SJU's adjudication process permitting only complainants to submit "impact" statements after the Conduct Board has rendered its decision and while the appropriate sanction is being considered,[28] nor is there anything procedurally irregular about the Appeals Board's denial of

---

[27] The Student Conduct procedure refers to the "Conduct Process" section of the Student Code.  (*See* Hurwit Decl. Ex. A, Dkt. 37-3, at ECF 15–25.)

[28] The Court notes that, in contrast to this limitation on who may submit an impact statement once a violation has been found, under the Student Code—of which Plaintiff was provided a copy (*see* SAC Ex. 5, Dkt. 23, at ECF 74)—the respondent has the opportunity to provide statements and other evidence, as well as witness lists, to investigators and the Conduct Board prior to and in connection with the hearing on the alleged misconduct (*see* Hurwit Decl., Ex. A, Dkt. 37-3, at ECF 20 (explaining that where student-on-student sexual misconduct is alleged, the Student Code allows for the respondent to "submit lists identifying the witnesses they expect to present at the hearing," and witnesses may either "appear at the hearing in person, or may submit a written statement for the panel's consideration"), 21 (participants have "the

Plaintiff's appeal challenging the lack of opportunity to do so.  This alleged deficiency in SJU's process falls far short of the deficiencies recognized by the Second Circuit as demonstrating a "clearly irregular investigative or adjudicative process," such as failing to seek out potential witnesses, coming to an adverse decision despite knowing that the accusations were false, or failing to provide an investigation report despite promising to do so.  *See Menaker*, 935 F.3d at 33–34; *see also id.* at 34 n.50 ("[W]e emphasize that our standard requires *clear* irregularities to raise an inference of bias.  Variations . . . are expected, and minimal irregularities (absent other indicia of bias) do not suffice to suggest discrimination."); *N.Y. Univ.*, 438 F. Supp. 3d at 185 ("[T]he mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent." (quoting *Iscenko v. City of New York*, 2017 WL 2880553 at *5 (S.D.N.Y. July 5, 2017))).

Equally insufficient is Plaintiff's allegation that the Control Board's decision regarding the Doe complaint was, in effect, punishment of Plaintiff for "admitting" that Doe "had initiated physical contact of a sexual nature."[29]  (SAC, Ex. 23, ¶ 56.)  This allegation is based on a plainly erroneous interpretation of the Conduct Board's decision, which reads, in relevant part:

> [Plaintiff] admitted in engaging in physical contact of a sexual nature with [Doe], and the evidence demonstrated a lack of affirmative consent to engage in such contact.  Such evidence included [Doe]'s intoxication, as described by multiple witnesses, and [Plaintiff]'s assertion, which was not disputed, that he was not impaired by alcohol.

---

opportunity to answer relevant questions by any member of the Conduct Board" and "question all witnesses who testify at the hearing")).

[29] The Court also notes that, though Plaintiff now asserts that the Conduct Board came to an erroneous conclusion because Doe was the one to initiate the sexual contact, his appeal of the decision to the Appeals Board was premised on only (1) the denial of an opportunity for him to present a written impact statement prior to the imposition of sanctions, (2) the sanctions being inappropriate, and (3) the alleged denial of his right to present witnesses during the Doe hearing. (*See* SAC Ex. 5, Dkt. 23, at ECF 72.)

(Hurwit Decl., Ex. G, Dkt. 38-5, at ECF 3; *see also* SAC, Dkt. 23, ¶ 28.)  As is clear from this portion of the decision (upon which Plaintiff relies), the Conduct Board found that Plaintiff "admitted" that he and Doe had engaged in sexual contact, and even though Plaintiff told SJU's investigator that Doe had initiated that contact, the Conduct Board concluded that Doe was unable to affirmatively consent to the contact due to her intoxication.  In other words, even assuming that the Conduct Board accepted Plaintiff's account of the events, *i.e.*, that Doe had placed Plaintiff's hand on Doe's breast, the Board found that Doe did not, and could not, have done so knowingly and voluntarily due to intoxication, and that Plaintiff, who was "not impaired by alcohol," would have known that.  Thus, Plaintiff's facially erroneous allegation about the Conduct Board's reasoning cannot give rise to a plausible inference that SJU's adjudicative process with respect to the Doe complaint was clearly irregular.

With respect to Plaintiff's contention that the Appeals Board's rejection of Plaintiff's appeal was motivated by the criticism SJU was receiving for its handling of sexual misconduct allegations around that time, Plaintiff fails to plausibly allege that this criticism led SJU to "'favor the accusing female over the accused male' in order to demonstrate its commitment to protecting female students from male sexual assailants."  *See Menaker*, 935 F.3d at 32 (quoting *Columbia Univ.*, 831 F.3d at 57).  Though the Appeals Board's decision was dated January 8, 2019, which was during the aftermath of #SurvivingSJU hashtag trending on twitter, Plaintiff had been suspended, by decision of the Conduct Board and the Office of Student Conduct, on October 15, 2018.  (SAC Ex. 5, Dkt. 23, at ECF 71–72; *see also* SAC, Dkt. 23, ¶ 31.)  Thus, the Conduct Board's decision and the Office of Student Conduct's imposition of sanctions clearly could not have been motivated by the public criticism following the trending hashtag.  At most, Plaintiff alleges that "[u]pon information and belief," Flynn asked "Cunningham[, the chair of the Appeals

Board,] to expedite the January 8, 2019 appeal decision due to pressure of over 2,000 tweets by female students against [SJU]."  (SAC, Dkt. 23, ¶ 130.)  While the allegation that the Appeals Board's decision was *expedited* due to public pressure is certainly plausible, that allegation, in itself, is insufficient to give rise to an inference that the Appeals Board's decision to *affirm* the Conduct Board's findings and the Office of Student Conduct's sanctions was because of the "tweet storm" and that Plaintiff's gender was a motivating factor in affirming the decision, especially in light of the unpersuasive, largely procedural arguments made by Plaintiff in his appeal and the Appeals Board's well-reasoned justifications for its decision.[30]  Plaintiff offers nothing more than the timing of the Appeals Board's decision to support his claim that the Appeals Board reached an erroneous outcome based on gender bias.  This is not enough.

Thus, in the absence of procedural irregularities and reason to infer that the Appeals Board's decision was motivated by public pressure rather than its stated reasons, Plaintiff fails to plead that SJU reached an erroneous outcome regarding the Doe complaint because of sex-based discrimination, and Plaintiff's Title IX claim in connection with the Doe complaint is dismissed.

---

[30] In his appeal of the Conduct Board's decision regarding the Doe complaint, Plaintiff principally argued that (1) he was not given the opportunity to submit a written impact statement "to the decision-maker prior to a determination of an appropriate sanction(s)," as required by Policy 703, (2) the sanctions were inappropriate, and (3) he was denied the opportunity to present witnesses at the Doe hearing.  (SAC Ex. 5, Dkt. 23, at ECF 71–72; *see also* SAC, Dkt. 23, ¶ 35.) In affirming the Conduct Board's decision, the Appeals Board addressed each of these arguments, explaining that: (1) Policy 703 did not provide grounds for appealing the Conduct Board's decision, the procedures for which were governed by the Student Code, and that, regardless, Plaintiff did not attempt to submit a written impact statement or demonstrate that the any statement would have impacted the sanctions imposed (SAC Ex. 5, Dkt. 23, at ECF 73–74); (2) the sanctions were appropriate under the circumstances (*id.* at ECF 74); and (3) Plaintiff was permitted to present witnesses at the hearing pursuant to SJU's Student Conduct Process, of which Plaintiff was provided a copy, and Plaintiff failed to explain which witnesses he would have called, thereby failing to sustain his burden of demonstrating that the witnesses would have impacted the decision (*id.* at ECF 74–75).

### B.      Failure to Investigate the Tweet

Plaintiff alleges that the Tweet constituted "'sexual harassment' of a 'verbal sexual nature,'" and that once he "made a complaint of hostile environment based on Doe's false and defamatory tweet in violation of Code of Conduct privacy requirements," SJU was required by Policy 703 to investigate the complaint.  (SAC, Dkt. 23, ¶¶ 77, 81–87.)  According to Plaintiff, his "sex was a motivating factor in [SJU]'s decision not to investigate his claim," and this "failure to investigate the tweet constituted deliberate indifference."  (*Id.* ¶¶ 79, 89; *see also id.* ¶ 87.)  As a result of SJU's "deliberate indifference and failure to follow its own policies and procedures in response to [Plaintiff]'s complaint," Plaintiff argues that he was subjected to "a hostile environment and ultimately deprived [] of access to educational opportunities."  (*Id.* ¶ 92.)

To bring a Title IX claim for hostile education environment, a "plaintiff must show that he subjectively perceived the environment to be hostile or abusive and that the environment objectively was hostile or abusive."  *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011) (citing *Hayut v. State Univ. of N.Y.*, 352 F.3d 733 744 (2d Cir. 2003)).  The "plaintiff must show not only that the educational environment was hostile or abusive, but actually constituted discrimination 'because of sex.'"  *Sutton v. Stony Brook Univ.*, No. 18-CV-7434(JS)(ARL), 2020 WL 6532937, at *6 (E.D.N.Y. Nov. 5, 2020) (citing *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 189 (2d Cir. 2001)).

SJU moves to dismiss this claim on the grounds that Plaintiff fails to plausibly plead that (1) he was subject to sex-based harassment (SJU's Br., Dkt. 37-1, at 17–18), (2) SJU acted with deliberate indifference (*id.* at 18–20), (3) any harassment was severe or pervasive, or denied him access to educational opportunities (*id.* at 20–21), and (4) SJU had control over the alleged harassing conduct (*id.* at 21–22).  The Court agrees that the Tweet does not constitute sex-based

harassment and that, regardless, Plaintiff fails to allege harassment to the severity contemplated by Title IX.

The court in *Nungesser v. Columbia University* addressed this exact argument when the plaintiff was accused of sexual misconduct but found "not responsible," after which the complainant began a public campaign "to brand him as a 'serial rapist'" by, *inter alia*, speaking with reporters, publishing an op-ed in Time Magazine entitled "My Rapist is Still on Campus," and undertaking "the Mattress Project, a performance art piece that involved carrying her mattress around Columbia's campus with her[] throughout her senior year," including at her graduation ceremony, with the stated goal of "get[ting] [her] rapist off campus." 169 F. Supp. 3d 353, 359–61 (S.D.N.Y. 2016). The plaintiff brought a claim against the school, Columbia University, alleging deliberate indifference to the alleged sex-based harassment in the form of the complainant's activism. *Id.* at 363. In finding that the complainant's activism was not considered sex-based under Title IX, the court explained:

> "On the basis of sex," as used in Title IX, refers to one's status [as male or female], not to whether the underlying conduct was sexual in nature.
>
> . . .
>
> That the accusations against [plaintiff] involved an act of sex does not mean they were motivated by his gender. [Plaintiff] distills his argument to a sentence in his opposition brief: "falsely accusing a male of being a 'rapist' . . . is inherently gender based and was directed to [plaintiff] as a male." As an initial matter, the Court rejects the assumption that calling someone a rapist, falsely or not, is inherently gendered [as persons of any gender may be perpetrators, or victims, of sexual assault].
>
> . . .
>
> To the extent that [the complainant]'s activism was aimed at [plaintiff] it was because of his conduct toward her (whether because of his rejection of her, as he alleges, or because of the rape, as she claims) not because of his status as a male. Personal animus is not gender-based harassment, and cannot form the basis for a Title IX violation.

*Nungesser*, 169 F. Supp. 3d at 364–66 (footnotes, emphasis, internal quotation marks, and citations omitted).

In finding that the complainant's activism did not constitute harassment under Title IX, the court further explained:

> Cases in which a plaintiff has stated a claim based on peer harassment under Title IX typically include allegations of unwelcome sexual touching or the use of gendered slurs.
>
> . . .
>
> [Plaintiff] does not allege that [the complainant] ever attempted to touch him, spoke to him, followed him, or otherwise interacted with him after the [] hearing. Nor does he allege that she ever used his name in any of her public statements.

*Id.* at 366 (collecting cases).

The Court similarly finds that the Tweet was not "on the basis of sex" because it was based on Plaintiff's alleged past conduct, not his gender. The Tweet also does not arise to the level of harassment for which Title IX offers a cause of action.[31] Furthermore, Plaintiff does not allege harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive [him] of access to the educational opportunities or benefits provided by the school." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). "Examples of such negative effects include a drop in grades, missing school, being forced to transfer schools, or mental health issues requiring

---

[31] Plaintiff argues that, by sending him a copy of SJU's "You are Not Alone" guide, SJU was acknowledging that Plaintiff was a victim of sexual misconduct, and thus obligated to investigate his complaints. This argument is meritless. Besides the fact that the Guide is available as a resource publicly, *see* https://www.stjohns.edu/sites/default/files/2020-08/yana_8-14-2020._2pdf.pdf, not just for those who allege sexual misconduct that SJU is obligated to investigate, it indicates in its preface that its purpose is "to provide support as well as important information about prohibited conduct, available resources on and off campus, and ways to file a complaint" and that it is directed at those who "have survived sexual misconduct or [those who] know someone who has" (SAC Ex. 11, Dkt. 23, at ECF 90). The Guide's preface therefore makes clear that its purpose is to provide information, rather than acknowledge that an actionable complaint has been filed.

therapy or medication." *Nungesser*, 169 F. Supp. 3d at 368.  To be sure, Plaintiff does allege having been threatened by another student over the internet, and being punched at a bar.  (SAC, Dkt. 23, ¶¶ 45, 47.)  But he "does not allege that he ever missed class, altered his study habits, or was otherwise unable to access educational opportunities as a result of these threats." *Nungesser*, 169 F. Supp. 3d at 369; *see also Manfredi v. Mount Vernon Bd. of Educ.*, 94 F. Supp. 2d 447, 455 (S.D.N.Y. 2000) (finding that the plaintiff "was not denied equal access to education" where she "missed only one day of school").

Accordingly, because Plaintiff fails to allege that he was subjected to sex-based harassment so severe, pervasive, and objectively offensive so as to deprive him of access to educational opportunities, his Title IX claim against SJU in connection with its failure to investigate the Tweet is dismissed.

### C.     Smith Complaint

In connection with the Smith complaint, Plaintiff appears to bring another erroneous outcome claim, alleging that SJU (1) "did not publish the procedures that were to be followed to ensure that due process w[ould be] observed at the" Smith hearing (SAC, Dkt. 23, ¶ 110), including procedures regarding how faculty members were selected for the Conduct Board or Appeals Board, who may speak to Board members during deliberations and what they may speak about, safeguards to prevent bias in light of the widespread knowledge of the Tweet (*id.* ¶ 128), and (2) violated Policy 703 because (a) "it [wa]s almost certain that one or more of the faculty members at the [Smith] hearing . . . [had] know[n] about the [T]weet, . . . it [was] impossible to eliminate bias so as to ensure the fair and impartial process" (*id.* ¶ 114), (b) there was no record as to communications between and among Flynn, investigators, Conduct Board and Appeals Board members, Foley, and Cunningham (*id.* ¶ 129); (c) "Flynn controlled every aspect of the [Doe and Smith hearings] . . . and every aspect of both appeals where sanctions were upheld against

42

[Plaintiff]" (*id.* ¶ 130); and (d) the Appeals Board demonstrated its "bias against [Plaintiff] as a male student" in its opinion (*id.* ¶ 131). Plaintiff further argues that SJU discriminated against him by "arbitrarily suspend[ing] [him] from [SJU] without a hearing, explanation or citation of rule." (*Id.* ¶ 52)

SJU argues that Plaintiff's allegations in support of his Title IX claim in connection with the Smith complaint "are devoid of any fact that would suggest that any aspect of SJU's investigative or adjudicatory process concerning [the Smith complaint] was conducted in error," and "instead recite a litany of trivial grievances having nothing whatsoever to do with the elements of a cause of action under Title IX." (SJU's Br., Dkt. 37-1, at 24 (emphasis omitted).)

Plaintiff does not refute this argument or address this cause of action *at all* in his counseled opposition brief. (*See generally* Pl.'s Opp., Dkt. 43, at 12–19.) The Court thus considers this claim abandoned. *See Williams v. Suffolk County*, 284 F. Supp. 3d 275, 284 (E.D.N.Y. 2018) ("The [p]laintiff did not respond, in any way, to the [d]efendants' arguments concerning [this] . . . claim. Therefore, th[e] claim is deemed abandoned." (collecting cases)); *Rohn Padmore, Inc. v. LC Play Inc.*, 679 F. Supp. 2d 454, 459 (S.D.N.Y. 2010) ("Where one party fails to respond to an opposing party's argument that its claim must be dismissed, courts may exercise their discretion and deem the claim abandoned" (citation omitted)); *Lipton v. County of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." (collecting cases)); *see also Wilkov v. Ameriprise Fin. Servs., Inc.*, 753 F. App'x 44, 46 n.1 (2d Cir. 2018) (summary order) (affirming dismissal of "claims on the ground that they were 'abandoned' by [the plaintiff] when she failed to oppose them in her opposition to [the] motion to dismiss").

Even had Plaintiff not abandoned this claim, however, the Court would dismiss it for failure to state a claim. Drawing all reasonable inferences in Plaintiff's favor, the Court agrees with SJU that the SAC alleges only trivial grievances that do not constitute "a clearly irregular investigative or adjudicative process" in connection with the Smith complaint. *See Menaker*, 935 F.3d at 33. First, as discussed *supra*, Plaintiff's reliance on Policy 703 is misplaced because the Policy makes clear that complaints against students are investigated and adjudicated pursuant to procedures outlined in the Student Code. Plaintiff cites no provision of the Student Code or Policy 703 giving rise to any obligation by SJU to publish hearing procedures addressing the Tweet, or maintain a record of communications between Flynn and Board members. Nor, as discussed *supra*, does the denial of an opportunity for Plaintiff to present a written impact statement constitute a procedural violation. Furthermore, Plaintiff provides no reason to believe that his suspension on January 8, 2019, was because of his gender, rather than because he was accused of sexual misconduct while on disciplinary probation which, as discussed *supra*, Plaintiff was warned would "result in additional sanctions," including but not limited to "suspension or expulsion." (Hurwit Decl. Ex. G, Dkt. 38-5, at ECF 2.)

Second, the suggestion in the SAC that there was something untoward about Flynn having been involved in suspending Plaintiff on January 8, 2019, and then selecting the members of the Conduct and Appeals Boards and their chairs, and then discussing Plaintiff's conduct with Foley and Cunningham, is meaningless. (*See* SAC, Dkt. 23, ¶ 130.) The fact that Flynn was SJU's Director of Student Conduct, and thus in a position to make decisions regarding Conduct Board members and sanctions following the Conduct Boards' findings of violations following the Doe and Smith hearings, does not give rise to an inference of irregularity. Indeed, that would seem to be the expected norm.

Furthermore, Plaintiff's allegation that Flynn "[c]oach[ed] the investigator to testify adversely [against] [Plaintiff]" at the Smith hearing amounts to a conclusory statement that does not independently give rise to the inference of a "a clearly irregular investigative or adjudicative process." *See Menaker*, 935 F.3d at 33. Plaintiff alleges, "[u]pon information and belief" that Flynn "conferred with the impartial investigator . . . both in advance of the hearing and thereafter" (SAC, Dkt. 23, ¶ 118), and intimates that, as a result, the investigator "question[ed] [Plaintiff's] credibility regarding the fact that he moved [out of his house where the Smith incident occurred] for his own convenience by stating falsely that he lived [with] his mother 15 miles away, when in fact, he moved [in] with his father only minutes away" (*id.* ¶ 130). However, the SAC contains no factual allegation to support this speculation that the investigator's testimony was a product of Flynn's "[c]oach[ing]" (*id.*), rather than the findings of the investigation itself (even if erroneous). There also is nothing in the SAC that explains how this allegedly erroneous testimony by the investigator affected Plaintiff's credibility or that it had any impact on the outcome of the hearing whatsoever. Indeed, this minor factual dispute was immaterial to the Conduct Board's rationale for its finding, which cited "key inconsistencies in [*Plaintiff*]*'s* testimony," "the accounts of [Plaintiff]'s housemates," and the fact that "key aspects of [Plaintiff]'s *account of the events* lacked credibility, including his testimony that he turned [Smith]'s face toward the couch in the event she vomited." (*Id.* Ex. 15, Dkt. 23, at ECF 134 (emphases added).)[32]

Finally, the timing of the proceedings relating to the Smith complaint, as alleged in the SAC, fails to show that SJU's response to the complaint was "amid criticism for reacting

---

[32] Plaintiff further complains that, on the day of the Smith hearing, he "and his counsel were kept waiting for an hour past the original scheduled time for the commencement of the [] hearing." (SAC, Dkt. 23, ¶ 115.) It belies logic to consider this one-hour delay an indication of "a clearly irregular investigative or adjudicative process." *See Menaker*, 935 F.3d at 33.

inadequately to allegations of sexual misconduct by" male students.  *See Menaker*, 935 F.3d at 33. Though Plaintiff was suspended on January 8, 2019, four days after the Tweet, that decision was made in response to Smith's complaint about Plaintiff having violated the Student Code while on disciplinary probation from the Doe incident.  (*See* SAC Ex. 6, Dkt. 23, at ECF 78; SAC, Dkt. 23, ¶ 50; *see also id.* Ex. 2, Dkt. 23, at ECF 63; SAC, Dkt. 23, ¶ 39.)  In fact, as previously discussed, Plaintiff was warned months earlier, on October 15, 2018, that any violation of the Student Code (including committing sexual misconduct) would "result in additional sanctions," including but not limited to "suspension or expulsion."  (Hurwit Decl. Ex. G, Dkt. 38-5, at ECF 2.)  Plaintiff provides no reason to believe that his suspension on January 8, 2019 was because of his gender, rather than because he was accused by Smith three days prior of sexual misconduct while on disciplinary probation.  (*See* SAC, Dkt. 23, ¶¶ 46, 108.)  Furthermore, though Plaintiff alleges that SJU was experiencing public pressure to investigate claims of sexual misconduct following the trending #SurvivingSJU hashtag in January 2019 (*e.g.*, *id.* Ex. 3, Dkt. 23, at ECF 65–66), there is no indication—beyond Plaintiff's conclusory assertion (SAC, Dkt. 23, ¶ 132)—that SJU continued to experience any such scrutiny when it conducted the Smith hearing over nine months later, on September 17, 2019 (*id.* ¶ 109).  Plaintiff believes that "it is almost certain that one or more of the faculty members [on] the Conduct [B]oard [at the Smith hearing] would [have] know[n] about the [T]weet" (*id.* ¶ 114), but does not allege that either the Tweet or hashtag played any actual role at the hearing.  Indeed, SJU's attorney confirmed in June that "there w[ould] be no reference to the [Tweet] at the [Smith hearing] unless [Plaintiff] opens the door."  (*Id.* Ex. 13, Dkt. 23, at ECF 129; *see also* SAC, Dkt. 23, ¶ 113.)

Having failed to plead that SJU "follow[ed] a clearly irregular investigative or adjudicative process . . . amid criticism for reacting inadequately to allegations of sexual misconduct by

members of one sex," Plaintiff has failed to establish an inference of discriminatory intent in SJU's conduct in connection with the Smith complaint. *Cf. Menaker*, 935 F.3d at 33. The Court accordingly finds that even if Plaintiff had not abandoned his Title IX claim as to the Smith incident, it would have been dismissed for failure to state a claim. The Court grants SJU's motion to dismiss this claim.

## III.  Dismissal of Plaintiff's State-Law Claim Against SJU

Having dismissed all Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over his state-law claim for breach of contract against SJU, and dismisses them without prejudice to bring in state court. *See Liverpool v. City of New York*, No. 19-CV-5527 (CM), 2019 WL 3745734, at *3 n.2 (S.D.N.Y. Aug. 7, 2019) ("Under 28 U.S.C. § 1367(c)(3)[,] a district court may decline to exercise supplemental jurisdiction over state-law claims when it has dismissed all claims over which it has original jurisdiction." (internal quotations omitted)).

## IV.  Dismissal of Plaintiff's Defamation Claim against Doe

The Court similarly declines to exercise supplemental jurisdiction over Plaintiff's defamation claim against Doe, *see Liverpool*, 2019 WL 3745734, at *3 n.2, and grants Doe's request to dismiss that claim.[33]   (Defendant Doe's Memorandum of Law in Support of SJU's Motion to Dismiss, Dkt. 40, at 14–17.)

---

[33] For the same reasons, the Court declines to exercise supplemental jurisdiction over Doe's counterclaims.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants SJU's and Doe's motion to dismiss in its entirety (Dkts. 37, 40), and Doe's counterclaims are dismissed for lack of subject matter jurisdiction.  Because this action is dismissed in its entirety, Defendants' request to amend the caption is moot.  The Clerk of Court is respectfully directed to enter judgment and close this case.


SO ORDERED.


*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 31, 2021
       Brooklyn, New York