UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2021

(Argued:  April 12, 2022   Decided:  January 31, 2024)

Docket No. 21-1125

━━━━━━━━━━━━━━━━━━

RICHARD ROE,
*Plaintiff-Counter-Defendant-Appellant*,

v.

ST. JOHN'S UNIVERSITY,
*Defendant-Appellee*,

JANE DOE,
*Defendant-Counter-Claimant-Appellee*.

━━━━━━━━━━━━━━━━━━

Before:      SACK, PARKER, AND MENASHI, *Circuit Judges*.[*]

St. John's University disciplined male plaintiff "Richard Roe" for allegedly sexually assaulting two women—"Jane Doe" and "Mary Smith"—on separate occasions.  Roe brought suit against St. John's University in the United States District Court for the Eastern District of New York, alleging that it violated his rights under Title IX of the Education Amendments of 1972 and under state contract law.  Roe also sued Doe under state law for allegedly defaming him in an anonymous tweet that accused Roe of sexual assault.  The district court (Pamela K. Chen, *J.*) granted St. John's University's motion to dismiss Roe's suit under Federal Rule of Civil Procedure 12(b)(6), concluding that Roe had failed to state a Title IX claim against St. John's University.  The district court also

---

[*] Judge Amalya L. Kearse, originally a member of the panel, recused herself from this case after it had been argued. Judge Barrington D. Parker, chosen at random, was subsequently added to the panel in her stead.

declined to exercise supplemental jurisdiction over Roe's state-law breach of contract and defamation claims.  Roe timely appealed, arguing that he had adequately pleaded facts raising a minimal plausible inference of sex discrimination in St. John's University's disciplinary procedures.  For the reasons set forth below, we disagree.  We therefore

AFFIRM the judgment of the district court.

Judge Parker concurs in a separate opinion.

Judge Menashi dissents in a separate opinion.

> PETER G. EIKENBERRY (Michael Valentine, *on the brief*, The Law Office of Michael Valentine, Brooklyn, NY), Law Office of Peter G. Eikenberry, New York, NY, *for Plaintiff-Counter-Defendant-Appellant*;
>
> LYLE S. ZUCKERMAN (Michael J. Goettig, *on the brief*), Davis Wright Tremaine LLP, New York, NY, *for Defendant-Appellee*;
>
> CHARDAIE C. CHARLEMAGNE (Victoria L. Stork, *on the brief*, Baker & Hostetler LLP, New York, NY), Baker & Hostetler LLP, San Francisco, CA, *for Defendant-Counter-Claimant-Appellee*.

SACK, *Circuit Judge*:

## INTRODUCTION

St. John's University ("SJU"), headquartered in the New York City

borough of Queens, disciplined male plaintiff Richard Roe for allegedly sexually

21-1125

*Roe v. St. John's University*

assaulting two women, Jane Doe and Mary Smith,[1] in different countries, several

months apart.  Roe claims that anti-male bias influenced SJU's adjudication of the

accusations against him, and based thereon, brought suit against SJU in the

United States District Court for the Eastern District of New York for violating his

rights under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C.

§ 1681 *et seq.*, and under state contract law.  Roe also sued Doe for defamation

based on an alleged anonymous tweet that falsely accused Roe of sexual assault.

Roe further contends that SJU's failure to adequately investigate his claims

regarding the tweet subjected SJU to liability under Title IX and for breach of

contract.

     SJU moved to dismiss Roe's complaint pursuant to Federal Rule of Civil

Procedure 12(b)(6).  The district court (Pamela K. Chen, *J.*) granted SJU's motion

and dismissed Roe's suit because, the court concluded, Roe had failed to allege

sufficient facts to support a minimal plausible inference of sex-based[2]

discrimination by SJU.  The court also declined to exercise supplemental

jurisdiction over Roe's state-law breach of contract and defamation claims.  Roe

---

[1] "Richard Roe," "Jane Doe," and "Mary Smith" are pseudonyms adopted for the purposes of this litigation.

[2] This opinion uses the terms "sex" and "gender" interchangeably.

21-1125

*Roe v. St. John's University*

timely appealed, arguing principally that the district court's dismissal of his Title

IX claims was erroneous.  For the reasons set forth below, we disagree and

therefore affirm the judgment of the district court.

We emphasize at the outset that our focus is on the decisions made and

related actions taken by university officials patrolling the behavior of the

university's students.  Despite their operation as a panel in a manner much like a

federal or state court adjudicating a case or controversy, the officials did not

constitute a court of law.  Moreover, while this case's facts involve charges of

highly offensive sexual predation by a male student against two female fellow

students, we express no opinion as to whether the *university* selected appropriate

punishments for the male student's alleged transgressions.  Instead, our review

is principally concerned with whether the *district court* correctly concluded that

the male student failed to plausibly allege that anti-male bias influenced the

university's disciplinary process in violation of his rights under Title IX.

21-1125
*Roe v. St. John's University*

## BACKGROUND

### I.      Factual Background

A.      The Doe Incident

According to the allegations in Richard Roe's complaint in the district court:  On April 12, 2018, Roe and Jane Doe were both SJU students studying in Paris, France, lodging in an SJU dormitory there.  On their first night in the city, Roe and Doe visited a local club with several other SJU students.  Doe asked Roe to dance with her, and he agreed.  "[W]hen Roe was back in the dorm, he went to Doe's room and found her awake and on her phone."  JA 12.  "Doe invited Roe into her room and, thereafter, Doe took Roe's right hand and placed it upon her fully clothed breast."  *Id.*  Roe "immediately said, 'I am not interested in sex,'" and Doe responded, "[t]hen, get the hell out of here."  *Id.*  Roe then left.[3]

B.      The Doe Incident's Aftermath

Doe submitted a complaint to SJU accusing Roe of sexual misconduct.  SJU notified Roe of Doe's complaint on September 4, 2018, some five months after the

---

[3] Inasmuch as the issue before us is whether Roe's complaint filed in the district court "contain[s] sufficient factual matter, accepted as true," to state a plausible claim for relief, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), Doe's allegations about Roe's misconduct have, at most, limited relevance to the questions at hand.

21-1125

*Roe v. St. John's University*

events allegedly occurred.  The following month, on October 3, 2018, SJU's

"Conduct Board" held a "Conduct Hearing" with respect to Doe's allegations.

Roe attended.

Although Roe asserts that SJU was required to follow its own internal

policies and procedures when determining the validity of Doe's complaint

against him, Roe has not alleged that this Conduct Hearing was required to

provide him with all the procedural protections that he would receive if his case

were tried in a federal court.  Indeed, SJU's Student Code of Conduct and

Conduct Process ("Student Code of Conduct") states that the applicable

evidentiary standard in a sexual misconduct case is a preponderance of the

evidence, a much lower burden of proof than the beyond a reasonable doubt

standard that would apply in a federal criminal case.[4]  The Student Code of

Conduct also states that "[s]trict conformity to the legal rules of evidence shall

not be required at hearings."  JA 227.

---

[4] Roe did not include SJU's Student Code of Conduct as an exhibit to his complaint, but SJU did include the document as an exhibit to its motion to dismiss.  The district court nonetheless concluded that it could consider the Student Code of Conduct without converting SJU's motion to dismiss into one for summary judgment because Roe heavily relied upon the document in his complaint and because the Student Code of Conduct is publicly available on SJU's website.  *Roe v. St. John's Univ.*, No. 19-CV-4694 (PKC) (RER), 2021 WL 1224895, at *14 (E.D.N.Y. Mar. 31, 2021).  Roe has given us no reason to question that conclusion, and Roe himself quotes from the Student Code of Conduct in his appellate briefs.

At the October 2018 Conduct Hearing, Roe stood accused of multiple charges in connection with the events of April 12.  But the Conduct Board concluded that he had violated only one applicable Student Code of Conduct provision:  that prohibiting non-consensual sexual contact.  The Conduct Board sent Roe a letter informing him of this finding and notifying him that the Student Conduct Administrator had determined that Roe would receive, in addition to other sanctions, a one-semester suspension for his misconduct.

The Conduct Board's stated rationale for its misconduct finding was that:

> [Roe] admitted in [sic] engaging in physical contact of a sexual nature with [Doe], and the evidence demonstrated a lack of affirmative consent to engage in such contact.  Such evidence included [Doe's] intoxication, as described by multiple witnesses, and [Roe's] assertion, which was not disputed, that he was not impaired by alcohol.

JA 80–81.[5]  Roe appealed his suspension to the SJU administration's "Conduct Appeals Board" on November 7, 2018.  The Appeals Board affirmed the decision and suspension on January 8, 2019, reasoning in part that "[Roe] had admitted to

---

[5] Exhibit F in support of SJU's motion to dismiss is an incident adjudication report that contains handwritten notes from the October 2018 Conduct Hearing that provide additional explanations for the Conduct Board's decision.  We conclude that consideration of Exhibit F was not necessary to resolve this case and therefore do not reach SJU's argument that the district court erred by excluding it.

21-1125

*Roe v. St. John's University*

the physical touching at issue here and, thus, should have expected a sanction of

some kind."  JA 82.

C.    The Smith Incident

According to Roe's complaint, another woman, Mary Smith, accused Roe

of sexually assaulting her in December 2018, while Roe was serving his

suspension based on the Doe allegations.  Roe alleges in his complaint that on the

night of December 15, 2018, Roe and Smith were both at a local bar in New York

City where Smith became intoxicated.  After the bar closed, a friend of Roe's

agreed to drive Smith back to Roe's house.  A short time after arriving there,

Smith went outside to sleep on a concrete patio adjacent to the house.  Roe

invited Smith to sleep on a couch in the living room instead because it was

raining and near freezing outside.  Smith accepted.  Because Roe was concerned

that Smith's intoxication might cause her to vomit, "he propped her up on her

side with her back against the sofa to ensure that she could not choke."  JA 28.

Roe then fell asleep at the foot of the couch, and Smith left Roe's home the next

morning without incident.[6]

---

[6] As with the discussion of the Doe incident above, inasmuch as the issue presented in
connection with the motion to dismiss Roe's complaint is whether Roe's complaint "contain[s]
sufficient factual matter, accepted as true," to state a plausible claim for relief, *Iqbal*, 556 U.S. at

21-1125
*Roe v. St. John's University*

D.     <u>The Tweets</u>

Roe alleges in his complaint that, on January 4, 2019, shortly after Smith

spent the night at Roe's home during the previous month, the hashtag

"#SurvivingSJU" was created, by whom we do not know.  Roe further alleges

that more than 2,000 tweets were posted under the hashtag on January 4 and

that, as a result, it was the "number one hashtag" trending on Twitter in the

United States from January 4 to January 6, 2019.  JA 15, 17**.**  SJU's student

newspaper reported that in response to the hashtag and the public criticism that

the tweets conveyed, SJU would investigate all claims posted under

#SurvivingSJU.

Roe contends that he was the subject of one among the thousands of tweets

published under the hashtag #SurvivingSJU.  The tweet, which was posted by an

anonymous user on January 4, the same day that the hashtag was created,

included a picture of Roe and contained the message  "[Roe] was allowed to stay

abroad after raping me with no travel restrictions.  Only got half a semester

suspension."  JA 72.

_____

678, the complete details of Smith's allegations against Roe in response are not relevant to this
discussion.

21-1125

*Roe v. St. John's University*

Roe asserts that "Doe almost instantly 'liked' the anonymously posted tweet, and less than 30 minutes later, posted in another tweet from her personal account that she had written a 'final statement' for the University Conduct Hearing . . . instead of 'writing essays' for her classes." JA 15–16. Roe claims that "only Doe, Roe and [SJU] officials were informed of Roe's suspension and the reason for it" and that "the only person who could have authored the [allegedly defamatory] tweet was Doe." JA 16. Roe asserts that shortly after the tweet was published, a male SJU student threatened him via phone calls and text messages and a female SJU student punched him in the face at a bar.

On January 7, 2019, Roe's attorney brought the tweet to the attention of SJU officials. On January 16, SJU's Director of Title IX Compliance informed Roe that SJU could not reprimand the individual who posted the tweet because it could not determine his or her identity. On July 18, 2019, Roe's attorney again contacted an SJU official in an attempt to determine how SJU would respond to the allegedly defamatory and harassing tweet. SJU's attorney denied that SJU had any obligation to investigate Roe's claim that Doe was the tweet's author because SJU did not have any evidence implicating Doe.

E.      <u>The Smith Incident's Aftermath</u>

On January 5, 2019—the day after the creation of #SurvivingSJU and the dissemination of the tweet accusing Roe of sexual assault—Smith filed a complaint with SJU against Roe accusing him of sexually assaulting her during the preceding month.  On January 7, SJU ordered Roe and Smith to refrain from contacting one another.[7]  The next day, SJU suspended Roe pending further investigation.  SJU officially notified Roe of Smith's complaint on June 6, 2019, and scheduled a Conduct Hearing for September 17, 2019, to review Smith's accusations.

Thomas Foley, an SJU attorney, chaired the panel that conducted the September 17 hearing.  Foley had also chaired the panel that conducted the hearing regarding Doe's allegations against Roe in October of the previous year. Following the September 17 hearing, the panel concluded that Roe had violated SJU's policy governing non-consensual sexual contact but not SJU's policy governing non-consensual sexual penetration.  The panel noted that the evidence supporting its determination included "key inconsistencies in [Roe's] testimony" and "accounts of [Roe's] housemates."  JA 143.  The panel also concluded that

---

[7] SJU sent Roe another no contact order on January 8.

21-1125

*Roe v. St. John's University*

"key aspects of [Roe's] account of the events lacked credibility, including his testimony that he turned [Smith's] face toward the couch in the event she vomited." *Id.*

On October 2, 2019, Jack Flynn—SJU's Director of Student Conduct— informed Roe that he was expelled from SJU, effective immediately, for his misconduct.  Roe appealed his expulsion to SJU's Conduct Appeals Board on October 25, 2019.  SJU's Appeals Board affirmed the SJU Conduct Board's findings and sanctions in all respects and closed the matter on January 15, 2020. *See* JA 152, 157 (reasoning that "[t]he evidence showed that [Roe] digitally penetrated [Smith's] vagina" and that "the sanction in this case—expulsion—was the only one justified by the evidence and the record").

## II.   Procedural History

On August 14, 2019, several months before his expulsion, Roe filed this lawsuit against SJU and Doe in the United States District Court for the Eastern District of New York.  On February 18, 2020, Roe filed a second amended complaint that alleged that SJU had engaged in sex-based discrimination in violation of Title IX and had breached an implied contract with Roe.  He further claimed that Doe had defamed him by authoring and disseminating the

21-1125

*Roe v. St. John's University*

anonymous tweet.  On May 8, 2020, Doe asserted counterclaims alleging

intentional infliction of emotional distress, negligent infliction of emotional

distress, and *prima facie* tort against Roe.

On March 31, 2021, the district court granted SJU's motion to dismiss Roe's

claims in their entirety.  *See generally Roe v. St. John's Univ.*, No. 19-CV-4694 (PKC)

(RER), 2021 WL 1224895 (E.D.N.Y. Mar. 31, 2021).  The court held that Roe had

failed to state a claim under Title IX; it also declined to exercise supplemental

jurisdiction over Roe's state-law claims and over Doe's counterclaims, dismissing

them.

Roe appealed the district court's judgment to this Court.  Doe did not

appeal the dismissal of her counterclaims.

## DISCUSSION

### I.    Standard of Review

We review *de novo* the district court's grant of SJU's motion to dismiss

under Federal Rule of Civil Procedure 12(b)(6).  *Cornelio v. Connecticut*, 32 F.4th

160, 168 (2d Cir. 2022).  A complaint must plead "enough facts to state a claim to

relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  "A claim is plausible 'when the plaintiff pleads factual content that

13

21-1125

*Roe v. St. John's University*

allows the court to draw the reasonable inference that the defendant is liable for

the misconduct alleged.'" *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011)

(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Although all factual

allegations contained in the complaint are assumed to be true, this rule does not

extend "to legal conclusions. Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S.

at 678 (citing *Twombly*, 550 U.S. at 555).

## II.   Roe's Argument Under Rule 12(b)(6)

Roe first argues that the district court violated Federal Rule of Civil

Procedure 12(b)(6) by improperly considering Doe's allegations regarding Roe's

behavior when granting the motion to dismiss Roe's complaint.  The district

court did recount Doe's competing allegations against Roe in its memorandum

and order.  *Roe*, 2021 WL 1224895, at *4.  But, as discussed below, Roe has argued

that SJU discriminated against him on the basis of his sex by investigating Doe's

and Smith's accusations of sexual assault more seriously than his allegation that

Doe harassed and defamed him in an anonymous tweet.  This theory required

the district court to give at least some consideration to Doe's and Smith's

allegations against Roe to compare them with Roe's accusations.

14

21-1125

*Roe v. St. John's University*

Moreover, the district court's memorandum and order decided not only whether Roe had stated a plausible claim against SJU, but also whether to exercise supplemental jurisdiction over Doe's counterclaims against Roe. *Roe*, 2021 WL 1224895, at *11, *23. Deciding whether to exercise jurisdiction over Doe's counterclaims is an issue that also justifies some consideration of Doe's counterclaims' alleged factual bases.

Finally, the district court recognized its obligation to accept the allegations in Roe's complaint as true when deciding SJU's motion to dismiss. *See id.*, at *12. And "[i]n the absence of contrary indications, courts are generally presumed to know the laws that govern their decisions and to have followed them." *United States v. Banks*, 464 F.3d 184, 190 (2d Cir. 2006). Other than noting that the district court "referenc[ed] the allegations of Doe's counterclaims" when issuing its decision, Plaintiff-Counter-Defendant-Appellant's Br. 22, Roe has given us no reason to conclude that the district court violated its obligations under Rule 12(b)(6). We therefore reject Roe's argument that we should vacate the district court's decision because the district court summarized Doe's recollection of events when describing this case's factual background.

15

21-1125
*Roe v. St. John's University*

### III.   Roe's Title IX Claims

Roe alleges that SJU violated Title IX by discriminating against him because of his sex in, broadly speaking, two different ways.  Roe first claims that anti-male bias influenced SJU's disciplinary proceedings.  He also contends that SJU's failure to investigate his allegations regarding the anonymous tweet that accused him of sexual assault demonstrated deliberate indifference to a hostile educational environment.

### A.   Roe's Complaints Regarding SJU's Disciplinary Proceedings

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).[8]  Hence, "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline."  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).  A Title IX complaint alleging that a university discriminated against a plaintiff on the basis of the plaintiff's sex when disciplining the plaintiff sufficiently alleges

---

[8] Although SJU is a private university, it receives federal funds, and Roe has alleged that SJU is therefore subject to Title IX.  SJU does not contend otherwise.

16

that the university acted with the discriminatory intent required for a successful

Title IX claim when, "like a complaint under Title VII, . . . it pleads specific facts

that support a minimal plausible inference of such discrimination." *Doe v.*

*Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016). This minimal-plausible-inference-

of-discrimination standard is "low," *id.* at 48, but failure to meet it is fatal, *see,*

*e.g.*, *Doe v. N.Y. Univ.*, 438 F. Supp. 3d 172, 181, 183–86 (S.D.N.Y. 2020) (noting

that "Title IX claims require evidence of intentional discrimination" and granting

motion to dismiss the plaintiff's Title IX claim in part because the plaintiff's

allegations failed to establish a plausible inference of intentional discrimination).

"[G]enerally," a plaintiff "attacking a university disciplinary proceeding

on grounds of gender bias" asserts that the university is liable under one or both

of two separate theories: an erroneous outcome theory or a selective

enforcement theory. *Yusuf*, 35 F.3d at 715; *see also Doe v. Colgate Univ.*, 760 F.

App'x 22, 30 (2d Cir. 2019) (summary order). The essence of an erroneous

outcome claim is that due at least in part to the plaintiff's sex, the university

wrongly concluded that the plaintiff committed misconduct. *Yusuf*, 35 F.3d at

715. To successfully plead such a claim, the plaintiff must allege (1) "facts

sufficient to cast some articulable doubt on the accuracy of the outcome of the

disciplinary proceeding" and (2) "circumstances suggesting that gender bias was

a motivating factor behind the erroneous finding." *Id.*; *see also Colgate Univ.*, 760

F. App'x at 30.  The essence of a selective enforcement claim is that "regardless of

the [plaintiff's] guilt or innocence," the university initiated disciplinary

proceedings against the plaintiff or disciplined the plaintiff more severely at least

in part because of the plaintiff's sex.  *Yusuf*, 35 F.3d at 715.

　　Roe argues on appeal that he has successfully pleaded in his complaint

that SJU is liable under both an erroneous outcome theory and a selective

enforcement theory.[9]  Roe contends that both theories are viable in this case

---

[9] We do not dispute the Dissent's assertion that the erroneous outcome and selective
enforcement theories described in *Yusuf* are not necessarily the only ways in which a plaintiff
may show that a university's disciplinary proceedings exhibited sex-based bias.  Dissent 4–5; *see
also Yusuf*, 35 F.3d at 715 (noting that plaintiffs' claims will "generally" fall within these two
categories).  In this case, however, Roe's challenges to SJU's disciplinary proceedings do fit
within *Yusuf*'s erroneous outcome and selective enforcement categories, and Roe himself
framed his claims around these two theories of sex-based discrimination.  *See* Plaintiff-Counter-
Defendant-Appellant's Br. 24, 30–31.  Determining whether Roe has sufficiently alleged that he
was the victim of sex discrimination by analyzing the sufficiency of Roe's erroneous outcome
and selective enforcement theories is also consistent with our precedents, even those that
postdate *Columbia University*.  *See, e.g., Radwan v. Manuel*, 55 F.4th 101, 130–32 (2d Cir. 2022)
(utilizing *Yusuf*'s framework when resolving a Title IX claim); *Colgate Univ.*, 760 F. App'x at 30,
33 (same).

We do, however, disagree with the Dissent's suggestion that reliance on *Yusuf* is incompatible
with the applicable standards under Title IX and Rule 12(b)(6).  Dissent 5–6.  Several of our
recent Title IX cases have cited *Yusuf* without any suggestion that it placed too high a pleading
burden on plaintiffs.  *See, e.g., Vengalattore v. Cornell Univ.*, 36 F.4th 87, 103 (2d Cir. 2022);
*Columbia Univ.*, 831 F.3d at 55–56; *Colgate Univ.*, 760 F. App'x at 30.

21-1125

*Roe v. St. John's University*

because his complaint contains sufficient factual allegations for a court crediting them to plausibly infer that his sex partially motivated SJU's decisions to discipline Roe for sexual assault and to not investigate Roe's allegations about the anonymous tweet.  We analyze Roe's erroneous outcome and selective enforcement claims in turn.

### 1.  *Roe's Erroneous Outcome Claims*

Roe asserts in his complaint that his sex was a motivating factor in SJU's decisions to discipline him for allegedly sexually assaulting Doe and Smith. Roe's argument fails because, even assuming that his complaint alleges "facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding[s]," Roe's complaint does not sufficiently allege "circumstances suggesting that gender bias was a motivating factor behind the erroneous finding[s]."  *Yusuf*, 35 F.3d at 715.[10]

Beginning with SJU's handling of Doe's complaint, Roe's allegations indicating that his sex influenced SJU's actions can be grouped into two general categories.  First, Roe contends that his factual allegations, if proven, indicate that

---

[10] It may bear re-emphasis here that the issue before us is not whether SJU's determinations respecting Roe's behavior were incorrect, but if so, whether they were incorrect *as a result of* gender bias on the part of SJU.

19

21-1125

*Roe v. St. John's University*

SJU provided a baseless explanation for its erroneous determination that Roe had committed sexual misconduct when—according to Roe—Doe grabbed his hand and put it on her breast.  Roe asserts that SJU's justification for its decision to discipline him is misguided inasmuch as SJU based its decision on the facts that Roe "admitted in [sic] engaging in physical contact of a sexual nature with" Doe when she could not affirmatively consent to that contact due to her intoxication. JA 80–81; *see also* Plaintiff-Counter-Defendant-Appellant's Br. 33 ("Obviously, the sexual contact to which Roe admitted was a violation of the Student Code by his accuser, not conduct constituting a violation of the Student Code by him.").

Accepting Roe's version of events as true, as we must at this stage of the litigation, SJU erroneously concluded that Roe violated SJU's Student Code of Conduct by engaging in non-consensual sexual contact with Doe.  But it does not follow that SJU reached this allegedly erroneous outcome due to gender bias.  As our cases have long held, such an allegation of an erroneous outcome, absent any additional allegations of fact indicating bias on account of sex, does not state a claim under Title IX.  *See, e.g., Columbia Univ.*, 831 F.3d at 57; *Yusuf,* 35 F.3d at 715 (explaining that a plaintiff proceeding on an erroneous outcome theory must allege facts that cast doubt on the disciplinary proceeding's outcome *and*

20

21-1125
*Roe v. St. John's University*

"allegation[s] relating to a causal connection between the flawed outcome and gender bias").

Roe's assertion that SJU provided a faulty explanation for its erroneous conclusion also does not convince us that the district court erred by dismissing Roe's complaint. SJU's stated reasoning for its conclusion was that Roe admitted to engaging in physical contact of a sexual nature with Doe while she was intoxicated. Roe therefore asserts that SJU's decision supports an inference of bias because it "[found] him in violation of the St. John's rules based upon the conduct of Doe taking his hand and placing it upon her breast." JA 19. Even reading this, as the Dissent does, as an allegation that "SJU accepted *his* version of events," Dissent 9, we cannot turn a blind eye to "an obvious alternative explanation" for alleged facts that undermine a plaintiff's theory of liability, *Twombly*, 550 U.S. at 567. Here, the obvious alternative explanation, based on the facts alleged by Roe, is that SJU accepted Roe's concession that he engaged in sexual contact with Doe but did not credit his assertion that Doe initiated the contact.[11]

---

[11] We note that the SJU panel that decided Smith's complaint against Roe concluded that "key aspects of [Roe's] account . . . lacked credibility." JA 143. While SJU did not explicitly note this finding in its explanation for its decision to discipline Roe for the Doe incident, factfinders are

21

21-1125

*Roe v. St. John's University*

Furthermore, the allegation that a university conducted its disciplinary proceedings in a less-than-flawless manner does not automatically permit a factfinder to reasonably infer that a university has committed sex discrimination. For instance, allegations of a deficient Title IX investigation may not be enough to enable a plaintiff to survive a motion to dismiss. *See Doe v. Samford Univ.*, 29 F.4th 675, 689 (11th Cir. 2022). A university's failure to comply with its internal Title IX policies may similarly be insufficient to support a minimal plausible inference of sex discrimination. *See id.* at 688 ("A deviation from a Title IX policy is not, in and of itself, a violation of Title IX.").[12]  Finally, even allegations of "potentially serious flaws" in a Title IX plaintiff's disciplinary proceedings may fail to allege "sufficient facts to support a plausible inference that the irregularities are attributable to sex bias." *Doe v. Stonehill Coll., Inc.*, 55 F.4th 302,

---

permitted to make decisions on the basis of unstated credibility assessments in settings such as criminal proceedings that are more formal than school disciplinary hearings. *See Doe v. Samford Univ.*, 29 F.4th 675, 691 (11th Cir. 2022).  As noted above, Roe's October 2018 Conduct Hearing was not required to provide many of the procedural protections afforded in a federal criminal trial such as utilization of the beyond a reasonable doubt standard and adherence to the Federal Rules of Evidence.

[12] The Dissent discusses *Samford* at length based on its suggestion that bias against respondents in disciplinary proceedings does not necessarily reflect bias on the basis of sex.  *See* Dissent 17–21.  Because the allegations in Roe's complaint do not require this court to reach this question, we refrain from responding.

21-1125

*Roe v. St. John's University*

334 (1st Cir. 2022).  In short, alleged "procedural errors are not inevitably a sign of sex bias."  *Id.*

Roe's complaint lacks the factual allegations of significant investigatory and procedural irregularity that have raised a plausible inference of discrimination in similar cases.  For instance, the male plaintiff in *Columbia University* alleged that his university conducted a biased investigation of the sexual assault allegations against him.  *See* 831 F.3d at 49–50.  According to the male plaintiff's complaint, the Title IX investigator's questioning of him "was akin to cross-examination calculated to elicit a confession," *id.* at 49, while the questioning of the plaintiff's accuser lacked leading questions and was more neutral, *id.* at 50.  The plaintiff in *Columbia University* also alleged that he reviewed the Title IX investigator's notes from their previous meeting and that the notes "inaccurately and inadequately paraphrased" his recollection of events. *Id.* at 50.  Finally, the plaintiff alleged that the Title IX investigator failed to interview specific witnesses who could have supported his recollection of events. *See id.* at 52 ("[The investigator's report] did not include reference to witnesses who could have supported Plaintiff's defense, allegedly because [the investigator] had declined to follow the leads Plaintiff had given her.").

21-1125

*Roe v. St. John's University*

Similarly, in *Menaker v. Hofstra University*, 935 F.3d 20 (2d Cir. 2019),[13] the male plaintiff accused of committing sexual harassment alleged that he provided the university that investigated those allegations with documents that proved that the accusations against him were false, *id.* at 29. Similarly, the plaintiff alleged that an official involved in the disciplinary process knew that at least one of the accusations was false and believed the complaint to be a "ploy." *Id.* at 28–29. The male plaintiff also identified particular students who could provide useful information, but whom the university did not interview. *Id.* at 29.

Roe's complaint does not contain similar allegations pointing to specific ways in which SJU's investigation of the accusations against him was deficient and biased. He merely complains that SJU justified its decision against him with an unsatisfying explanation. *Cf. Doe v. Univ. of So. Ind.*, 43 F.4th 784, 797 (7th Cir. 2022) ("What we have left are procedural choices that could arguably be considered mistakes. They are not enough to show a likely bias against men."). We do not think that this allegation rises to the level of the allegations of

---

[13] *Menaker* was brought by a male university employee under Title VII of the Civil Rights Act of 1964 after he was terminated following a student's complaint of sexual harassment. 935 F.3d at 26–28. But as we explained in *Menaker*, "[w]e apply similar principles in both Title VII and Title IX when seeking to identify discriminatory intent." *Id.* at 32 (discussing *Columbia University*'s application to Title VII cases).

24

objectively deficient investigations in *Columbia University* and *Menaker*. *See Samford Univ.*, 29 F.4th at 688 ("[A]llegations that are 'merely consistent with' liability 'stop[] short of the line between possibility and plausibility.'" (second alteration in original) (quoting *Twombly*, 550 U.S. at 557)).

Despite these deficiencies, the Dissent argues that we should conclude that SJU's justification for its allegedly erroneous decision to discipline Roe is itself enough to support an inference of sex bias. Dissent 13–14. But such a conclusion would conflict with this Circuit's precedents, *see, e.g.*, *Yusuf*, 35 F.3d at 715 ("[A]llegations of a . . . flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss."), and Title IX's text, which prohibits discrimination only "on the basis of sex," 20 U.S.C. § 1681(a). And while it may be true that in some cases an erroneous decision is sufficiently "inexplicable" to warrant inferring that the university reached its decision due to sex-based bias, *see Doe v. Oberlin Coll.*, 963 F.3d 580, 588 (6th Cir. 2020), this is not such a case. Roe's allegations regarding SJU's treatment of Doe's accusations against him do not give us "grave" doubts as to "the merits of the decision itself," *id.*, and they are not serious enough to give rise to a minimal

plausible inference of sex discrimination, *see id.* (noting that in that case the alleged facts favored the male plaintiff to such a degree that "one could regard this as nearly a test case regarding the College's willingness ever to acquit a respondent").

Roe's second category of allegations supporting his argument that his sex influenced SJU's review of Doe's complaint against him consists of allegations that SJU treated Doe differently than Roe.  For instance, Roe alleges that SJU suspended Roe and not Doe for conduct that, according to Roe's complaint, Doe initiated and to which Roe did not consent.  Roe also points to SJU's decision not to investigate his allegation that Doe published a tweet accusing Roe of sexually assaulting her.  We do not think that these allegations create a minimal plausible inference of sex discrimination.

As we will discuss further when analyzing Roe's selective enforcement theory of discrimination, Roe's allegations regarding SJU's different treatment of Roe and Doe are not persuasive because Roe and Doe were not similarly situated.  Although Roe's complaint alleges that it was Doe who initiated sexual contact with Roe, Roe does not allege that he reported Doe to SJU for sexual misconduct.  *Cf. Doe v. Rollins Coll.*, 77 F.4th 1340, 1354 (11th Cir. 2023) (affirming

rejection of male plaintiff's selective enforcement theory of discrimination in part because male plaintiff did not file a sexual misconduct complaint against alleged female victim).  We also do not view Roe's allegation that Doe harassed and defamed him in an anonymous tweet as comparable to Doe's allegation that Roe sexually assaulted her in light of the differences between the nature and, indeed, seriousness of the two offenses.[14]  Roe cites *Prasad v. Cornell University*, Civ. A. No. 5:15-CV-322, 2016 WL 3212079 (N.D.N.Y. Feb. 24, 2016), for the proposition that "differential treatment between the complainant and respondent in the adjudicatory process" can create a plausible inference of sex discrimination, Plaintiff-Counter-Defendant-Appellant's Br. 31.  But Roe has not explained how SJU treated Roe and Doe differently when reviewing Doe's complaint other than by not suspending Doe for her alleged behavior.  As noted, there were no formal sexual assault charges against Doe.

In short, Roe argues that—accepting his allegations as true, as we must on a motion to dismiss—the SJU panel that reviewed Doe's complaint got it wrong. Roe supports his argument by offering a description of events in which his

---

[14] For these reasons, especially inasmuch as the tweet was not comparable to Roe's alleged behavior, even if Roe had alleged that Doe published the tweet non-anonymously, which he did not, we do not think that his allegations would give rise to a minimal plausible inference of sex discrimination.

21-1125

*Roe v. St. John's University*

behavior was completely innocent and by noting the weaknesses in SJU's explanation for its decision to discipline him. But Roe's second amended complaint contains no plausible allegations linking SJU's alleged error to gender bias. And in light of the absence of "circumstances suggesting that gender bias was a motivating factor behind [SJU's] erroneous finding," *Yusuf*, 35 F.3d at 715, the district court did not err in concluding that Roe's allegations regarding Doe's complaint failed to articulate a plausible Title IX claim.

Roe also alleges that his sex influenced SJU's review of Smith's complaint against him.

> [W]here a university (1) takes an adverse action against a student or employee, (2) in response to allegations of sexual misconduct, (3) following a clearly irregular investigative or adjudicative process, (4) amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex, these circumstances provide the requisite support for a *prima facie* case of sex discrimination.

*Menaker*, 935 F.3d at 33. Roe argues that his complaint's allegations meet this standard in light of the #SurvivingSJU "tweet storm" and the procedural irregularities that he argues impacted SJU's review of Smith's complaint. We disagree.

Beginning with Roe's allegations about the "tweet storm," he claims that #SurvivingSJU was the number one hashtag trending on Twitter in the United

21-1125
*Roe v. St. John's University*

States between January 4 and January 6, 2019, and that thousands of tweets

under the hashtag criticized SJU's treatment of women's sexual assault claims.

These allegations do weigh in favor of Roe's theory of sex discrimination.  *See*

*Menaker*, 935 F.3d at 33.  But we have also made clear that public pressure,

standing alone, is not sufficient to permit a plaintiff to survive a motion to

dismiss.  Instead, the pressure must be "*combined* with *clear* procedural

irregularities in a university's response to allegations of sexual misconduct."  *Id.*

(emphasis added); *see also id.* at 33 n.48 (suggesting that evidence of clear

procedural irregularity is more important than evidence of outside pressure).

Roe has failed to identify any clear procedural irregularities in either SJU's

immediate or ultimate response to Smith's complaint.

Regarding SJU's immediate response to Smith's complaint, around the

same time that #SurvivingSJU was trending, SJU ordered Roe and Smith to

refrain from contacting each other and notified Roe that he would be

immediately suspended due to, as SJU later officially informed Roe, Smith's

21-1125

*Roe v. St. John's University*

sexual assault accusation.[15]  These actions were entirely consistent with SJU's

internal procedures.

SJU's Student Code of Conduct describes interim actions that the

university may institute after receipt of a complaint.  The Student Code of

Conduct states that interim actions, including but not limited to "an interim

suspension; a 'no contact' order with the student who raised the concern or with

other students involved or with knowledge of the matter; . . . [and] limitation of

privileges to engage in specified University activities," may be issued "for any

student accused of a violation."  JA 223.  The Student Code of Conduct also

states:

> Interim actions may be issued in the following circumstances: (1) to
> ensure the physical or emotional safety and well-being of members of
> the University or its property; (2) to ensure the student's own physical
> or emotional safety and well-being; or (3) if the student poses an
> ongoing threat or disruption of the normal operations of the
> University.

---

[15] Around this time, SJU's Appeals Board affirmed the Conduct Board's decision to suspend Roe for sexually assaulting Doe.  But since the Appeals Board merely affirmed the Conduct Board's October decision for the reasons the Conduct Board gave for its actions, *see* JA 83 ("[Roe,] while sober, engaged in physical conduct of a sexual nature with [Doe] . . . [while] lack[ing] affirmative consent to do so."), and Roe has not alleged any procedural irregularities in SJU's review of Doe's complaint other than the Conduct Board's incomplete justification for its earlier decision, the January "tweet storm" does not change our conclusion that Roe failed to plausibly allege that his sex influenced SJU's review of Doe's complaint.

30

. . . .

> Once imposed, an interim suspension takes effect immediately. A
> suspension pending a hearing is not a University sanction, and no
> notation of it will be made in the student's transcript or file.

JA 223.

SJU issued a no contact order between Roe and Smith in January 2019.

SJU's Student Code of Conduct explicitly allows for SJU to issue such an order,

and it does not appear to us to be irregular for SJU to have issued this order after

Smith accused Roe of sexually assaulting her.  While Roe complains that he was

suspended on a temporary basis "without any explanation or an opportunity to

present his case," Plaintiff-Counter-Defendant-Appellant's Br. 41, this

suspension was consistent with SJU's internal procedures, which allow for the

issuance of an interim suspension "[a]t any time during the Student Conduct

Process, and at the discretion of the Vice President of Student Affairs, the Dean of

Students or designee."  JA 223.  The suspension also appears reasonable since

Roe was accused of sexually assaulting a student while serving the suspension

he received for mistreating another student.  We do not see any evidence of

"clear procedural irregularities" impacting these interim decisions.  *Menaker*, 935

F.3d at 33.

21-1125

*Roe v. St. John's University*

We also are not convinced that Roe has identified any particularly
significant irregularities in SJU's ultimate decision regarding Smith's complaint.
Roe focuses his attention on two principal aspects of the disciplinary process:  (1)
the Conduct Hearing panel's composition and deliberations and (2) the Appeals
Board's conclusions.

First, Roe asserts that "as a result of the bias of [SJU] officials from the
tweet storm, it's [sic] attorney[, Thomas Foley,] improperly served as chair of the
Smith hearing panel."  Plaintiff-Counter-Defendant-Appellant's Br. 35.[16]  But Roe

---

[16] While Roe did not mention his claim about Foley's appointment as chair in Roe's counseled
brief in opposition to SJU's motion to dismiss, Roe now raises this claim on appeal.  Because it
was not raised previously, we need not address it.  *See, e.g. In re Nortel Networks Corp. Sec. Litig.*,
539 F.3d 129, 132 (2d Cir. 2008) (per curiam).  Because Roe devotes so much of his attention on
appeal to this claimed irregularity, we nonetheless exercise our discretion to evaluate this claim.
We conclude that it is meritless.

We decline to exercise our discretion to consider the other alleged procedural irregularities that
Roe did not raise on appeal—but on which the Dissent now focuses—such as the claim that Roe
was denied the opportunity to present an impact statement regarding the Smith incident and
the Dissent's assertion that SJU's delay in deciding Smith's complaint violated a separate SJU
policy that the district court deemed inapplicable.  As this Court has explained, "[w]e think it
reasonable to hold appellate counsel to a standard that obliges a lawyer to include his most
cogent arguments in his opening brief, upon pain of otherwise finding them waived."
*McCarthy v. SEC*, 406 F.3d 179, 186 (2d Cir. 2005).  This practice "promotes the orderly briefing
and consideration of appeals."  *Id.*; *see also* Fed. R. App. P. 28(a)(8) (stating that appellant's brief
"must contain . . . appellant's contentions and the reasons for them, with citations to the
authorities and parts of the record on which the appellant relies"); *JP Morgan Chase Bank v. Altos
Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 428–29 (2d Cir. 2005) (affirming district court's order
granting defendant's motion to dismiss and holding that "arguments not made in an appellant's
opening brief are waived even if the appellant pursued those arguments in the district court or
raised them in a reply brief"); *LoSacco v. City of Middletown*, 71 F.3d 88, 92 (2d Cir. 1995)

21-1125

*Roe v. St. John's University*

has not demonstrated that Foley's appointment as chair was irregular;[17] SJU

policy states that SJU "reserves the right to have an attorney as a part of the

Conduct Board hearing process."  JA 227.  Moreover, Roe alleges that Foley

chaired the Doe panel in October 2018, which further weakens Roe's assertion

that the January 2019 "tweet storm" caused SJU to appoint Foley to the Smith

panel.

Roe also complains that Foley and the other members of the Smith panel

deliberated privately with two other SJU officials—Jack Flynn, SJU's Director of

Student Conduct, and John Breheny, an impartial investigator—before ruling on

the charges against Roe.  Roe appears to assert that the Smith panel's

deliberations with these officials violated SJU's Student Code of Conduct's

statement that after the conclusion of all testimony, "the Conduct Board shall

meet in private to deliberate the matter."  JA 228.  But in part because SJU's

Student Code of Conduct explicitly provides that "[h]earing panel members may

separately question [a] Student Conduct Administrator or Title IX Investigator as

---

("Although [the appellant] stridently opposed the motion, he did not raise this issue in his
appellate brief.  Consequently, he has abandoned it.").

[17] Roe does claim that "St. John's Code mandated that the three-member body be chaired by one
of its own."  Plaintiff-Counter-Defendant-Appellant's Br. 35.  Roe has not explained, though,
why Foley would not qualify as one of SJU's "own."

21-1125

*Roe v. St. John's University*

appropriate," *id.*, it is not clear to us that the Smith panel's expanded

deliberations violated SJU's policies.  In any event, any such deviation would

appear to us to be minor, insufficient to persuade us that SJU violated Title IX.

*See Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 599 (2d Cir. 2001) ("[T]he

mere fact that an employer failed to follow its own internal procedures does not

necessarily suggest that the employer was motivated by illegal discriminatory

intent." (citation omitted)); *Samford Univ.*, 29 F.4th at 688 ("A deviation from a

Title IX policy is not, in and of itself, a violation of Title IX.").[18]  Roe also does not

identify any SJU policy that prevented the Smith panel from discussing Roe's

case "before and after the hearing" or otherwise explain how these additional

deliberations demonstrate sex-based bias.  Plaintiff-Counter-Defendant-

Appellant's Br. 38.

---

[18] Our conclusion that this deviation would be minor is based in part on our agreement with the district court that, due to Flynn's position, it "would seem to be the expected norm" for him to be involved in the disciplinary process.  *Roe*, 2021 WL 1224895, at *22.  We also note that while the Dissent claims that Roe has plausibly alleged that Flynn tainted the Smith panel with anti-male bias because Flynn was the subject of criticism directed at SJU during the tweet storm for its handling of Title IX complaints, Dissent 38–40, Roe's complaint does not allege that the tweet storm subjected Flynn to a harsher level of criticism than the many other SJU officials involved in Title IX proceedings.  In addition, Roe alleges that Flynn was involved in the October 2018 panel that considered Doe's allegations and that predated the January 2019 tweet storm, further undermining the suggestion that Flynn's involvement in SJU's disciplinary proceedings after the tweet storm was irregular.

21-1125

*Roe v. St. John's University*

Second, Roe complains that when the Appeals Board affirmed the Smith panel's conclusion that Roe violated SJU's prohibition against non-consensual sexual contact, the Appeals Board stated that "[t]he evidence showed that [Roe] digitally penetrated [Smith's] vagina while she was asleep."  JA 152.  But the Smith panel determined that Roe was guilty of violating only SJU's policy against non-consensual sexual contact—and not non-consensual sexual penetration—despite Smith's description of Roe's alleged assault.  JA 142.[19] However, since the Appeals Board recognized that the Smith panel determined that Roe violated only the policy against non-consensual sexual contact, *see* JA 152 (listing the two charges against Roe and then stating the one charge the Conduct Board found Roe violated), we do not consider the Appeals Board's statement regarding the evidence against Roe to be a major procedural irregularity.[20]

_____

[19] The Dissent describes the Smith panel's conclusion as "perplexing."  Dissent 33.  But as the Dissent recognizes, the record does not contain all the evidence the Smith panel considered when it reached its conclusion.  *See id.* at 34 n.16 (explaining that the evidence against Roe included accounts of Roe's housemates that are not in the record).  We therefore do not see any firm basis upon which we can conclude that the Smith panel's decision was perplexing or, more importantly, whether the decision was perplexing in a way that lends support to Roe's theory of sex-based discrimination.

[20] For similar reasons, we are not persuaded by Roe's claim that the Appeals Board acted highly irregularly by allegedly misstating the evidence regarding Doe's complaint against Roe.  *See* Plaintiff-Counter-Defendant-Appellant's Br. 14–15 (noting that the Appeals Board stated that

35

In sum, the alleged procedural irregularities are not serious enough to support a claim of sex-based discrimination. *See Menaker*, 935 F.3d at 34 n.50 ("[W]e emphasize that our standard requires *clear* irregularities to raise an

inference of bias . . . . [M]inimal irregularities (absent other indicia of bias) do not suffice to suggest discrimination."). And in the absence of clear procedural irregularities, Roe's allegations regarding the "tweet storm" are insufficient to support denial of the motion to dismiss. *See id.* at 33 & n.48. We conclude, therefore, that even after considering Roe's allegations concerning the Doe incident and the Smith incident together, Roe has failed to articulate a viable erroneous outcome claim because he has failed to plausibly allege "circumstances suggesting that gender bias was a motivating factor behind [SJU's allegedly] erroneous finding[s]" that Roe sexually assaulted Doe and Smith. *Yusuf*, 35 F.3d at 715.

### 2. *Roe's Selective Enforcement Claim*

Roe also argues that SJU engaged in selective enforcement by deciding Doe's and Smith's sexual assault complaints against him while failing to

---

Doe was unconscious, but the Doe panel found that she was intoxicated); *see also Samford Univ.*, 29 F.4th at 688–89 (explaining that the availability of obvious alternative "lawful explanations" for procedural irregularities, including "ineptitude [and] inexperience," undermine the viability of a plaintiff's Title IX claim).

21-1125

*Roe v. St. John's University*

investigate his theory that Doe published the anonymous tweet accusing him of sexual assault. The district court correctly ruled that Roe's claim of selective enforcement "fail[s] in the absence of allegations that SJU treated a similarly situated student [of the opposite sex] differently." *Roe*, 2021 WL 1224895, at *17. As another district court in our Circuit recently explained, "following *Columbia*, courts in this circuit have consistently dismissed selective enforcement claims absent allegations that a school treated similarly situated members of the opposite sex—that is, members of the opposite sex facing comparable disciplinary charges—differently." *N.Y. Univ.*, 438 F. Supp. 3d at 182 (internal quotation marks and citation omitted) (collecting cases).

To repeat: Roe and both Doe and Smith were not, in this context and for these purposes, similarly situated. Roe accused Doe of anonymously publishing an allegedly harassing, defamatory tweet. Doe and Smith accused Roe of sexual assault. The allegation that SJU investigated complaints of sexual assault more thoroughly than an allegation of circulation of a harassing and defamatory tweet does not demonstrate selective enforcement. The conduct alleged was not similar. Moreover, SJU observed that it could not "sanction the individual who posted the tweet because [it could] not confirm their identity." JA 95. Doe's and

37

21-1125

*Roe v. St. John's University*

Smith's complaints, by contrast, were about alleged sexual attacks by a specific individual whose identity was not in doubt.  We therefore reject Roe's selective enforcement theory of sex discrimination.

### 3.  *Conclusion*

For the foregoing reasons, we affirm the district court's rejection of Roe's erroneous outcome and selective enforcement theories of discrimination.  While Roe has alleged a few significant facts that do indeed weigh in favor of his claims, his allegations as a whole are not sufficient to plausibly support a minimal inference of sex-based discrimination.

We note that, accepting Roe's claims as true, SJU's treatment of him and the complaints against him may well not have been up to the standards that would apply if the issues that the university officials decided were adjudicated in a federal court proceeding.  But Doe's and Smith's complaints against Roe were not decided by Article III judges in a federal court—they were decided by school officials in a school setting.  Hence, even if we accept Roe's claimed innocence and agree that SJU's conduct of Roe's disciplinary proceedings was not flawless, we conclude that, on the record before us, Roe has not alleged facts that could

38

reasonably support a minimal plausible inference of sex discrimination.  And *that*

is the issue before us.

B.      Roe's Hostile Educational Environment Claim

        Roe brings a separate Title IX claim asserting that SJU's failure to

investigate his allegations regarding the anonymous tweet subjected him to a

hostile educational environment in violation of Title IX.  This claim fails because

the abuse that Roe claims to have suffered as a result of the tweet was not

sufficiently severe or pervasive to support a hostile environment claim.

        Title IX permits a plaintiff to recover damages when he or she is subjected

to a hostile environment that constitutes discrimination on the basis of sex and

deprives the plaintiff of the ability to enjoy the benefits of an educational

program receiving federal funds.  *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S.

629, 633 (1999); *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89

(2d Cir. 2011).  The "plaintiff must show that he subjectively perceived the

environment to be hostile or abusive and that the environment objectively was

hostile or abusive, that is, that it was permeated with discriminatory

intimidation, ridicule, and insult sufficiently severe or pervasive to alter the

conditions of his educational environment."  *Papelino*, 633 F.3d at 89.  A school

21-1125

*Roe v. St. John's University*

may be liable for its deliberate indifference to acts of harassment committed by

students against other students.  *Davis*, 526 U.S. at 633.

The district court properly dismissed Roe's hostile environment claim

because the alleged harassment of Roe through an allegedly defamatory tweet in

this case was not "so severe, pervasive, and objectively offensive that it can be

said to [have] deprive[d him] of access to the educational opportunities or

benefits provided by the school." *Davis*, 526 U.S. at 650.  Roe's claims stem from

a single anonymous tweet accusing him of sexual assault.[21]  To be sure, the single

tweet was broadly disseminated, but "[g]enerally, incidents [of harassment] must

be more than episodic [to justify a hostile environment claim]; they must be

sufficiently continuous and concerted in order to be deemed pervasive." *Demoret*

*v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (citation omitted).  *But cf. Ferris v.*

*Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir. 2001) (explaining that in extreme

cases, such as rape, a single incident of abuse can give rise to a hostile

---

[21] Roe's complaint does not indicate that he asked SJU to initiate disciplinary proceedings against the female student who allegedly struck him in the face or the male student who allegedly sent him threatening messages after the tweet was published.  Instead, Roe focuses his attention on SJU's failure to investigate the individual who published the tweet.  Regardless, even if Roe's additional allegations were considered part of his hostile environment claim, they would not change our decision in light of the events' sporadic and disconnected nature.  *See* *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006).

21-1125

*Roe v. St. John's University*

environment claim).  We conclude that the single anonymous tweet brought to

the attention of SJU here was not, standing alone, sufficiently severe for a court

to conclude that Roe was denied access to an educational benefit even assuming

that the tweet was, as Roe asserts, false and offensive.  Roe's hostile environment

claim is therefore fatally deficient.

## CONCLUSION

We have considered Roe's remaining arguments on appeal and conclude

that they are without merit.  For the foregoing reasons, we AFFIRM the

judgment of the district court.